1   JOHN D. CLINE (CA State Bar No. 237759)
    50 California Street, Suite 1500
2   San Francisco, CA 94111
    Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3   Email: cline@johndclinelaw.com

4
    KEVIN M. DOWNEY (Admitted Pro Hac Vice)
5   LANCE A. WADE (Admitted Pro Hac Vice)
    AMY MASON SAHARIA (Admitted Pro Hac Vice)
6   KATHERINE TREFZ (CA State Bar No. 262770)
    WILLIAMS & CONNOLLY LLP
7   725 Twelfth Street, NW
    Washington, DC 20005
8   Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
9   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

10  Attorneys for Defendant ELIZABETH A. HOLMES

11

12                          UNITED STATES DISTRICT COURT

13                        NORTHERN DISTRICT OF CALIFORNIA

14                                SAN JOSE DIVISION

15

16  UNITED STATES OF AMERICA,              )   Case No. CR-18-00258-EJD
                                           )
17          Plaintiff,                     )   **MS. HOLMES' MOTION TO EXCLUDE**
                                           )   **CERTAIN EVIDENCE RELATING TO**
18      v.                                 )   **THERANOS' INTERACTIONS WITH**
                                           )   **GOVERNMENT REGULATORY AGENCIES**
19                                         )   **UNDER FEDERAL RULES OF EVIDENCE 401-**
    ELIZABETH HOLMES and                   )   **404 AND 801-803**
20  RAMESH "SUNNY" BALWANI,                )
                                           )
21          Defendants.                    )   Date:      January 22, 2021
                                           )   Time:      10:00 AM
22                                         )   CTRM:  4, 5th Floor
                                           )
23                                         )
                                           )   Hon. Edward J. Davila
24                                         )
                                           )
25  _____       )

26

27

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803
    CR-18-00258 EJD

1
2

**MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'**
**INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES**

3

PLEASE TAKE NOTICE that on January 22, 2021, at 10:00 a.m., or on such other date and time

4

as the Court may order, in Courtroom 4 of the above-captioned Court, 280 South 1st Street, San Jose,

5

CA 95113, before the Honorable Edward J. Davila, Defendant Elizabeth Holmes will and hereby does

6

respectfully move *in limine* to exclude certain evidence relating to Theranos' interactions with

7

government regulatory agencies.  Ms. Holmes makes this motion under Federal Rules of Evidence 401-

8

404 and 801-803.  The Motion is based on the below Memorandum of Points and Authorities, the

9

exhibits and declarations that accompany this motion, the record in this case, and any other matters that

10

the Court deems appropriate.

11
12

DATED: November 20, 2020

13
14

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

15
16
17
18
19
20
21
22
23
24
25
26
27
28

MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
OF EVIDENCE 401-404 AND 801-803
CR-18-00258 EJD                            i

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................1

BACKGROUND .............................................................................................................................2

    ARGUMENT ...............................................................................................................................5

I.    The Court Should Exclude Evidence Relating to the December 2013 Inspection of Theranos' Laboratory .......................................................................................5

    A.    Evidence Relating to the December 2013 CDPH Inspection Is Irrelevant. ...............................................................................................................6

    B.    Evidence Relating to the December 2013 CDPH Inspection Is Unfairly Prejudicial, Misleading, and Confusing ....................................................................9

    C.    Evidence Relating to the December 2013 CDPH Inspection Is Inadmissible under Rule 404. ..............................................................................10

    D.    The 2013 CDPH Report Is Inadmissible Hearsay. ..............................................10

II.    The Court Should Exclude Evidence Relating to Theranos' September 2015 Communications With CMS. ...............................................................................................11

    A.    Evidence Relating to Theranos' September 2015 Communications with CMS Is Irrelevant ..........................................................................................11

    B.    Evidence Relating to Theranos' September 2015 Communications with CMS Is Unfairly Prejudicial, Misleading, and Confusing. ..........................12

    C.    Evidence Relating to Theranos' September 2015 Communications with CMS Is Inadmissible Under Rule 404. ......................................................13

III.    The Court Should Exclude Evidence Relating to the Hiring and Retention of Theranos' Qualified Laboratory Director, Dr. Sunil Dhawan, M.D. .................................13

    A.    Evidence Relating to Dr. Sunil Dhawan, M.D. Is Irrelevant. ...............................13

    B.    Evidence Relating to Dr. Sunil Dhawan, M.D. Is Unfairly Prejudicial, Misleading, and Confusing. .................................................................................15

    C.    Evidence Relating to Dr. Sunil Dhawan, M.D. Is Inadmissible Under Rule 404. ..............................................................................................................16

IV.    The Court Should Exclude Any Evidence Relating to Still-Unnamed "Other Regulatory Organizations" ...............................................................................................16

CONCLUSION ..............................................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Lloyd C. Lockrem, Inc. v. United States*, 609 F.2d 940 (9th Cir. 1979) ........................................7

*Tennison v. Circus Circus Enters.*, 244 F.3d 684 (9th Cir. 2001) ....................................10, 13

*United States v. Atalig*, 502 F.3d 1063 (9th Cir. 2007) ........................................8

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) ........................................5

*United States v. Bonds*, 608 F.3d 495 (9th Cir. 2010) ........................................12

*United States v. Brown*, 880 F.2d 1012 (9th Cir. 1989)........................................ passim

*United States v. Hitt*, 981 F.2d 422 (9th Cir. 1992) ........................................5

*United States v. Hodges*, 770 F.2d 1475 (9th Cir. 1985) ........................................5

*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013) ........................................8

*United States v. Johnson*, 937 F.2d 392 (8th Cir. 1991) ........................................7

