1  JOHN D. CLINE (CA State Bar No. 237759)
   50 California Street, Suite 1500
2  San Francisco, CA 94111
   Telephone: (415) 662-2260 │Facsimile: (415) 662-2263
3  Email: cline@johndclinelaw.com

4  KEVIN M. DOWNEY (Admitted Pro Hac Vice)
   LANCE A. WADE (Admitted Pro Hac Vice)
5  AMY MASON SAHARIA (Admitted Pro Hac Vice)
   KATHERINE TREFZ (CA State Bar No. 262770)
6  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, NW
7  Washington, DC 20005
   Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8  Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9  Attorneys for Defendant ELIZABETH A. HOLMES

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          SAN JOSE DIVISION

14

15  UNITED STATES OF AMERICA,              )  Case No. CR-18-00258-EJD-SVK
                                           )
16          Plaintiff,                     )  **MS. HOLMES' OPPOSITION TO**
                                           )  **GOVERNMENT'S MOTION FOR ORDER**
16       v.                                )  **THAT DEFENDANTS LACK INDIVIDUAL**
                                           )  **PRIVILEGE INTEREST IN THERANOS**
17                                         )  **CORPORATE DOCUMENTS**
    ELIZABETH HOLMES and                   )
18  RAMESH "SUNNY" BALWANI,                )
                                           )  Date:    December 16, 2020
19          Defendants.                    )  Time:    11:00 AM
                                           )  CTRM:  5, 4th Floor
20                                         )
                                           )  Hon. Nathanael Cousins
21  _____    )

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

BACKGROUND ................................................................................................................2

    I.      Boies Schiller's Representation of Ms. Holmes and her Company....................................2

    II.     The Government's Disregard for Ms. Holmes' Attorney-Client Relationship..................5

ARGUMENT ....................................................................................................................9

    I.      Ms. Holmes' Privilege Claims over the Thirteen Communications Are Valid .................10

         A.     Ms. Holmes Had a Personal Attorney-Client Relationship with Boies Schiller ...........................................................................................................................10

         B.     The Thirteen Documents at Issue Are Privileged and Some are Work Product .......................................................................................................................13

    II.     The Government Relies on Inapposite Cases Involving Implied Attorney-Client Relationships ........................................................................................................15

CONCLUSION ................................................................................................................16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Mfg. Techs., Inc. v. Motorola, Inc.*, 2002 WL 1446953 (D. Ariz. July 2, 2002) .....................10

*Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441 (D. Minn. 2011) ..........................................12

*E. F. Hutton & Co. v. Brown*, 305 F. Supp. 371 (S.D. Tex. 1969)............................................................11

*FDIC v. Ogden Corp.*, 202 F.3d 454 (1st Cir. 2000)........................................................................10, 11

*H.W. Charter & Sons, Inc. v. William Carter Co.*, 1995 WL 301351
    (S.D.N.Y. May 16, 1995)..............................................................................................................14

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1986)................................15

*In re Grand Jury Investigation*, 974 F.2d 1068 (9th Cir. 1992) ..............................................................13

*In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900 (9th Cir. 2004) ...................15

*In re Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007)....................................................... *passim*

*Mohawk Indust. Inc. v. Carpenter*, 558 U.S. 100 (2009)..........................................................................9

*Montgomery Acad. v. Kohn*, 82 F. Supp. 2d 312 (D.N.J. 1999)................................................................15

*Oppliger v. United States*, 2010 WL 503042 (D. Neb. Feb. 8, 2010) .......................................................10

*Robert Bosch LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142 (D. Del. 2009)..................................................10

*United States v. Bauer*, 132 F.3d 504 (9th Cir. 1997) ......................................................................10, 14

*United States v. Graf*, 610 F.3d 1148 (9th Cir. 2011)................................................................1, 9, 15, 16

*United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) ..........................................................................13

*United States v. Nobles*, 422 U.S. 225 (1975) ........................................................................................15

*United States v. Richey*, 632 F.3d 559 (9th Cir. 2011) ...........................................................................14

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)...................................................................................9

## STATE CASES

*Cooke v. Laidlaw, Adams & Peck, Inc.*, 126 A.D.2d 453 (N.Y. 1987) ...............................................11, 12

*Lister v. State Bar*, 51 Cal.3d 1117 (1990) .............................................................................................10

**RULES**

Fed. R. Evid. 501 ...............................................................................................................10

Fed. R. Evid. 404(b)..............................................................................................................7

Cal. R. of Prof'l Conduct 4.4 ...............................................................................................8

**OTHER AUTHORITY**

Restatement (Third) of the Law Governing Lawyers § 131 (2000) ........................................10

Since early 2018, Defendant Elizabeth Holmes has consistently asserted her privilege interests in confidential communications with her former attorney David Boies and his firm, Boies Schiller Flexner LLP.  The government initially assured Ms. Holmes that it did not intend to invade any of her personal privileges, but more recently has changed tack.  Ignoring Ms. Holmes' clear assertions, the government included on its proposed trial exhibit list thirteen documents that on their face fall under the claimed privilege.  The government then demanded that Ms. Holmes prove to the government's satisfaction her attorney-client relationship with Boies Schiller before it would remove the documents.  After Ms. Holmes instead provided a privilege log—a customary method for claiming and protecting privilege— the government filed this motion.

