1   STEPHANIE M. HINDS (CABN 154284)
    Attorney for the United States,
2   Acting Under Authority Conferred By 28 U.S.C. § 515

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4
    JEFF SCHENK (CABN 234355)
5   JOHN C. BOSTIC (CABN 264367)
    ROBERT S. LEACH (CABN 196191)
6   VANESSA BAEHR-JONES (CABN 281715)
    Assistant United States Attorneys
7
        150 Almaden Boulevard, Suite 900
8       San Jose, California 95113
        Telephone: (408) 535-5061
9       Fax: (408) 535-5066
        Robert.Leach@usdoj.gov
10
    Attorneys for United States of America
11
                        UNITED STATES DISTRICT COURT
12
                     NORTHERN DISTRICT OF CALIFORNIA
13
                             SAN JOSE DIVISION
14

15  UNITED STATES OF AMERICA,           )   Case No. 18-CR-00258 EJD
                                        )
16         Plaintiff,                   )   UNITED STATES' OPPOSITION TO
                                        )   DEFENDANT'S MOTION *IN LIMINE* TO
17     v.                               )   EXCLUDE EVIDENCE OF ALLEGED
                                        )   VIOLATIONS OF INDUSTRY STANDARDS
18  ELIZABETH HOLMES,                   )   AND GOVERNMENT REGULATIONS UNDER
                                        )   RULES 401-403 [ECF NO. 569]
19         Defendant.                   )
                                        )   Date:  March 23, 2021
20                                      )   Time:  10:00 a.m.
                                        )   Court: Hon. Edward J. Davila
21  _____)

22

23

24

25

26

27

28

GOVT. OPP'N TO MOT. TO EXCLUDE VIOLATIONS
OF INDUSTRY STANDARDS & REGULATIONS,
CASE NO. 18-258 EJD

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Evidence of Alleged Violations of Industry Standards and Government Regulations Under Rules 401-403.

Defendant seeks a ruling that "[t]he government shall not introduce at trial any evidence, argument, references to violations of industry standards or government regulations and rules regarding research and development procedures, medical devices, and clinical laboratory practices."  ECF No. 569-1.  There is no basis for such a sweeping order.  The specific evidence Defendant focuses on is admissible.  For example, Defendant received emails authored by her lab director, Dr. Adam Rosendorff, to the effect that Theranos was not complying with regulations for the laboratory.  Such evidence is relevant and admissible to show Defendant's state of mind.  *See, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1164 (9th Cir. 2010).  The same is true for evidence Defendant and Ramesh Balwani sought to undermine his authority as lab director.  In addition, evidence regarding the Centers for Medicare & Medicaid Services ("CMS") survey is highly probative of the falsity of Defendant's statements and not excludable under some theory it is improper "industry standard" evidence. Defendant's remaining arguments fail.  The motion should be denied.

## FACTUAL BACKGROUND

On September 9, 2013, Theranos announced a partnership with Walgreens, boasting that it was "introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples" and that its "proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results."  *See* January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions *in Limine* ("1/8/2021 Leach Decl."), Ex. 25. According to Theranos's CLIA laboratory director, Adam Rosendorff, the validation of Theranos's protocols before the launch was "very rushed."  *Id.* Ex. 38 at 93.

On November 6, 2013, Defendant started using the Theranos blood analyzer (TSPU/Edison 3.5) in the CLIA laboratory.  *Id.* Ex. 6.

On November 10, 2013, Dr. Rosendorff, the CLIA lab director, advised Balwani by email:  "we are currently not complaint in terms of CLIA law."  *Id.* Ex. 45.  Dr. Rosendorff drew to Balwani's

attention regulations relating to the verification of performance specifications.  He observed Theranos had not established the upper end of reportable ranges for assays.  And he said, "we have not established control procedures for ISEs (diluted protocols) or Edisons."  Balwani forwarded Dr. Rosendorff's message to Defendant.  *Id.* Ex. 45 at THPFM0001559650.  Balwani replied, in an email blind-copied to Defendant:  "This topic is of critical importance.  We meet every week and are in office every day, and you have never brought this issue. . . . [Y]ou will need to share why we you [sic] suspect we are out of compliance. . . . [Y]ou actually knew that we were using the reportable ranges from Siemens all along."  *Id.* Ex. 46.