*United States v. Jones*, 664 F.3d 966 (5th Cir. 2011) ........................................7

*United States v. King*, 660 F.3d 1071 (2011)........................................9

*United States v. Mayans*, 17 F.3d 1174 (9th Cir. 1994)........................................5, 10

*United States v. Migliaccio*, 34 F.3d 1517 (10th Cir. 1994)........................................7

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ........................................12

*United States v. Orellana-Blanco*, 294 F.3d 1143 (9th Cir. 2002) ....................................10, 11

*United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980)........................................11

*United States v. Spatig*, 870 F.3d 1079 (9th Cir. 2017)........................................8

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) ........................................5

*United States v. Wassner*, 141 F.R.D. 399 (S.D.N.Y. 1992) ........................................12

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) ........................................7

## STATUTES, REGULATIONS, AND RULES

18 U.S.C. § 1001........................................1, 8, 9

42 U.S.C. § 263a........................................2

42 C.F.R. § 493........................................ passim

MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
OF EVIDENCE 401-404 AND 801-803
CR-18-00258 EJD                         iii

Fed. R. Evid. 401 ................................................................................................................. passim

Fed. R. Evid. 402 ................................................................................................................. passim

Fed. R. Evid. 403 ................................................................................................................. passim

Fed. R. Evid. 404 ................................................................................................................. passim

Fed. R. Evid. 801 ................................................................................................................. passim

Fed. R. Evid. 802 ................................................................................................................. passim

Fed. R. Evid. 803 ................................................................................................................. passim

17 CA ADC § 1039.2.................................................................................................................4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2      Defendant Elizabeth Holmes moves, pursuant to Federal Rules of Evidence 401-404 and 801-

3   803 to preclude the government from introducing at trial certain evidence relating to Theranos'

4   interactions with government agencies.

5      Theranos operated in one of the most heavily regulated industries in the country—the field of

6   medical laboratories.  Theranos sought clearances for its laboratories and personnel from the relevant

7   federal and state authorities, and, during the period of the charged conspiracies, Theranos representatives

8   interacted with numerous government officials from multiple agencies dozens of times.  Theranos

9   employees communicated with government officials in person and over email, and hosted them for

10  laboratory inspections.  The company spent millions of dollars on outside legal counsel in order to

11  navigate a complex and shifting regulatory environment.  And despite all of these interactions with

12  federal and state officials, the government has not filed a single false statement charge against any

13  Theranos employee, *see* 18 U.S.C. § 1001, and none of the charges in this case alleges fraud upon the

14  government.

15     Nevertheless, the government has noticed its intent to introduce into evidence certain documents

16  and testimony relating to what it calls "[f]alse and misleading representations to FDA, CMS, CDPH and

17  other regulatory organizations."  Ex. 3 at 63-65 (Sept. 28, 2020 Gov't Supp. Rule 404(b) Notice).  This

18  proposed Rule 404(b) evidence is a hodgepodge of loosely connected pieces of evidence.  As relevant to

19  this motion, the government has cobbled together three categories of evidence involving two agencies

20  over a period of two years: (1) an on-site inspection performed by the California Department of Public

21  Health (CDPH) in December 2013; (2) interactions between Theranos representatives and the Centers

22  for Medicare & Medicaid Studies (CMS) in September 2015; and (3) Theranos' decision to employ a

23  CMS-qualified laboratory director, Dr. Sunil Dawhan, M.D., in 2014 and 2015.[1]

24     This proffered evidence is irrelevant to the charged conduct in this case, Fed. R. Evid. 401-402;

25

26   _____

27     [1] Ms. Holmes is not presently moving to exclude the government's noticed evidence in this
     category of its Rule 404(b) notice concerning Theranos' interactions with the U.S. Food & Drug
     Administration (FDA).

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803
     CR-18-00258 EJD                         1

1   is unfairly prejudicial, misleading, and confusing, Fed. R. Evid. 403; constitutes inadmissible "bad acts"

2   evidence, Fed. R. Evid. 404; and, in the case of the December 2013 CDPH report, is inadmissible

3   hearsay, Fed. R. Evid. 801-803.  This Court should exclude the three aforementioned categories of

4   evidence.

5                                          **BACKGROUND**

6           As relevant here, the government has noticed its intent to introduce Rule 404(b) evidence

7   concerning Theranos' interactions with two regulators: CMS and CDPH.  Theranos interacted with those

8   agencies on the subject of its laboratory practices and personnel.  CMS and CDPH conducted

9   inspections of the Theranos laboratory in order to accredit the company and ensure its compliance with

10  applicable regulations.  CMS and CDPH also verified that Theranos laboratory personnel, including the

11  laboratory director, were qualified under CMS regulations.

12  **I.      Laboratory Inspections**

13          The Clinical Laboratory Improvement Amendments Act of 1988 (CLIA), 42 U.S.C. § 263a,

14  provides for federal regulation and oversight of all laboratories.  Under the CLIA statute, CMS regulates

15  all laboratory testing performed on human samples in the United States, although it deputizes certain

16  accreditation responsibilities to qualified state agencies.  *See id*.  In California, the CDPH's Laboratory

17  Field Services section is the state agency division with responsibility for accreditation and compliance

18  for CLIA-certified laboratories.