The government's motion rests on a fundamental misunderstanding of Ms. Holmes' privilege claims.  As founder and CEO of Theranos, Ms. Holmes sought legal advice on the company's business from numerous law firms:  Arnold & Porter Kaye Scholar LLP; Covington & Burling LLP; Fenwick & West LLP; Hyman, Phelps & McNamara, P.C.; Morgan, Lewis & Bockius LLP; Richard, Layton & Finger, PA; Wilson Sonsini Goodrich & Rosati; and Zuckerman Spaeder LLP, among others.  Ms. Holmes has never claimed a personal privilege over communications with any of these firms.  Her relationship with Boies Schiller was different.  From the start, the firm represented (and appeared in courts, including this Court, on behalf of) both Ms. Holmes and her company.  From there, the list of subjects on which Mr. Boies and his firm advised Ms. Holmes and Theranos grew organically and without reference to any engagement letter.  The nature of the representation, however, did not change— it remained joint, as it had begun in 2011.  Under the law governing joint representations, Boies Schiller continued to jointly represent Ms. Holmes and Theranos until the end of the representation in 2016.  *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-63 (3d Cir. 2007).  It was only then that Ms. Holmes retained personal counsel other than Boies Schiller, and the firm withdrew from its latest representation of *both* Ms. Holmes and Theranos in a lawsuit in Arizona federal court.

The government ignores this evidence of Boies Schiller's joint-representation and argues that, to maintain her privilege claims, Ms. Holmes must satisfy the five-prong test in *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2011).  The government's reliance on *Graf* is inapt because *Graf* does not speak to

joint representations.  Rather, it governs when a corporate employee who is not a firm client

nevertheless may obtain limited privilege protections for her communications with corporate counsel by

operation of an implied privileged relationship.  That is not what occurred here.

The government's mistaken reliance on *Graf* renders irrelevant its arguments on the thirteen

documents at issue.  Judged against the test for attorney-client privilege in the Ninth Circuit, all thirteen

documents are subject to a valid claim of personal privilege.  The Court should deny the motion.

## BACKGROUND

## I.    Boies Schiller's Representation of Ms. Holmes and her Company

Boies Schiller began representing Ms. Holmes and Theranos in fall 2011 in relation to an

intellectual property dispute with a man named Richard Fuisz and related parties.  That dispute led to

Boies Schiller's filing an action in this court as counsel for both Theranos and Ms. Holmes personally.

Decl. of Elizabeth Holmes ¶ 2 (Holmes Decl.); Decl. of Lance Wade ("Wade Decl."), Ex. 1 (*Fuisz*

Complaint Excerpt).  Boies Schiller litigated the case on behalf of Ms. Holmes and Theranos through

trial in March 2014.  Holmes Decl. ¶ 2.  The firm also pursued a related action in the District of

Columbia on behalf of Theranos and Ms. Holmes personally throughout 2013 and into the beginning of

2014.  Holmes Decl. ¶ 2; Wade Decl., Ex. 2 (D.C. Super. Ct. Docket Excerpt).

Springing from these initial litigations, the scope of Boies Schiller's representation of Ms.

Holmes and her company eventually expanded to many of the subjects now at issue in Ms. Holmes'

criminal case and involved both litigation and non-litigation issues.  To Ms. Holmes and the

undersigned's knowledge, there was no engagement letter relating to Mr. Boies' or his firm's

representation of Ms. Holmes and/or Theranos, much less one limiting or delineating any of the areas on

which Mr. Boies or his firm advised Ms. Holmes and/or Theranos or limiting any part of the relationship

to only one of the joint clients.  *See* Wade Decl. ¶ 2; Holmes Decl. ¶ 2.

For example, the firm "began reviewing Therano[s'] patent portfolio."  Wade Decl., Ex. 5 at 1

(USPIS Mem. of Jan. 23, 2018 David Boies Interview).  This portfolio included all of the patents and

patent applications where Ms. Holmes is named inventor, Holmes Decl. ¶ 3, and reflected the core

scientific and technological contributions that Ms. Holmes had made to the company and the industry.

Mr. Boies also began advising Ms. Holmes on the importance of protecting Theranos' broader intellectual property portfolio, which included both the patents and other inventions that were being maintained as trade secrets. Ex. 5 at 7 ("BOIES 'probably' gave some advice to Theranos about protecting trade secrets in the context of the Fuisz litigation and the intellectual property portfolio."); *id.* at 3 ("BOIES spoke to HOLMES about the technology almost exclusively . . . ."); *see* Holmes Decl. ¶ 3.

The truthfulness of statements attributed to Ms. Holmes and Theranos in media stories features prominently in the indictment. *See* Third Superseding Indictment, ECF No. 469 ¶ 12(I) (alleging that false representations were communicated to investors through the media). David Boies' influence on Ms. Holmes' and the company's interactions with the media was profound. Mr. Boies and his firm managed Theranos' and Ms. Holmes' interactions with the press and advised on related legal implications. *See* Holmes Decl. ¶ 4. For example, Mr. Boies and his firm coordinated a June 23, 2015 meeting with Mr. John Carreyrou and others at the Wall Street Journal where they represented Ms. Holmes' and Theranos' interests as Dr. Daniel Young, a Theranos vice president, addressed questions posed by Mr. Carreyrou. *See* Wade Decl., Ex. 4 (Jun. 23, 2015 WSJ Tr. Excerpt). During that meeting, Heather King, a former (and current) Boies Schiller partner who was then serving as Theranos' general counsel, told the attendees that Mr. Boies was "intimately involved" with the company, that he had "advise[d] Elizabeth and the company on an ongoing basis," and that he was one of the people "best positioned" to answer Mr. Carreyrou's questions. *Id.* at 3:11-4:15. Mr. Boies also advised Ms. Holmes concerning a potential defamation action on her personal behalf relating to the *Journal* reporting. Holmes Decl. ¶ 4.