Defendant, Balwani, and Daniel Young (their Vice President) coordinated on a response to Dr. Rosendorff.  *Id.* Exs. 47 & 48.  Dr. Rosendorff still pointed out issues.  ECF No. 582-8 at THPFM0000266083 (Def. Ex. 24) (adding to Balwani's comments:  "we cannot assume that the predicate ULOQ would apply" and "I am still working with the ELISA team to establish the acceptable QC for the Edisons").  Dr. Rosendorff also observed that specificity studies were missing for certain assays and were "required" and "[v]ery important."  *Id.* at THPFM0000266077 & 78 & 83.  Balwani again blamed Dr. Rosendorff for not raising the issue sooner:  "As you know, we take these issues with seriousness.  Why didn't you raise these before to me when I was asking . . . ."  *Id.* at THPFM0000266079.  Dr. Rosendorff replied that certain studies were added to validation documents after he signed them; that Theranos was expediting getting these studies done; that Young was not as responsive as Dr. Rosendorff would like; and that he "still [has] not seen any ISE validation work, despite numerous requests."  *Id.* at THPFM0000266078.  Balwani forwarded the entire exchange to Defendant.  1/8/2021 Leach Decl. Ex. 49.

In February 2014, Dr. Rosendorff advised Balwani:  "we need to migrate our proficiency testing to Theranos methods ASAP.  I have been monitoring how we would perform on API or NYS surveys and once we have collected enough data we should discuss.  CLIA requires PT to be performed the same way we test patient samples.  Currently this is not 100% the case.  PT is a complex issue that needs to be vetted, but is essential[] in maintaining licensure and quality."  ECF No. 583 (Ex. 26).  Balwani forwarded the email to Defendant emphasizing a response was "critical."  *Id.*  Dr. Rosendorff  is

expected to testify he left Theranos in part because Defendant failed to address his concerns. For example, in a parallel case he has testified:

> Q    Was proficiency testing conducted at Theranos?
> . . .
> [DR. ROSENDORFF]: It was conducted, but – for the -- it wasn't conducted while I was there for the Theranos methods, and that was a big reason of why I left, because I kept trying to impress upon management the importance of doing alternative assessment of proficiency and they kept saying, yes, and -- an outline was drawn up by Daniel Young. But by October 2014, over a year had gone by and they hadn't done proficiency testing on the Theranos methods.
>
>            . . .
>
> In October 2014 there was a meeting – a big meeting or many people present in the boardroom to discuss proficiency. Daniel was there, Elizabeth, Sunny, Brad Arington, who was general counsel, and a bunch of other people, and we discussed the performance of alternative proficiency for the Theranos methods.
>
> But I left that meeting with the feeling that it was just lip service, that nothing was actually going to be done and that resources weren't going to be allocated to this.
>
> **Q.    What gave you the impression that it was just lip service?**
>
> A.    There was no follow-up. It wasn't something that I could do on my own. We needed a roster. We needed a list of samples that we had to produce. We needed all these things that – I needed a team, basically, to be built around me that I could marshal in – in the interest of this alternative proficiency.

1/8/2021 Leach Decl. Ex. 38 at 46-48.

Dr. Rosendorff also is expected to testify that Balwani and others who lacked medical training overruled or interfered with Dr. Rosendorff's responsibilities as lab director. For example, Defendant was alerted that Dr. Rosendorff was concerned his "authority as laboratory director [was] counteracted" in testing for HbA1c. *Id.* Ex. 50 at THPFM00000500867. Defendant was advised that Balwani wanted to review "critical values" – a value that is so high or low that it should be communicated immediately to the clinician – before they were released to doctors. ECF No. 583 (Ex. 26). He is expected to testify his judgment was questioned so frequently he forwarded emails with Defendant and Balwani to his personal Gmail account because he feared CMS would take away his license. 1/8/2021 Leach Decl. Ex. 51.

In September 2015, CMS commenced a survey of Defendant's CLIA laboratory in Newark. The surveyors found numerous deficiencies, noting, among other things, instances where Edison devices

failed quality control (yet results were still provided to patients), Theranos failed to verify accuracy, precision, and/or reportable range for assays such as calcium, $CO_2$, and glucose, Theranos failed to ensure that quality control for the PT/INR assay and the TSPU/Edison device was acceptable before reporting results, and Theranos failed to have a quality assessment procedure to identify and correct problems with quality control values for the TSPU. *See generally* ECF No. 581-1 (Def. Ex. 12).

## ARGUMENT

### I.    The Court Should Not Exclude Evidence of What Dr. Rosendorff Communicated to Defendants.

Contrary to Defendant's suggestion, there is no rule against admission of legal conclusions communicated to a defendant. Quite the opposite: the Ninth Circuit has affirmed admission of legal conclusions communicated to a defendant as relevant to a defendant's state of mind. For example, in *United States v. Graf*, an attorney testified he told defendant that marketing certain health insurance plans "would be a criminal offense because they did not comply with federal or state law." 610 F.3d 1148, 1164 (9th Cir. 2010). The Ninth Circuit affirmed, holding "[t]he statement on direct examination that the Plans did not comply with state and federal law and that marketing them would be a crime was admissible to show that Graf was on notice that his conduct was illegal." *Id.*