19          As part of the accreditation and compliance process, CDPH generally performs biennial onsite

20  inspections for CLIA laboratories in California.[2]  Inspections of CLIA laboratories must conform to

21  extensive federal regulations.  *See* 42 C.F.R. §§ 493.1771, 493.1773.  Those regulations place CMS or

22  its agent (here, CDPH) firmly in control of the inspection.  By contrast, laboratory personnel play a

23  passive role, making available sites, records, and personnel at the inspector's request.  *See id*.  The

24  inspector "may require the laboratory" to test samples, permit interviews of laboratory personnel, or

25  allow observation of laboratory personnel in all phases of testing.  *Id*. § 493.1773(b)(1)-(3).

26  _____

27          [2] *See* Laboratory Field Services (LFS) – About Us, CDPH, https://www.cdph.ca.gov/Programs/
    OSPHLD/LFS/Pages/AboutUs.aspx (last viewed Nov. 17, 2020).

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803
    CR-18-00258 EJD                              2

1    Laboratories must have all records and data "accessible and retrievable" during inspections, and "must

2    provide, upon request, all information and data" required by the inspector to determine compliance.  *Id.*

3    § 493.1773(c), (d).  Relevant here, laboratories must also "[p]ermit [the] CMS or a CMS agent access to

4    all areas encompassed under the [CLIA] certificate, including . . . [t]esting and reporting areas."  *Id.*

5    § 493.1773(b)(4)(i)-(iii).

6         State inspectors like CDPH must observe detailed, uniform protocols promulgated by CMS when

7    conducting laboratory inspections on behalf of CMS.  *See* Ex. 35 at 1 (CMS Survey Procedures and

8    Interpretive Guidelines for Laboratories and Laboratory Services).  Under these protocols, the inspector

9    possesses considerable discretion, and her "professional judgement [sic] is the most critical element in

10   the survey process."  *Id.* at 1.  The protocols make clear that the objective of surveys is to review a

11   "cross section of information," rather than to conduct an exhaustive excavation of every laboratory.  *Id.*

12   at 4.  Thus, inspections need not visit every laboratory site, review every record, or observe every test,

13   unless a broader survey is necessary to make an informed determination about a lab's compliance.  *Id.* at

14   10; *see also id.* at 8 ("The amounts of records selected and reviewed is not intended to be statistically

15   valid, but rather a representative cross-section of various records.").

16        Theranos obtained a certificate of registration and a CLIA identification number for its

17   California laboratory in June 2011, as well as a Clinical Laboratory License from the State of California.

18   After an initial inspection of Theranos' California laboratory in January 2012, CMS issued a certificate

19   of compliance to Theranos.  In the coming years, Theranos engaged in routine correspondence with

20   CMS and CDPH and hosted inspectors for multiple inspections.

21   **II.    Laboratory Personnel Requirements**

22        In addition to regulating laboratory practices, CMS administers regulations concerning

23   laboratory personnel, including laboratory directors.  *See* 42 C.F.R. § 493.1443.

24        Although the term "laboratory director" might evoke the image of an official exercising day-to-

25   day physical oversight of a laboratory, the CMS regulations envision a different role, even for

26   laboratories (like Theranos') performing "high complexity testing."  *See* §§ 493.1441 *et seq.*  Federal

27   regulations provide that the laboratory director "is responsible for the overall operation and

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

administration of the laboratory," but make clear that the laboratory director need not be a full-time employee. § 493.1445. Indeed, the regulations provide that one individual may serve as laboratory director for as many as *five* high complexity laboratories at the same time, so long as the director is "accessible to the laboratory to provide onsite, telephone or electronic consultation *as needed*." § 493.1445(c), (d) (emphasis added). Further, under the regulations, the director may "reapportion[] performance of his or her responsibilities," although she "remains responsible for ensuring that all duties are properly performed." § 493.1445(b).

In addition to setting out laboratory directors' responsibilities, CMS regulations establish baseline qualifications. The director must have a "current license as a laboratory director" from the State in which the lab is located; must be a doctor of medicine, osteopathy, or hold a Ph.D in a chemistry, physics, biology, or clinical lab science; and possess either a certain quantum of experience in laboratory testing (typically two years) or a Board certification. *See id*. § 493.1443(a)-(b).[3]

Consistent with the notion that laboratory directors need not exercise close supervision over their laboratories, CMS regulations set out detailed credentialing requirements for other professionals in CLIA-certified laboratories. It is the "General Supervisor," not the Laboratory Director, who is "responsible for providing day-to-day supervision" of testing and lab personnel. *Id*. § 493.1463.

Theranos had a number of laboratory directors over the years. The government has noticed its intent to introduce evidence relating to one of them, Dr. Sunil Dhawan, M.D. Ex. 3 at 64. At the time he joined Theranos as laboratory director, Dr. Dhawan had 21 years' experience as a lab director for CLIA laboratories, and had experience with tests classified as "high complexity" under CLIA, and with clinical trials. *See* Ex. 36 (CTRL-DHAWAN-00007615); Ex. 38 (THPFM0003619903); Ex. 39 (US-REPORTS-0008333). In addition, Theranos had a co-laboratory director, Lynette Sawyer, D.P.H., for part of Dr. Dhawan's tenure. Ex. 37 at 5 (THER-2179627). Following its 2015 inspection, CMS concluded that Dr. Dhawan was a qualified laboratory director.

---

[3] On top of these federal regulations, California imposes additional requirements for laboratory personnel. *See, e.g*., 17 CA ADC § 1039.2.

MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS' INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES OF EVIDENCE 401-404 AND 801-803
CR-18-00258 EJD                4

**ARGUMENT**

Evidence that does not tend to prove a fact of consequence is irrelevant and inadmissible. *See* Fed. R. Evid. 401, 402. The Federal Rules also prohibit the admission of minimally probative evidence when "there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992). And when, as here, the government seeks to introduce evidence of "a crime, wrong, or other act" that is not part of the charged conduct, it must satisfy a four-part test. *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). Specifically, such evidence may be admitted only if "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *Id.* (quoting *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994)). The government bears the burden of proving that the evidence "meets all of the above requirements." *United States v. Bailey*, 696 F.3d 794, 799 (9th Cir. 2012). Even when the government meets that burden, the court must conduct a Rule 403 balancing. *United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985). Lastly, an out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls under a hearsay exception. *See* Fed. R. Evid. 801, 802.

These principles require the exclusion of three categories of evidence relating to: (1) an on-site inspection performed by CDPH in December 2013; (2) interactions between Theranos representatives and CMS in September 2015; and (3) Theranos' decision to employ a CMS-qualified laboratory director, Dr. Sunil Dhawan, M.D., in 2014 and 2015.

## I.    The Court Should Exclude Evidence Relating to the December 2013 Inspection of Theranos' Laboratory.

This Court should exclude the government's proffered evidence relating to the December 2013 laboratory inspection by CDPH. The government has noticed its intent to introduce a CDPH report, which identified three standard deficiencies from the December 2013 inspection. Ex. 2 at 12-13 (Apr. 3, 2020 Gov't Supp. Rule 404(b) Notice). In addition, the government seeks to present evidence that Mr.

1    Balwani and others "misled an inspector into believing that the Theranos CLIA laboratory was limited

2    to a single area," Ex. 1 at 7 (Mar. 6, 2020 Gov't Rule 404(b) Notice), on the theory that this tends to

3    show "consciousness that full regulatory scrutiny would expose that Theranos was unable to provide

4    accurate and reliable results," Ex. 3 at 65.  The government has identified two documents in support of

5    this theory:  (1) an FBI 302 memorandum purporting to summarize an interview of onetime Theranos

6    CLIA lab employee Kerry Denise Elenatinoba-Johnson, and (2) an email from Theranos employee

7    Daniel Young to then-laboratory director Adam Rosendorff.  *See id.*; Ex. 2 at 13.

8        The proffered evidence is irrelevant, unfairly prejudicial, misleading, and confusing, and fails to

9    satisfy the standards for admitting Rule 404(b) evidence.  The CDPH report is also inadmissible hearsay.

10   *See* Fed. R. Evid. 401-402, 403, 404, 801-803.

11       **A.    Evidence Relating to the December 2013 CDPH Inspection Is Irrelevant.**

12       This evidence is irrelevant for four reasons.

13       *First*, the CDPH report does not even hint that Ms. Holmes made "false or misleading"

14   representations to that agency.  The report notes only technical deficiencies under CMS regulations, and

15   the government has not explained why this report was even included in this category of Rule 404(b)

16   evidence.[4]

17       *Second*, what is more, the findings of the CDPH inspection do not tend to show that "Theranos

18   was unable to provide accurate and reliable results" in the first place.  Ex. 3 at 65.  That is because,

19   under CMS regulations, CDPH inspections assess whether laboratories maintain proper policies and

20   procedures, have qualified staff, and keep thorough files, *see* 42 C.F.R. §§ 493.1230 *et seq.*, not whether

21   the laboratory or its underlying technology is capable of producing consistent and accurate results.

22

23

24       [4] The deficiency report appears in two noticed documents—one, a standalone copy of the report,
25   and the second, as one document in a production made to the Securities and Exchange Commission by
     Adam Rosendorff's counsel.  Dr. Rosendorff served as laboratory director at the time of the December
26   2013 inspection.  The remainder of the 100+ page production apparently made on Mr. Rosendorff's
     behalf contains miscellaneous documents and emails with no apparent relation to the noticed category of
27   Rule 404(b) evidence.  To the extent the government seeks to introduce those miscellaneous documents,
     this Court should exclude them as irrelevant.

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1   CDPH also apparently understood Theranos to have addressed any deficiencies in a timely and

2   satisfactory fashion, as CDPH continued to certify and accredit the laboratory following this visit.

3          *Third*, the government's argument concerning Mr. Balwani's supposed directions to Theranos

4   staff is premised on the notion that Theranos somehow intended to, or did, mislead regulators by not

5   disclosing information.  But this assertion simply raises the question: what did CMS and CDPH

6   regulations and protocols require Theranos to disclose, and how did Theranos' representations deviate

7   from those requirements?  More precisely, whether Theranos "fully explain[ed]" its technology to

8   CDPH depends on what the relevant law and CDPH officials required Theranos to explain during the

9   inspection.  Ex. 3 at 65.

10         In the regulatory context, the truth or falsity of a given representation turns on the defendant's

11  interpretation of the specific regulation or request by the government agency.  Unless the defendant has

12  an unreasonable interpretation of the governing regulation, a communication to the government under

13  that regulation cannot be false.  Courts have recognized this principle, holding that the government bears

14  the burden of establishing that the defendant's statements were "not true under a reasonable

15  interpretation of the law."  *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002).  This is the

16  case when private parties classify costs under Medicare regulations for reimbursement, *see id.* at 1351;

17  *United States v. Jones*, 664 F.3d 966, 977 (5th Cir. 2011); when they describe surgeries for payment

18  under the Civilian Health and Medical Program for the Uniformed Services, *see United States v.*

19  *Migliaccio*, 34 F.3d 1517, 1523-25 (10th Cir. 1994); and when they submit statements at the direction of

20  the Air Force, *see United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1991); *see also Lloyd C.*

21  *Lockrem, Inc. v. United States*, 609 F.2d 940, 944 (9th Cir. 1979) (ambiguous regulations violate due

22  process).