Boies Schiller also advised Theranos and Ms. Holmes on their interactions with the Center for Medicare and Medicaid Services ("CMS") in late 2015 and 2016 following an inspection of Theranos. Among the threatened CMS sanctions involved the potential for a personal sanction against Ms. Holmes preventing her from owning or operating a clinical laboratory for a period of two years.[1]

David Boies advised Ms. Holmes on corporate governance issues relating to a Theranos board

---

[1] Ms. Holmes is prepared, upon the Court's request, to submit on an *ex parte* basis for the Court's *in camera* review certain privileged documents that further evidence Boies Schiller's advice on this topic. *See* Wade Decl. ¶ 3.

MS. HOLMES' OPPOSITION TO MOTION FOR ORDER THAT DEFENDANTS LACK PRIVILEGE INTEREST
CR-18-00258

1   vote granting Ms. Holmes certain voting rights.  *See* Wade Decl., Ex. 5 at 3 ("He talked to HOLMES

2   about the changes in corporate governance in advance of a Board meeting."); *see also* Holmes Decl. ¶ 4.

3   This work necessarily was done in part on Ms. Holmes' personal behalf, as it squarely implicated her

4   interests as founder, CEO, Board member, and controlling shareholder in addition to the interests of

5   Theranos and its other shareholders.  (A special committee of disinterested directors voted on the

6   proposal).  *See* Wade Decl., Ex. 3 (Oct. 8, 2013 Theranos Board Minutes).

7          In fall 2015, David Boies advised Ms. Holmes personally in connection with inquiries from the

8   Securities and Exchange Commission and, eventually, from the Department of Justice as part of the

9   investigation that led to this prosecution.  The SEC served its first of several document requests and

10  subpoenas on the company on October 22, 2015.  Wade Decl., Ex. 6.  The DOJ issued its first grand jury

11  document subpoena to Theranos on January 11, 2016.  Wade Decl., Ex. 8.  SEC and DOJ subpoenas to

12  Theranos sought, among other things, Ms. Holmes' communications.  *E.g.*, Wade Decl., Ex. 7

13  (requesting specific categories of Ms. Holmes' communications).  Only later in 2016 did Ms. Holmes

14  retain separate counsel on these matters.  *See* Holmes Decl. ¶ 5.  Before then, Ms. Holmes did not

15  believe that she needed separate counsel because David Boies and Boies Schiller were her attorneys.

16  *See id.*[2]

17         Even after Ms. Holmes retained new counsel for the SEC and DOJ investigations, Boies Schiller

18  continued to represent her personally.  The firm defended Ms. Holmes in her personal capacity in a

19  putative class action lawsuit in Arizona federal court.  *See* Holmes Decl. ¶ 6; Wade Decl., Ex. 9 (Sept. 2,

20  2016 *Toy* Pleading Excerpt).  The basis of the plaintiffs' claims against Ms. Holmes there overlap with

21  the issues in this case.

22         As Boies Schiller attorneys advised Ms. Holmes and her company on the above matters, they did

23  not admonish Ms. Holmes that she was not the firm's client.  Holmes Decl. ¶¶ 2-6.  To the contrary,

24  Boies Schiller attorneys would preface advice as being conveyed on behalf of Ms. Holmes *and* the

25

26

27         [2] Ms. Holmes is prepared, upon the Court's request, to submit on an *ex parte* basis for the
    Court's *in camera* review certain privileged evidence of a personal representation by Boies Schiller in

28  government investigations.  *See* Wade Decl. ¶ 3.

1  company.[3]

2  **II.    The Government's Disregard for Ms. Holmes' Attorney-Client Relationship**

3       The government, in its motion, seeks to downplay Ms. Holmes' attorney-client relationship with

4  Boies Schiller by suggesting that this issue arose only in June 2020 after the government served its

5  exhibit list.  The government also minimizes the risk of intrusion to Ms. Holmes' privilege by claiming

6  that it engaged in a "liberal" review of documents with an eye towards Ms. Holmes' personal privilege.

7  The record suggests otherwise.

8       The government has long been aware that Boies Schiller represented Ms. Holmes, including as

9  early as 2011 when Boies Schiller appeared for Ms. Holmes in litigation in this Court.  To the extent

10  there was any confusion, Ms. Holmes clarified in correspondence with the government in February 2019

11  that she had a prior attorney-client relationship with Mr. Boies and his firm.  ECF No. 559-3 (Bostic

12  Decl., Ex. B) (explaining that Mr. Boies may have violated his legal and/or ethical obligation to Ms.

13  Holmes as a result of his participation in an interview with the prosecution team).  It was at that point

14  that Ms. Holmes first asked the government to cease its review of any potentially privileged materials.

15  *Id.*  In the ensuing exchange of correspondence, Ms. Holmes provided the government with publicly

16  available evidence that Mr. Boies and his law firm had represented her personally, explained to the

17  government how statements from counsel for Boies Schiller about the representation were mistaken in

18  light of that evidence, and reiterated her request that the government cease its review of potentially

19  privileged materials.  ECF No. 559-5 (Bostic Decl., Ex. D).