Similarly, in *United States v. McLennan*, the Ninth Circuit allowed a statement by an attorney describing his former communications with a client, during which he expressed dismay that the client was doing something the attorney previously told him was illegal. 563 F.2d 943, 946-47 (9th Cir. 1977). The Ninth Circuit noted that the statement was not offered to prove whether the advice was correct but "simply to show that the statement concerning illegality had been made." *Id.* at 946. Therefore it was a verbal act that could "come in to bring home notice to the Defendant." *Id.* at 947. Further, it was irrelevant whether the advice was correct or incorrect; what mattered was its effect on the hearer: "[T]he statement was not offered or admitted to prove the truth of what [the attorney] said that defendants' actions were illegal . . . but simply to show that the statement concerning illegality had been made. When the defense is advice of counsel, the advice given, whether correct or not, and whether recitals in it are true or not, is always admissible." *Id.* at 946-47; *see also United States v. Moran*, 482 F.3d 1101, 1110 (9th Cir. 2007) (holding evidence about reliance on qualified experts is relevant to

1   intent); *United States v. Castro,* 887 F.2d 988, 1000 (9th Cir. 1989) (finding when evidence is

2   introduced to show the information available to a defendant at the time of his or her actions, it is not

3   hearsay); *United States v. Greenspan*, 923 F.3d 138, 148 (3d Cir. 2019) (holding a "lawyer's advice was

4   admissible non-hearsay" because it was not used to show agreements were in fact unlawful but state of

5   mind as to defendant's belief of lawfulness).

6          Defendant's Ninth Circuit cases are not to the contrary and do not establish the purported rule

7   they would have the Court apply.  In *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443,

8   447 (9th Cir. 1992), the court affirmed the exclusion of testimony by "an avowed expert in employment

9   application interpretation" on a matter of law relating to contract interpretation.  The evidence was not

10  contemporaneous with the events in question and was not offered to prove state of mind.  The case

11  stands for little more than the proposition that expert testimony regarding the existence of contract or

12  meaning of its terms not admissible.  The same is true for *SEC v. Capital Consultants, LLC*, 397 F.3d

13  733, 749 (9th Cir. 2005), which involved a receiver's distribution of assets in a plan, not the state of

14  mind of a criminal defendant.  The court held "interpretation of . . . agreements and their legal effect is

15  an issue of law for the court."  *Id.* ("Experts may interpret and analyze factual evidence but may not

16  testify about the law.").  The case the *Capital Consultants* court relied on *Crow Tribe of Indians v.*

17  *Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996), too involved contract interpretation:  "The interpretation of

18  a contract is an issue of law . . . .  Expert testimony is not proper for issues of law."  And this Court

19  excluded testimony from a retained expert in a wrongful termination case regarding "whether California

20  law requires the placement of shunt strips outside an elevator machine room," which was "far from

21  settled" and "an important legal question for this case."  *Lukov v. Schindler Elevator Corp.*, 2012 WL

22  2428251, at *2 (N.D. Cal. June 26, 2012) (Davila, J.).  Again, the testimony at issue had nothing to do

23  with state of mind.

24         Accordingly, Dr. Rosendorff is not providing "impermissible legal opinions."  ECF No. 569 at

25  3:9-10.  Right or wrong, Dr. Rosendorff's statements to Defendant are relevant to central issues

26  regarding notice to Defendant and Defendant's state of mind.  How did Defendant react when she was

27  told "we are currently not complaint in terms of CLIA law"?  Did she meet with Dr. Rosendorff?  Did

28

1    she expend resources to get at the heart of problem?  Did she express surprise?  Did she stop to reflect

2    that the Walgreens launch was rushed?  Did she delay the launch?  Did she follow up to ensure that

3    Theranos had "establish[ed] the acceptable QC for the Edisons" – as Dr. Rosendorff warned was a

4    problem and as CMS in September 2015 found was a reality?  Did she do anything about Balwani's

5    reflexive, defensive blaming of the lab director?  The evidence has a tendency to show Defendant's state

6    of mind, her knowledge of or willful blindness to problems with Theranos's technology, her intent to

7    deceive and cheat investors, and knowledge at the time of the offenses.  The same is true for Dr.

8    Rosendorff's concerns about proficiency testing.  Defendant's and Balwani's reaction to Dr.

9    Rosendorff's concerns speaks to their fear about what running proficiency testing on Theranos methods

10   might show, their indifference to testing accuracy, the dynamics of the lab and coordination with Daniel

11   Young rather than a medical doctor, and ultimate their knowledge and intent.

12        The defense argues testimony about Theranos's lab practices will "confuse the issues and waste

13   time."  Not so.  How Defendant responded to Dr. Rosendorff is highly probative of her state of mind,

14   which is an element of fraud offenses that is often proved circumstantially through different pieces of

15   evidence.  Further, the operative indictment alleges Theranos publicly stated its laboratory could

16   perform tests quickly and accurately on samples as small as a single drop, and that Defendant

17   represented to doctors and patients that Theranos could provide accurate, fast, reliable, and cheap blood

18   test result despite knowing that Theranos's technology was not capable of consistently producing

19   accurate and reliable results.  ECF No. 469 ¶ 9, 16.  The indictment squarely puts Theranos's lab

20   practices at issue.  And, if Theranos was not performing proficiency testing consistent with industry

21   standards, as Dr. Rosendorff warned and as Dr. Master opines is the case, that fact tends to prove the

22   falsity of Defendant's statements to investors and patients.