23         Here, the government has not even attempted to show that Theranos' communications with

24  CDPH so deviated from regulations governing private parties' disclosure obligations to that agency as to

25  render them false.  *See Whiteside*, 285 F.3d at 1351.  Nor has the government explained what the law

26  required Theranos to disclose during the course of the inspection.  As discussed *supra* pp. 2-3,

27  laboratories must make available their facilities, personnel, and records for review, but inspectors (not

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803

1   laboratory technicians) determine how to run CLIA-certification inspections.  Laboratory personnel are
2   not obligated to direct inspectors to certain areas, employees, or records unprompted, or to ascertain for
3   themselves what the inspector should prioritize during her survey of the lab.  The inspector relies on her
4   professional judgment to set the contours of the inspection, and the inspector's default objective is
5   simply to assess a cross-section of the lab—not to scour every corner of the lab, interview every
6   employee, or run down every last record.  *See supra* p. 3.  All to say:  if Theranos' conduct was
7   consistent with reasonable interpretations of its duties under the law, then the company cannot be said to
8   have acted in a misleading way, rendering this evidence irrelevant.  And the government has not even
9   attempted to show the opposite.

10          For the same reason, the government's inference that the December 2013 inspection reveals
11   consciousness of guilt is completely speculative.  Because the government has failed to show that false
12   or misleading statements were made to CDPH in connection with that inspection, the government has
13   necessarily failed to show that Ms. Holmes *knew* that Theranos representatives made such statements.
14   *Cf. United States v. Atalig*, 502 F.3d 1063, 1066-67 (9th Cir. 2007) (requiring both falsity and
15   knowledge to sustain a conviction under 18 U.S.C. § 1001).

16          Nor has the government pointed to any evidence tending to show that Ms. Holmes possessed the
17   specific intent to make a false or misleading statement, *i.e.*, that she "intended [the] particular purpose or
18   objective" of transmitting a false or misleading statement.  *United States v. Spatig*, 870 F.3d 1079, 1083
19   (9th Cir. 2017).  Because wire fraud requires the "specific intent to defraud," *United States v. Jinian*,
20   725 F.3d 954, 960 (9th Cir. 2013), this evidence is irrelevant and must be excluded, *see United States v.*
21   *Brown*, 880 F.2d 1012, 1015 (9th Cir. 1989) (excluding Rule 404(b) evidence that did not tend to prove
22   specific intent).

23          *Fourth*, the evidence relating to Mr. Balwani's supposed directions to staff does not bear on the
24   accuracy and reliability of Theranos' test results.  Even accepting the documents for the truth of the
25   matter asserted, the fact that Mr. Balwani directed a Theranos employee or consultant to use a side
26   entrance or "not remind" an inspector about a particular location within the CLIA laboratory "unless she
27   asks again" bears no logical connection to whether Theranos' laboratory produced results in an accurate

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803
     CR-18-00258 EJD                          8

1    and reliable way.  For example, Mr. Balwani could have desired to minimize disruption in that particular

2    location—a preference that is consistent with inspection protocols, which instruct inspectors to minimize

3    interference with the work of the lab.  *See* Ex. 35 at 3.  Such a purpose would not evince an intent to

4    mislead government inspectors.

5        **B.    Evidence Relating to the December 2013 CDPH Inspection Is Unfairly Prejudicial,
          Misleading, and Confusing**

6

7        The risk of unfair prejudice and juror confusion resulting from the government's proffered

8    evidence relating to the December 2013 CLIA inspection far outweighs any probative value it might

9    have.  *See* Fed. R. Evid. 403.

10       The proffered evidence surrounding the December 2013 CDPH inspection is unfairly prejudicial.

11   The government seeks to introduce a CDPH report that lists deficiencies, and risks giving jurors the

12   misimpression that the laboratory was unsafe.  In addition, the technical, industry-specific jargon in that

13   report would sow confusion among lay jurors.  *See generally* Ms. Holmes' Motion to Exclude Evidence

14   of CMS Survey Findings and Sanctions Under Federal Rules of Evidence 401-403 and 801-803.

15       As to Mr. Balwani's alleged directions to staff, the government never charged Ms. Holmes—or,

16   for that matter, anyone at Theranos—with making a false statement to CDPH officials.  *See United*

17   *States v. King*, 660 F.3d 1071, 1081-82 (2011) (false statement to state authorities prosecutable under 18

18   U.S.C. § 1001 when agency administers federal program).  Nor has the government identified any

19   regulation governing inspections that Ms. Holmes or her colleagues violated during the course of the

20   December 2013 inspection.  *See supra* pp. 2-3 (reviewing inspection regulations and protocols).  Instead,

21   the government wishes to introduce evidence to suggest that Theranos employees misled CDPH

22   inspectors, without context for how inspections are actually conducted, and what Theranos' legal

23   obligations were.

24       Admitting this evidence would lead to a significant diversion of precious trial time.  Given the

25   substantial risk of unfair prejudice to Ms. Holmes, she would be compelled to contextualize and explain

26   the regulatory framework for inspections, the significance and meaning of a CDPH report like this one,

27   the discretion afforded inspectors, and the expectations for laboratories during CLIA inspections.  This

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1   would produce a "mini-trial" on an issue removed from the charged conduct.  *See Tennison v. Circus*

2   *Circus Enters.*, 244 F.3d 684, 690 (9th Cir. 2001).