20       In response, the government did not question or challenge the fact that Mr. Boies and Boies

21  Schiller had jointly represented Ms. Holmes and Theranos.  Instead, the government represented that it

22  had not sought "to invade Ms. Holmes' attorney client privilege" during its interview, and noted that

23  counsel from the law firm of Wilmer Cutler Pickering Hale & Dorr LLP who "represented Theranos and

24  Ms. Holmes" were present at Mr. Boies' interview "for the sole purpose of protecting the privilege."

25

26

27       [3] Ms. Holmes is prepared, upon the Court's request, to submit on an *ex parte* basis for the
Court's *in camera* review certain privileged evidence reflecting legal advice to Ms. Holmes and

28  Theranos as joint clients.  *See* Wade Decl. ¶ 3.

1   Wade Decl., Ex. 12 (May 20, 2019 Ltr.).[4]  The government did not press the issue further, leaving Ms.

2   Holmes to understand that it would respect her attorney-client relationship with Mr. Boies and his firm.

3        In early 2019, Ms. Holmes also understood that the government was organizing a taint team to

4   review a subset of the documents produced by Theranos—those produced in September 2018 during the

5   final weeks of the company's operations—that were produced subject to a non-waiver agreement and

6   were not subject to a document-by-document privilege review by the company prior to production.

7   Judge van Keulen had ordered the use of a taint team after determining that there was a "high

8   probability . . . that the documents produced to the government may contain information subject to a

9   privilege belonging to [Ms. Holmes]," and that "additional steps to ensure that the trial team does not

10  obtain access to privileged materials are appropriate."  ECF No. 54 at 8.  Although the government did

11  not uphold its commitment to the Court that it would "solicit input from defense counsel regarding

12  search terms and additional procedures," Wade Decl., Ex. 10 (May 3, 2019 Ltr.), the prosecution team

13  nevertheless confirmed to Ms. Holmes that the taint team's review would focus in part on

14  "communications involving David Boies . . . and other documents containing generic terms sometimes

15  associated with privileged information."  Wade Decl., Ex. 11 (May 16, 2019 Ltr.).

16       Although the government claims that the taint team took a "very liberal view of [Ms. Holmes']

17  privilege claims," Mot. 2, it became apparent at the conclusion of its work that the team had not focused

18  on documents subject to a joint, common interest, or personal privilege arising from Ms. Holmes'

19  representation by Mr. Boies and his firm.  *See* Wade Decl., Ex. 14 (Jan. 22, 2020 Ltr.).  This oversight

20  required the government and defense to re-review thousands of documents for Ms. Holmes' personal

21  privilege, which resulted in the identification of more than 300 additional privileged documents that the

22  taint team missed during its initial review.[5]  *See* Wade Decl., Ex. 15 (Mar. 13, 2020 Ltr.).  After Ms.

23  Holmes addressed the taint team's questions regarding the nature of her personal privilege, Wade Decl.,

24  Ex. 16 (Mar. 26, 2020 Ltr.), the taint team did not challenge the privilege and agreed to withhold the

---

25      [4] The government's claim of a joint representation by Wilmer of Ms. Holmes and Theranos—a

26  claim Ms. Holmes has not made—is ironic given its willful blindness to the joint representation by
    Boies Schiller despite Ms. Holmes' repeated assertions regarding the latter firm.

27      [5] The government's suggestion that only 25 documents were identified as privileged during the

28  taint team process is thus untrue.  *See* Mot. 2.

1    Boies Schiller documents from the prosecution team, Wade Decl., Ex. 17 (Mar. 31, 2020 Email).[6]

2       In January 2020, at the same time Ms. Holmes was engaged in discussions with the taint team,

3 the government's prosecution team tried an end run around Ms. Holmes' privilege assertion by

4 contacting Boies Schiller. Wade Decl., Ex. 13 at 2 (USAO-007776) ("I need to speak with someone at

5 the firm about certain Theranos-related issues."). After a conversation with Boies Schiller's general

6 counsel, the government provided Boies Schiller with two documents that the government had received

7 from counsel for Ms. Holmes "regarding the representation issue." *Id.* at 1. The prosecution team did

8 not raise this issue with Ms. Holmes at the time, and it has yet to produce any further correspondence

9 with Boies Schiller on this issue.

10       The government next ignored Ms. Holmes' privileged relationship with Boies Schiller when it

11 identified a privileged document in connection with its disclosure of potential Rule 404(b) evidence.

12 Wade Decl., Ex. 18 (Jun. 15, 2020 Ltr.). Ms. Holmes again explained that she was asserting "all

13 privileges, including with respect to materials relating to joint representations involving her and the

14 company." *Id.* The government, for its part, agreed temporarily to refrain from making any use of the

15 document at issue. Wade Decl., Ex. 19 (Jun. 17, 2020 Ltr.).

16       Finally, the government included thirteen documents on its trial exhibit list that implicate Ms.

17 Holmes' personal privilege because they reflect communications with attorneys at Boies Schiller. Ms.

18 Holmes objected to the government's use of these documents, reiterated the points that she had

19 previously explained to the government, and, as is customary in privilege disputes, provided the

20 government with a privilege log for the documents at issue.[7] *See* ECF Nos. 559-6, 559-9, 559-11, 559-

21 12 (Bostic Decl., Exs. E, H, J, K). The government attempts to justify its conduct on the grounds that

22 these documents had been produced in prior matters, Mot. 3, but that artfully ignores the fact that, for

---

23

24      [6] The prosecution team's recent letter confirms that it was actively communicating with the taint team on issues relating to Ms. Holmes' privilege. ECF No. 559-10 at 1 (letter from the prosecution team

25 referring to Ms. Holmes' interactions with the taint team on privilege issues). This is concerning given that the taint team had unfettered access to Ms. Holmes' privileged documents and information.

26      [7] The government criticizes Ms. Holmes for not establishing her representation by Boies Schiller to the government's satisfaction. Mot. 4. The government appears to see itself as the arbiter of Ms.