23        Defendant also appears to attempt to exclude statements by Dr. Rosendorff that his authority as

24   lab director was being undermined.  This is highly relevant and not excludable under Rule 403 or some

25   conjured rule against "industry standards."  The evidence will show Defendant and Balwani ignored and

26   turned a blind eye to problems raised by Dr. Rosendorff, who had medical responsibility as the licensed

27

28

1    laboratory director to make sure the results he was putting out were accurate.[1]  Whether this is

2    "reasonable debate between a senior executive and lab management" or a reflection that Defendant

3    intended to defraud investors and patients and raise money at all costs despite the truth is an inference

4    that is appropriately left to the jury.

5    **II.    The Remaining Evidence Referenced by the Motion Is Admissible**

6         Defendant also seeks to exclude "CMS and CDPH Reports and Correspondence."  ECF No. 569

7    at 8.  For reasons stated in the government's responses to other motions *in limine*, ECF Nos. 574 & 575,

8    there is no basis to exclude such highly probative evidence.  The 2013 CDPH survey is relevant to

9    Defendant's state of mind; it put her on notice of deficiencies in the lab – deficiencies that persisted and

10   grew throughout the period of the crimes.  The 2015 CMS survey observations are also highly relevant.

11   The reports have a tendency to show the falsity of Defendant's statements to investors and patients.

12   They do not provoke an "emotional response" or give rise to some other undue prejudice that

13   substantially outweighs the probative value of the evidence.  The reports are public records and not

14   excludable hearsay, but even they were, Defendant's response and subsequent admissions are not.

15   Further CMS witnesses such as Sarah Bennett and Gary Yamamoto are fully competent to testify to

16   what they observed and concluded in connection with the survey and will be subject to cross-

17   examination.  They need not say "Theranos violated Title 42 of the Code of Federal Regulation" in order

18   to state (1) what they saw at Theranos, and (2) whether those conditions met industry standards.  The

19   Ninth Circuit has permitted testimony about industry standards even where the testimony "relie[s] in

20   part on [an] understanding of the requirements of . . . law."  *See, e.g.*, *Hangarter v. Provident Life &*

21   *Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) ("'[A] witness may refer to the law in expressing

22

23

24   [1]     Dr. Rosendorff's view that his authority was being counteracted is hardly unique.  The
government's retained expert, Dr. Stephen Master, has stated:  "A second major requirement of CLIA is

25   a designated laboratory director, who is legally and medically responsible for results that are returned
from the laboratory. The director is ultimately responsible for all aspects of testing, including the

26   analytical portions as well as reporting of results.  Because the laboratory director is ultimately
responsible for determining that the results are appropriate for medical use, it is critical that they be

27   given appropriate authority to ensure that staffing, processes, instrumentation, and other resources are
sufficient."  ECF No.  580-5 at p.9-10.  Dr. Master further explains why lab directors must be familiar

28   with CLIA regulation.  *Id.*

1  an opinion without that reference rendering the testimony inadmissible.  Indeed, a witness may properly

2  be called upon to aid the jury in understanding the facts in evidence even though reference to those facts

3  is couched in legal terms.'" (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)).

4         In addition, Defendant seeks to exclude research and development validation studies.  There is

5  no basis to do so.  The government anticipates witnesses will describe Theranos's launch efforts in 2013

6  as rushed.  Defendants themselves commented on the quality of their validation reports.  ECF No. 595 at

7  THER-2566768 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach (ECF No. 588-1))

8  (Balwani to Defendant:  "Our validation reports are terrible.").  This is probative evidence of the basis

9  for Defendant's statements during the fraud offense and not excludable under any theory.

10                                              **CONCLUSION**

11         The Court should deny the motion.

12  DATED:  January 8, 2021                                    Respectfully submitted,

13                                                             STEPHANIE M. HINDS

14                                                             Attorney for the United States,
                                                               Acting Under Authority Conferred

15                                                             By 28 U.S.C. § 515

16                                                             */s Robert S. Leach*

17                                                             _____
                                                               JEFF SCHENK

18                                                             JOHN C. BOSTIC
                                                               ROBERT S. LEACH

19                                                             VANESSA BAEHR-JONES
                                                               Assistant United States Attorneys

20

21

22

23

24

25

26

27

28