3   **C.    Evidence Relating to the December 2013 CDPH Inspection Is Inadmissible under**
        **Rule 404.**

4

5        The government has not come close to meeting its burden under Rule 404(b).  Nowhere does the

6   government "articulate precisely the evidential hypothesis by which a fact of consequence" with respect

7   to the charges against Ms. Holmes "may be inferred from the other acts evidence."  *Mayans*, 17 F.3d, at

8   1181 (citation omitted).  The government has identified no theory linking the deficiency report to the

9   charged conduct.  And although the government asserts that the evidence concerning Mr. Balwani

10  reveals "consciousness that full regulatory scrutiny would expose that Theranos was unable to provide

11  accurate and reliable results," Ex. 3 at 65, the government has not explained how Theranos declined to

12  subject itself to "full" regulatory scrutiny under CMS regulations.  *Id*.

13       Instead, the government's theory of relevance hinges on propensity:  the notion that, because

14  others at Theranos allegedly misled CDPH officials in December 2013, Ms. Holmes is more likely to

15  have possessed the specific intent to defraud investors and patients as alleged in the indictment.  Absent

16  a strong logical connection to an element of the offense—and there is none here—Rule 404(a) bans

17  propensity evidence of this kind.  *See Brown*, 880 F.2d, at 1015.

18       **D.    The 2013 CDPH Report Is Inadmissible Hearsay.**

19       The CDPH deficiency report must be excluded as hearsay.  Under Rules 801 and 802, an out-of-

20  court statement offered for the truth of the matter asserted is inadmissible unless it falls under a hearsay

21  exception.  The CDPH report is a public record, and the Ninth Circuit has held that "[w]hen public

22  records are used against a defendant in a criminal prosecution, the public records exception is the

23  exclusive applicable hearsay exception."  *United States v. Orellana-Blanco*, 294 F.3d 1143, 1149 (9th

24  Cir. 2002).  The CDPH report contains "factual findings from a legally authorized investigation" and is

25  therefore governed by Rule 803(8)(a)(iii).  Specifically, the report was based on surveys conducted by

26  CDPH, a federally deputized state agency, and was created for the purpose of determining whether the

27  laboratory was in compliance with CMS requirements under 42 C.F.R. § 493.  But public records that

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803

1  contain factual findings from legally authorized investigations are admissible only "in a civil case or

2  against the government in a criminal case." Fed. R. Evid. 803(8)(a)(iii) (emphasis added). As a result,

3  under Rule 803(8), reports of public agencies setting forth factual findings from legally authorized

4  investigations are inadmissible against a criminal defendant. *Id.*; *United States v. Sims,* 617 F.2d 1371,

5  1377 (9th Cir. 1980); Fed. R. Evid. 803(8) advisory committee's note. In addition, out-of-court

6  statements from Theranos personnel that appear within the report are double hearsay, and cannot be

7  introduced for the truth of the matter asserted. Because the CDPH report is ineligible for any other

8  hearsay exception,[5] the government may not introduce it against Ms. Holmes.

9  **II.    The Court Should Exclude Evidence Relating to Theranos' September 2015**
10  **Communications With CMS.**

11      The government also seeks to admit evidence relating to interactions between Theranos

12  representatives and CMS in September 2015. Specifically, the government has noticed its intent to

13  introduce a single document that Theranos provided to CMS stating that the company's decision to use

14  different devices in the CLIA laboratory "does not reflect on the reliability or accuracy of any platform."

15  *See* Ex. 3 at 64. The government claims that this document evinces an "intent to defraud" and

16  "consciousness that full regulatory scrutiny would expose that Theranos' [proprietary device] was

17  unable to provide accurate and reliable test results." *Id.* at 65. That is incorrect, and this evidence is

18  inadmissible under Rules 401-404.

19      **A.    Evidence Relating to Theranos' September 2015 Communications with CMS Is**
20  **Irrelevant.**

21      The government's noticed evidence is irrelevant for two reasons.

22      *First*, the government has not tied Ms. Holmes to the statement in question. *See id.* at 64. The

23  government has stated that Theranos representatives "attend[ed] a CMS inspection, with Ms. Holmes[']

24

25  _____
     [5] The Ninth Circuit has held that public records that relate to "routine, nonadversarial matters
26  made in a nonadversarial setting, reflecting ministerial, objective observations," may be admitted against
     a criminal defendant. *Orellana-Blanco*, 294 F.3d at 1150. Public records generated by agencies or law
27  enforcement that contain "subjective observations, summaries, opinions and conclusions" do not fall
     within this exception, however. *Id.* Because the CDPH report reflects the "subjective observations" of
     the particular inspector who surveyed the facility, it is inadmissible on this basis.

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803
    CR-18-00258 EJD                    11

1   knowledge," but has not asserted that those representatives actually made the relevant representations at

2   Ms. Holmes' direction or with her knowledge.  *See id.*  If the government cannot link the statement of

3   Theranos representatives to Ms. Holmes, then the statement is not relevant to the charged conduct, and

4   should be excluded.  *See United States v. Bonds*, 608 F.3d 495, 508 (9th Cir. 2010) (excluding as

5   irrelevant documents that were unconnected to defendant).

6           *Second*, even if the statement could be connected to Ms. Holmes, the government has not shown

7   that it evinces an intent to defraud or consciousness of guilt.  *See* Ex. 3 at 65.  The charged conduct in

8   this case does not include fraud on (or false statements to) CMS, and the government has not shown why

9   this communication from Theranos representatives to CMS reveals intent, as opposed to a less culpable

10  mental state such as negligence.  The mere fact that a representation contained misleading or false

11  information is irrelevant to the charged conduct unless the government can show that Ms. Holmes

12  possessed an "intent to deceive."  *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020); *see*

13  *Brown*, 880 F.2d, at 1015 (excluding other acts evidence because it did not tend to prove "specific

14  intent").  The government has made no effort to meet this burden.