27 Holmes' privilege claims. Mot. 4 ("In order to allow the government to weigh Holmes' privilege claim . . . ."). That is not how privilege disputes are resolved; it is the courts (not opposing parties) that

28 weigh and adjudicate assertions of the attorney-client privilege and work product protections.

many of the documents, (1) similar versions were identified on the Theranos privilege log that was

provided to the government during the course of its investigation; (2) similar versions were redacted or

withheld as privileged elsewhere in Theranos' production; (3) they had been clawed back by Theranos

as privileged; and/or (4) were produced by Theranos subject to clear non-waiver provisions.  *E.g.*, ECF

Nos. 559-6 at 2-3 (Bostic Decl., Ex. E), 559-9 (Bostic Decl., Ex. H); Wade Decl., Ex. 22 (Feb. 7, 2017

Ltr.).  The government also ignores that it subsequently entered into a non-waiver agreement with

Theranos that required the government to "promptly notify Theranos in writing" if it discovered

privileged material in Theranos productions and made clear that the government retained "any ethical

obligations an attorney may have with respect to discovery of inadvertent disclosure[.]"  Wade Decl.,

Ex. 21 (Mar. 29, 2018 Agreement).  Moreover, the government ignores that many, if not all, of these

documents were produced by Theranos to the government without Ms. Holmes' prior review or consent.

Together, this should have been more than enough context for the government to understand that the

thirteen documents involving Boies Schiller attorneys it included on its exhibit list were inadvertently

produced.  Having not done so, but in the face of Ms. Holmes' objections, the government agreed to

refrain from reviewing or making use of these thirteen documents[8] and filed this motion.

      Because Boies Schiller jointly represented Ms. Holmes and Theranos, there are documents at

issue that implicate a privilege held by both Ms. Holmes and Theranos (assignment for the benefit of

creditors), LLC ("the Assignee").  Perhaps unsurprisingly, the government has had no trouble obtaining

a privilege waiver from the Assignee over documents that it seeks to use at trial.  *E.g.*, ECF No. 559-7 at

2 (Bostic Decl., Ex. F).  But the government has refused to provide Ms. Holmes with correspondence

between the government and the Assignee on these privilege determinations.  ECF No. 559-10 at 2

(Bostic Decl., Ex. I).  As a joint privilege holder, Ms. Holmes needs this information to understand

whether the Assignee has purported to waive privilege over these documents, declined to assert

privilege, or determined they are not privileged.  Ms. Holmes is completely in the dark on these

---

[8] The government claims that its conduct regarding these thirteen documents is consistent with California Rule of Professional Conduct 4.4.  Mot. 4.  The government fails to explain why it even attempted to make use of these documents, and why it did not "promptly notify" Ms. Holmes when it identified these documents given the government's longstanding knowledge that Ms. Holmes had been personally represented by Mr. Boies and his firm.

1   questions.  Absent daylight on this process, the government has free rein to unilaterally pressure the

2   Assignee on privilege calls for documents that the government believes to be favorable to its case,

3   without allowing Ms. Holmes the ability to assess the implications that the Assignee's decisions may

4   have on both her rights as a joint privilege holder as well as her right to present certain evidence at trial.

5                                              **ARGUMENT**

6         The attorney-client privilege "is one of the oldest recognized privileges for confidential

7   communications."  *Mohawk Indust. Inc. v. Carpenter*, 558 U.S. 100, 108 (2009).  The purpose of the

8   attorney-client privilege "is to encourage full and frank communication between attorneys and their

9   clients and thereby promote broader public interests in the observance of law and administration of

10  justice."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  The government's lackadaisical

11  response to Ms. Holmes' privilege assertions over her communications with her attorneys at Boies

12  Schiller, culminating in this belated motion, threatens those interests.  Shorn of its rhetoric, the

13  government's motion presents two straightforward questions:  did Ms. Holmes have a personal attorney-

14  client relationship with David Boies and his firm, and do the thirteen documents on Ms. Holmes'

15  privilege log fall within that privilege?  The answer to both is yes.  As set forth above, Boies Schiller

16  represented Ms. Holmes from 2011 through 2016, counseling her on various matters including those

17  addressed in the thirteen documents on her privilege log.  That log contains sufficient information to

18  satisfy the test for attorney-client privileged communications and/or work product for each

19  communication at issue.[9]

20        The government's motion obscures this inquiry.  Its attempt to invade Ms. Holmes' privilege

21  rests entirely on *United States v. Graf*, 610 F.3d 1148 (9th Cir. 2011), which states the rule for when an

22  attorney-client relationship may arise by implication when an employee approaches her employer's

23  attorneys for personal legal advice.  *See, e.g.*, Mot. 1 (citing *Graf*).  But *Graf* has no purchase here;

24  Boies Schiller's representation of Ms. Holmes (in addition to Theranos) is a matter of public record and

25  thus there is no relationship to be implied.  The Court should deny the government's motion.

26

27         _____

28         [9] Ms. Holmes is prepared upon the Court's request to submit the thirteen documents on an *ex parte* basis for the Court's *in camera* review.  *See* Wade Decl. ¶ 3.