15          **B.      Evidence Relating to Theranos' September 2015 Communications with CMS Is
                      Unfairly Prejudicial, Misleading, and Confusing.**
16

17          The risk of unfair prejudice and juror confusion far outweighs any probative value of Theranos'

18  September 2015 communication with CMS.  For this reason, this evidence is inadmissible under Rule

19  403.

20          It is axiomatic that "[g]uilt by association is just what Fed. R. Evid. 403 was intended to

21  exclude."  *United States v. Wassner*, 141 F.R.D. 399, 405 (S.D.N.Y. 1992).  Because the government

22  has failed to connect Ms. Holmes to this "bad act" evidence, it is unfairly prejudicial, as it invites the

23  jury to convict based on the acts of persons other than Ms. Holmes.  *See supra* p. 10.  In addition, it

24  would mislead and confuse the jury to admit this document into evidence without substantial context on

25  the responsibilities of CMS, the requirements under the CLIA statute, implementing regulations and

26  relevant guidance, the nature of the specific disclosure requests made by CMS to Theranos, and the legal

27  justification for those requests.  This would divert precious time for the purpose of explaining evidence

28  MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
    INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
    OF EVIDENCE 401-404 AND 801-803

1    with an attenuated link to the dispositive issues in this case.  *See Circus Circus Enters.*, 244 F.3d, at 690.

2    ### C.    Evidence Relating to Theranos' September 2015 Communications with CMS Is Inadmissible Under Rule 404.

3

4    The government has not shown the requisite connection between its proffered evidence and an

5    ultimate issue at trial.  The government asserts that September 2015 communications between

6    unspecified Theranos representatives and CMS officials reveals an "intent to defraud" and

7    "consciousness that full regulatory scrutiny would expose that Theranos' [proprietary technology] was

8    unable to provide accurate and reliable test results."  Ex. 3 at 65.  But the government never asserts that

9    its evidence shows an intent to defraud, or consciousness, on the part of Ms. Holmes—as opposed to the

10   unnamed "Theranos representatives" who communicated with FDA.  Moreover, the government has

11   failed to explain how the communications at issue constituted a "false or misleading representation"

12   under CMS regulations.  That showing is an essential predicate to the government's theory of relevance.

13   In the end, this evidence does little more than show propensity, *i.e.*, suggest that because Ms.

14   Holmes' associates may have committed one "bad act," she is likely to have committed another.  Rule

15   404(a) forbids the admission of evidence for this purpose.  *Brown*, 880 F.2d, at 1015.

16   ### III.    The Court Should Exclude Evidence Relating to the Hiring and Retention of Theranos' Qualified Laboratory Director, Dr. Sunil Dhawan, M.D.

17

18   The government has noticed a number of exhibits concerning Dr. Sunil Dhawan, M.D.,

19   Theranos' onetime laboratory director.  It is not apparent why the government has done so, as none

20   involves "false or misleading representations" to CMS or any other government agency.  This evidence

21   is irrelevant to Ms. Holmes' charged conduct; unfairly prejudicial, misleading, and confusing; and does

22   not satisfy this Circuit's standards for the admission of 404(b) evidence.  The Court should exclude it.

23   ### A.    Evidence Relating to Dr. Sunil Dhawan, M.D. Is Irrelevant.

24   The government asserts that the hiring and retention of Dr. Dhawan tend to show a "willingness

25   to turn a blind eye to issues in the CLIA laboratory and patient safety"; Ms. Holmes' "control over

26   Theranos' operations"; "that the laboratory was not the revolution in blood testing that Theranos claimed

27   it to be"; and Ms. Holmes' "consciousness that Theranos was unable to provide accurate and reliable test

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1    results." Ex. 3 at 65. None of these propositions logically flows from the fact of Dr. Dhawan's

2    employment at Theranos.

3            Even assuming the government could show that Dr. Dhawan's employment constituted a

4    violation of CMS regulations, that does not tend to prove the inflammatory Rule 404(b) purposes recited

5    above. That is so for four reasons. *First*, the mere fact that a laboratory failed to comply with a given

6    CMS regulation does not mean that the laboratory "turn[ed] a blind eye" toward patient safety. Indeed,

7    CMS and its agents commonly cite certain deficiencies in laboratories; a deficiency does not

8    intrinsically reveal a disregard for human safety. *See* Ex. 31 at 98:19-24 (Jan. 29, 2020 Bennett Dep.).

9    *Second*, the fact that Dr. Dhawan was hired at Theranos says no more about Ms. Holmes' "control" over

10   the company than the hiring of any employee. (Indeed, Ms. Holmes' role in this particular hiring was

11   actually quite limited.) *Third*, CMS regulations do not purport to assess the accuracy or reliability of

12   laboratory technology. *See* Ms. Holmes' Motion to Exclude Evidence of CMS Survey Findings and

13   Sanctions Pursuant to Rules 401-403 and 801-803. For this reason, one or more CMS deficiencies do

14   not necessarily reveal a shortcoming in the technology's ability to generate accurate and reliable results.