## I.    Ms. Holmes' Privilege Claims over the Thirteen Communications Are Valid

### A.    Ms. Holmes Had a Personal Attorney-Client Relationship with Boies Schiller

It is commonplace for a single attorney or firm to represent two or more clients with shared interests.[10]  While joint representations have some unique features,[11] the law governing formation of a joint attorney-client relationship does not vary from a single-client scenario.  "Just as in single-client representation, the lawyer and co-clients begin their relationship when the co-clients convey their desire for representation, and the lawyer consents."  *Teleglobe*, 493 F.3d at 362; *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 263 F.R.D. 142, 145 (D. Del. 2009).  And regardless whether it is joint or individual, "[c]ourts customarily determine the existence . . . of an attorney-client relationship by evaluating whether the putative client's belief that such a relationship existed was objectively reasonable under all the circumstances."  *FDIC v. Ogden Corp.*, 202 F.3d 454, 463 (1st Cir. 2000); *see also Oppliger v. United States*, 2010 WL 503042, at *4 (D. Neb. Feb. 8, 2010) ("A number of factors are relevant to determine the relationship between the individuals and counsel including the reasonable subjective views and conduct of the individuals and the attorney.").[12]  "Once begun, a co-client representation generally continues until a client discharges the lawyer," "the lawyer withdraws," or when "it becomes clear to all parties that the clients' legal interests have diverged too much to justify using common attorneys."  *Teleglobe*, 493 F.3d at 362.

---

[10] *See* Restatement (Third) of the Law Governing Lawyers § 131 (2000) ("For example, when an organization is accused of wrongdoing, an individual such as a director, officer, or other agent will sometimes be charged as well, and the lawyer representing the organization might be asked also to represent the individual."); *see also* Bradford S. Babbitt, *How to Avoid Attorney-Client Privilege Problems in Joint Representations*, Am. Bar. Ass'n Practice Points (July 11, 2018), *available at* https://www.americanbar.org/groups/litigation/committees/commercial-business/practice/2018/how-to-avoid-attorney-client-privilege-problems-in-joint-representations/ ("Joint engagements can be attractive.").

[11] *See generally* Babbit, *How to Avoid Attorney-Client Privilege Problems in Joint Representations* (providing guidance on avoiding conflicts of interest in joint representations).

[12] Federal common law governs whether a given document is privileged.  *See* Fed. R. Evid. 501; *United States v. Bauer*, 132 F.3d 504, 510 n.4 (9th Cir. 1997).  To the extent that is also true for the antecedent question of formation of the attorney-client relationship, federal and California law do not conflict; both look to the parties' actions for evidence of assent and emphasize the client's reasonable belief that she is seeking legal counsel.  *Compare Lister v. State Bar*, 51 Cal.3d 1117, 1125-26 (1990) (stating California law); *with Advanced Mfg. Techs., Inc. v. Motorola, Inc.*, 2002 WL 1446953, at *4 (D. Ariz. July 2, 2002) (surveying federal law stating substantially similar inquiry).

Objective evidence supports Ms. Holmes' belief that David Boies and his firm jointly represented her and Theranos. Boies Schiller attorneys appeared as counsel of record for her and Theranos in multiple legal proceedings. *See* pp. 2, 4, *supra*. Courts have held that entries of appearance for two clients are nearly dispositive of the joint-client inquiry. *See Ogden*, 202 F.3d at 462 ("entries of appearance" on behalf of parent corporation and subsidiary "constitute persuasive evidence of a joint client relationship"); *E. F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 387 (S.D. Tex. 1969) (entrance of appearance on behalf of two entities in litigation creates "almost irrebuttable" presumption of joint representation); *see also Cooke v. Laidlaw, Adams & Peck, Inc.*, 126 A.D.2d 453, 455 (N.Y. 1987) (on-record statement of personal representation of officer established joint nature of representation).

These litigation appearances in 2011 and 2016 bookend Boies Schiller's five-year relationship with Ms. Holmes and Theranos, supporting a belief that the representation was joint throughout. The government cites no evidence to undermine that belief. It has not alleged that Ms. Holmes discharged Boies Schiller (she did not), that Boies Schiller withdrew from its representation of her personally (it did not), or that it was clear to all parties at the relevant times that Ms. Holmes' and Theranos' legal interests had diverged too much to continue the joint representation (it was not). It was not until late 2016 when Ms. Holmes finally engaged separate counsel to represent her apart from Theranos, in connection with these proceedings. *See* p. 4, *supra*. That engagement occurred several months after Theranos received SEC and DOJ subpoenas requiring production of Ms. Holmes' notes, correspondence, and other records as part of the investigation that led to this prosecution. Boies Schiller orchestrated that collection and production process. *See* p. 4, *supra*. That Ms. Holmes had Boies Schiller coordinate the initial responses to those inquiries—and that Boies Schiller found it appropriate to do so—further demonstrates the shared understanding that Boies Schiller acted for both Ms. Holmes and Theranos until Ms. Holmes retained separate counsel.

Ms. Holmes' reasonable belief in the joint representation finds further support in the many times that Mr. Boies and/or his firm advised her on matters implicating her personal interests in addition to those of Theranos (even as the co-clients' interests overlapped). As noted above, *see* pp. 3-4, *supra*, Mr. Boies advised Ms. Holmes on matters of corporate governance where her interests as controlling

1    shareholder were at least as much at issue as those of Theranos and the company's other shareholders.

2    Other examples include advice in 2015 concerning potential defamation claims on Ms. Holmes' behalf

3    and interactions with CMS in 2016 which occurred under threat of sanctions against Ms. Holmes

4    personally. *See* p. 3, *supra*. In each of these instances, while Ms. Holmes and Theranos interests as

5    joint clients remained "congruen[t]," *Teleglobe*, 493 F.3d at 363, Ms. Holmes' personal stake was plain

6    as day. Mr. Boies and Boies Schiller's consistent willingness to advise Ms. Holmes on these topics

7    supports her belief that she was as much a Boies Schiller client as was the company she founded and

8    ran.[13]

9        The government argues that the length of Boies Schiller's involvement with Theranos and the

10    breadth of its advice to Ms. Holmes and Theranos undermine Ms. Holmes' privilege claims. *See* Mot. 9

11    (Ms. "Holmes's privilege claims here are further weakened by the fact that David Boies and his firm