15   *Fourth*, and relatedly, the fact that a federal regulation is not observed says nothing about the

16   "revolutionary" nature of a laboratory's work, as the government contends. The CMS regulations do not

17   purport to be—and are plainly not—a benchmark for innovation in the laboratory and medical-device

18   fields. What is more, the government has never alleged that Dr. Dhawan was unqualified, or that

19   Theranos failed to comply with the web of regulations relating to CLIA laboratory directors when it

20   hired and retained him. To the contrary, Dr. Dhawan met and exceeded CLIA's rigorous credentialing

21   requirements to serve as laboratory director—a point that CMS itself endorsed in its 2015 audit of

22   Theranos.

23           The employment of a qualified laboratory director simply does not show a disregard for patient

24   safety, a failing on the part of the technology, or knowledge of that failing—particularly when Theranos

25   employed a co-laboratory director for part of the relevant period. The government also claims that

26   certain standard operating procedures (SOPs) were "drafted and/or approved . . . immediately before or

27   during regulatory inspections." Ex. 1 at 7. The timing of the execution of such documents does not

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1    appear to be a "representation" at all, and the government has not explained why it placed this evidence

2    in this Rule 404(b) category or was its purpose is.  And, once again, whether Theranos' representations

3    to federal and state authorities concerning Dr. Dhawan's status were false or misleading turns on the

4    governing law.  The government has identified no objectionable communications to CMS or CDPH

5    concerning Dr. Dhawan.  Here, CMS regulations expressly contemplate that the same person may serve

6    as laboratory director to as many as five labs at the same time, and that the laboratory director may

7    delegate his or her duties to colleagues.  This contrasts with other positions regulated by CLIA, where

8    laboratory professionals are expected to exercise direct supervision over testing.  *See supra* p. 3.  The

9    government has not met its burden to show that Theranos misled regulators under the relevant law.  *See*

10   *supra* pp. 7-8.

11       **B.**    **Evidence Relating to Dr. Sunil Dhawan, M.D. Is Unfairly Prejudicial, Misleading,**
     **and Confusing.**

12

13          Whatever minimal probative value Dr. Dhawan's employment has, it is far outweighed by the

14   risk of unfair prejudice to Ms. Holmes and confusion to the jury.  Indeed, given Dr. Dhawan's

15   unquestionable qualifications to serve as lab director, unfair prejudice is the most likely purpose for the

16   government's notice of this evidence.

17          The government seeks to admit evidence relating to Dr. Dhawan for a simple reason: to suggest

18   to lay jurors that, because Dr. Dhawan was only part-time at Theranos, was an acquaintance of Mr.

19   Balwani, and because he also practiced medicine as a dermatologist, he was not qualified to serve as

20   laboratory director—and that this tends to prove indifference to lab and patient safety and knowledge of

21   defective technology on the part of Ms. Holmes.  This line of argument is grossly unfair and prejudicial,

22   as it preys on lay impressions of the role a lab director should play, rather than what the law actually

23   requires.  If this evidence were admitted, Ms. Holmes would be compelled to introduce evidence

24   explaining the context, including the CLIA statute, governing regulations, the application of those

25   regulations, and industry practices and customs.  This would be a substantial diversion of jury time and

26   attention on a subject of minimal relevance to the core issues in the Indictment.

27

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1    **C.    Evidence Relating to Dr. Sunil Dhawan, M.D. Is Inadmissible Under Rule 404.**

2    For the foregoing reasons, the government has failed to satisfy its burden under Rule 404(b).

3    The proffered evidence simply lacks any connection to a "material issue in the case." *Brown*, 880 F.2d

4    at 1016.  As explained above, even assuming Theranos' hiring and retention of Dr. Dhawan violated a

5    CMS regulation, that does not tend to show disregard for lab and patient safety, "control" over the

6    company, that the technology was not "revolutionary," or consciousness of guilt on the part of Ms.

7    Holmes.  *See supra* pp. 13-15.  Findings of certain deficiencies are commonplace; the fact of an

8    employee's hiring does not tend to say anything about the extent of a CEO's "control" over a company;

9    CMS regulations do not purport to comprehensively assess the accuracy and reliability of lab

10   technology; and CMS regulations are not a benchmark for whether or not an innovation is

11   "revolutionary."  *See id.*  And brushing all of that to the side, there is no dispute that Theranos hired a

12   qualified laboratory director, and the government has not identified any misrepresentations made in

13   connection with the Dr. Dhawan's hiring or retention.

14   **IV.    The Court Should Exclude Any Evidence Relating to Still-Unnamed "Other Regulatory
        Organizations."**

15

16   In Rule 404(b) correspondence dating back to March of this year, the government has noticed an

17   intent to introduce evidence relating to "representations made to FDA, CMS, CDPH, and other

18   regulatory organizations."  Ex. 1 at 7; Ex. 2 at 12; Ex. 3 at 63.  In more than eight months, the

19   government has not identified these unspecified "other regulatory organizations."  Rule 404(b)(2)(A)

20   requires that the government "provide reasonable notice of the general nature of any such evidence that

21   the prosecutor intends to offer at trial."  It is far too late for the government to inject new "regulatory

22   organizations" into the case.

23                                    **CONCLUSION**

24   For the foregoing reasons, Ms. Holmes respectfully requests an order precluding the government

25   from introducing the categories of evidence relating to Theranos' interactions with government

26   regulatory agencies summarized in this motion.

27

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803

1    DATED:  November 20, 2020                    Respectfully submitted,

2

3                                                 /s/ Amy Mason Saharia
                                                  KEVIN DOWNEY
4                                                 LANCE WADE
                                                  AMY MASON SAHARIA
5                                                 KATHERINE TREFZ
                                                  Attorneys for Elizabeth Holmes
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
     INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
     OF EVIDENCE 401-404 AND 801-803
     CR-18-00258 EJD                    17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2020 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' MOTION TO EXCLUDE CERTAIN EVIDENCE RELATING TO THERANOS'
INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER FEDERAL RULES
OF EVIDENCE 401-404 AND 801-803
CR-18-00258 EJD