12    were heavily involved in Theranos's activities from the early days of the company" and by the fact that

13    the firm "worked on a wide range of issues"). The opposite is true. Boies Schiller's extensive

14    involvement over many years and across many subject matters ***supports*** Ms. Holmes' belief of a joint

15    representation because, even in those "early days," Mr. Boies and his firm were appearing in cases for

16    both Ms. Holmes and Theranos. There was never a time from 2011 through 2014 when Mr. Boies was

17    not litigating jointly for Ms. Holmes and Theranos. From there, the firm's role at Theranos evolved

18    organically and without reference to an engagement letter. And, after a one-year gap (2015) during

19    which the firm continued to advise Ms. Holmes on various matters (including litigation and non-

20    litigation matters), the firm in 2016 again appeared in court claiming Ms. Holmes as a client. *See* p. 4,

21    *supra*. In this context, Ms. Holmes had ample reason to believe that she was a Boies Schiller client. *See*

22    *Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 450 (D. Minn. 2011) (law firm's failure to

23    document its intended narrow scope of representation of officer supported officer's reasonable belief in

24    broad, joint representation with company).

25

26    _____

27        [13] In light of this clear message from Boies Schiller, it is of no moment that Boies Schiller was
paid from company funds or company stock. Corporations routinely pay legal fees in joint
representations of the company and its officers, s*ee Cooke*, 126 A.D.2d at 455 (fact that company paid

28    retainer was "not critical" to joint-client inquiry), as Theranos did here.

The government also relies on Mr. Boies' statement during a government interview that he did not represent Ms. Holmes personally. Mot. 8. As the above makes clear, that statement from Mr. Boies is factually inaccurate. Whether Mr. Boies simply forgot about the multiple litigations in which Boies Schiller publicly claimed Ms. Holmes as a client, or whether he was seeking to distance himself from Ms. Holmes and Theranos in the face of public scrutiny about the ethics of his unorthodox role at Theranos as attorney, investor, and Board Member,[14] his plainly mistaken statement cannot defeat Ms. Holmes' privilege claim.

## B.    The Thirteen Documents at Issue Are Privileged and Some are Work Product

Ms. Holmes has a valid privilege claim for each of the thirteen documents on her privilege log. The Ninth Circuit has framed the eight elements of the privilege as:

> (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived.

*United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (citing 8 Wigmore, Evidence § 2292, at 554 (McNaughton rev.1961)). All elements are satisfied by Ms. Holmes' disclosures.[15]

The government all but concedes that "Ms. Holmes will establish that she engaged in these communications because she was seeking legal advice," Mot. 7, satisfying the first through third elements of the above test. The government is correct not to contest seriously these factors. Documents 2, 4-11, and 13 are attorney-client communications regarding various legal matters: responses to investors, legal strategy in response to claims by journalists, and regulatory issues. Document 1 reflects

---

[14] In addition to serving as outside counsel to Ms. Holmes and Theranos, Mr. Boies became a Theranos investor and Board Member. Mr. Boies' many roles have been extensively documented in the media. *See, e.g.*, Andrew Rice, *The Bad, Good Lawyer: Was David Boies just doing right by Harvey Weinstein?*, N.Y. Mag. (Sept. 30, 2018) (explaining that Mr. Boies was "at the heart" of Theranos' strategy vis-à-vis the media and regulators); Steven Davidoff Solomon, *David Boies' Dual Roles at Theranos Set Up Conflict*, N.Y. Times (Feb, 2, 2016) ("Theranos is in trouble, and David Boies, a star lawyer, has placed himself at the heart of it, a decision that he may come to rue.")

[15] A privilege log will make out a *prima facie* claim of privilege by disclosing: "[1] the attorney and client involved, [2] the nature of the document, [3] all persons or entities shown on the document to have received or sent the document, [4] all persons or entities known to have been furnished the document or informed of its substance, and [5] the date the document was generated, prepared, or dated." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992). The burden then shifts to the party opposing the privilege claim to provide a factual basis for its contrary argument. *Id.* at 1075.

communications regarding retention of attorneys for litigation.  Document 3 sets forth a legal analysis regarding a response to claims by journalists prepared for the benefit of and shared with Ms. Holmes.[16] Document 12 reflects communications containing facts provided to counsel in connection with a planned response to claims by journalists.

The communications were made in confidence.  With one exception, the communications are between Ms. Holmes or other senior Theranos employees, Theranos in-house attorneys, and Boies Schiller attorneys.  That exception, document 12, reflects communications involving public relations consultants that Boies Schiller hired and on whom it relied to provide legal advice to Ms. Holmes and Theranos.  *See, e.g.*, *H.W. Charter & Sons, Inc. v. William Carter Co.*, 1995 WL 301351, at *3 (S.D.N.Y. May 16, 1995) (Chin, J.) (public relations consultants hired "to assist the lawyers in rendering legal advice" fall under privilege); *see also United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) ("The attorney-client privilege may extend to communications with third parties who have been engaged to assist the attorney in providing legal advice.").

Ms. Holmes is the sender or recipient of all but two documents.  "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, *as well as an attorney's advice in response to such disclosures*."  *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997) (internal quotation marks and alterations omitted) (emphasis in original).  As noted above, document 3 was shared with Ms. Holmes.  And document 4 reflects attorney-client communications between a Theranos employee who reported to Ms. Holmes and a Boies Schiller attorney on a matter that related to advice rendered to Ms. Holmes.

Finally, Ms. Holmes has not waived her joint privilege claims over the thirteen documents.  It is immaterial that the government says it has secured the Theranos Assignee's waiver or non-assertion over the documents because "waiving the joint-client privilege requires the consent of all joint clients."  *Teleglobe*, 493 F.3d at 363 (citing Restatement (Third) of the Law Governing Lawyers § 75(2)).  Ms. Holmes, in contrast to the Assignee, has been consistent and diligent in asserting her joint-privilege over

---

[16] Ms. Holmes, upon the Court's request, is prepared to submit *ex parte* for the Court's *in camera* review, a privileged communication that included Document 3 as an attachment.  *See* Wade Decl. ¶ 3.

these documents.  *See* pp. 5-8, *supra*.

In sum, Ms. Holmes' log is sufficient to establish her privilege claim for each document.
Documents 3, 5, 7-10 are also attorney work product.  "At its core, the work-product doctrine shelters
the mental processes of the attorney, providing a privileged area within which he can analyze and
prepare his client's case."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).  To qualify, the
documents "must be prepared in anticipation of litigation or for trial" and have been prepared "by or for
another party or by or for that other party's representative."  *In re Grand Jury Subpoena (Mark Torf/Torf
Envtl. Mgmt.)*, 357 F.3d 900, 907 (9th Cir. 2004) (internal quotation marks omitted).  Each of these six
documents reflects attorney mental processes recorded in preparation for litigation regarding claims by
journalists.  Boies Schiller treated this topic as a legal matter after first contacting reporter John
Carreyrou in May 2015.[17]  That view "animated every document [Boies Schiller] prepared" on the topic,
including those at issue here.  *Id.* at 908.

## II.     The Government Relies on Inapposite Cases Involving Implied Attorney-Client Relationships

The government invokes an inapposite line of cases governing when a corporate employee who
is not a firm client nevertheless may obtain limited privilege protections for her communications with
corporate counsel by operation of an implied privileged relationship.  *See* Mot. 6 (citing *Graf*, 610 F.3d
at 1148 and *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir. 1986)).  But Ms.
Holmes does not claim an implied attorney-client relationship because it is beyond question that she was
a firm client.  Consequently, the controlling law is not *Bevill* (which the Ninth Circuit adopted in *Graf*),
but rather the law of joint client representations stated by the Third Circuit in its later *Teleglobe* opinion.
*See Teleglobe*, 493 F.3d at 362-364 (surveying in detail the law on joint client representations without
discussing *Bevill*); *see also Montgomery Acad. v. Kohn*, 82 F. Supp. 2d 312, 316 (D.N.J. 1999)
(distinguishing *Bevill* with the record before it where the individual had a preexisting confidential
relationship with the attorney).

---

[17] Ms. Holmes is prepared to submit, upon the Court's request, on an *ex parte* basis for the
Court's *in camera* review privileged evidence reflecting this posture.  *See* Wade Decl. ¶ 3.

1   A close reading of *Graf* only demonstrates its irrelevance here.  In *Graf*, the Ninth Circuit

2   emphasized that the attorneys provided sworn declarations that "Graf was not the firm's client" and that

3   they "[n]ever informed Graf that he was their client."  610 F.3d at 1161.  Another attorney swore that

4   "he would have refused to represent Graf personally had he ever been asked."  *Id.* at 1163.  In light of

5   the fact that no attorney-client relationship ever existed between Graf and the attorneys on the matters

6   relating to the company, Graf had to meet the multi-factor *Bevill* test in order to claim a qualified

7   privilege over conversations he had with corporate counsel.  *See id.*[18]  *Graf* thus is not just

8   distinguishable on its facts, it is inapposite.

9   Further proof that *Graf* does not speak to joint representations like the one Ms. Holmes and

10   Theranos had with Boies Schiller is the test's fifth element, which requires a showing that the employee

11   and counsel communicated solely about matters unrelated to "the general affairs of the company."  *Id.* at

12   1160.  A joint representation, in contrast, is defined by the "congruence of the clients' interests."

13   *Teleglobe*, 493 F.3d at 363.  It thus is nonsensical to ask a jointly represented client to satisfy the *Graf*

14   test because co-clients necessarily communicate with their common counsel on common matters.

## CONCLUSION

16   For the foregoing reasons, the Court should deny the government's motion to invade Ms.

17   Holmes' privileged communications.

---

[18] The government notes that one of the firms previously represented Graf.  Mot. 9.  The government, however, ignores that the Ninth Circuit noted that the "personal matters" on which the attorney advised Graf were not "legally or factually related to the matters" the attorney handled for the company.  *Graf*, 610 F.3d at 1163.  Ms. Holmes does not claim a prior attorney-client relationship with Boies Schiller unrelated to Theranos.  Rather, Boies Schiller represented Ms. Holmes and Theranos jointly on matters related to Theranos (and, consequently, this criminal case) from the first instance.

MS. HOLMES' OPPOSITION TO MOTION FOR ORDER THAT DEFENDANTS LACK PRIVILEGE INTEREST
CR-18-00258

16

1

2 DATED:  December 4, 2020                    Respectfully submitted,

3

4                                            /s/ Lance Wade
                                             KEVIN DOWNEY
5                                            LANCE WADE
                                             AMY MASON SAHARIA
6                                            KATHERINE TREFZ
                                             Attorneys for Elizabeth Holmes
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **<u>CERTIFICATE OF SERVICE</u>**

2
     I hereby certify that on December 4, 2020 a copy of this filing was delivered via ECF on all

3
counsel of record.

4

5
                     /s/ Lance Wade

                     LANCE WADE

6
                     Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MS. HOLMES' OPPOSITION TO MOTION FOR ORDER THAT DEFENDANTS LACK PRIVILEGE INTEREST
CR-18-00258