STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Vanessa.Baehr-Jones@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT HOLMES'S MOTION TO EXCLUDE THERANOS' TRADE SECRETS PRACTICES |
| v. | |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | Date: March 23, 2021<br>Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |
| Defendants. | |

GOVT. OPP. TO MOT. TO EXCLUDE EVIDENCE OF THERANOS' TRADE SECRETS
PRACTICES
18-CR-00258 EJD

1

## INTRODUCTION

Defendant Elizabeth Holmes's motion is not about trade secrets. Defendant seeks to exclude evidence of her attempts to muzzle and intimidate whistleblowers who reported Theranos's unsafe lab practices, and her efforts to hide the dangerously unsafe conditions within Theranos's clinical lab. This evidence is probative of Defendant's fraudulent intent and her consciousness of guilt, and is admissible under Federal Rule of Evidence 404(b). There is no basis for exclusion.

## BACKGROUND

The government anticipates whistleblowers Erika Cheung and Tyler Shultz will testify about how Theranos and Defendant attempted to intimidate them from coming forward about Theranos's unsafe lab practices.

Cheung started working as a lab assistant in Theranos's clinical lab in or around November 2013. Immediately, she noticed problems with Theranos's Quality Control (QC) tests.[1] According to Cheung, Theranos had a practice of re-running QC tests and deleting outlier data to get the QC tests to pass. Cheung attempted to report her concerns within Theranos. For example, in March 2014, she emailed supervisors within the lab to explain, "We have been getting strange results for QCs and patient samples." (Decl. of Robert Lech ("Leach Decl."), Exh. 81.) In April 2014, Cheung reported her concerns that assays were failing Theranos's QC tests to Ramesh Balwani. Balwani explained that her job was to process patient samples. She offered her resignation the following day.

Around a year later, when Theranos started to suspect that former employees were alerting the media to Theranos's dangerously unsafe lab practices, agents working for Theranos's lawyers tracked Cheung down and waited for her late at night outside her new employer in an unmarked, black SUV. Her co-workers noticed the SUV and advised her to be careful, ultimately accompanying her as she walked to her car out of concern for her safety. In the parking lot, the agent served her with a letter which threated to sue her and demanded she execute an affidavit "under penalty of perjury" certifying

---

[1] Quality control tests are run on blood testing equipment before patient samples are run to ensure that the equipment is performing accurately on known, pre-tested samples. Since there is no way to tell whether a specific patient blood test is accurate on its own, the QC tests provide assurance in a clinical laboratory setting that the analyzers and tests can be relied on for actual patients. These measures are critical to performing patient blood tests safely.

that she had complied with all the various demands of the letter. (*Id.*, Exh. 82.) Theranos lawyers addressed the letter to an address that was so temporary—she had moved there that week—that not even her mother knew it. Feeling terrified that she was being followed, Cheung moved to another friend's house and tried to seek legal advice.

Defendant's intimidation efforts failed, however. In September 2015, Cheung filed a complaint with the Centers for Medicare & Medicaid Services (CMS), documenting the problems she observed in Theranos's clinical lab. (*Id.*, Exh. 83.) This complaint led to CMS's inspection of Theranos's clinical lab, which confirmed that Theranos's blood tests had such egregious accuracy and reliability problems that they could not be safely administered on patients.

Shultz worked at Theranos from the summer of 2012 through approximately 2014. Among other things, he worked on validation tests using known samples, including the validation of Theranos's syphilis test. Shultz observed that the validation tests were not producing reliable results.[2] Shultz expressed his concerns about Theranos's validation results to Daniel Young, Defendant, and Balwani. When Shultz spoke to Young about how Theranos's validation data did not seem to match what Defendant was reporting to the media, Young told him that he (Young) was using the "medians" of the test data, rather than providing the full data. (Using "medians" would tend to skew the results, since this method would omit outliers.)

Shultz also attempted to inform his grandfather, George Shultz, a member of Theranos's Board of Directors, about the problems he was seeing with Theranos's tests. Shultz tried to explain to his grandfather that Defendant was not telling him the truth about Theranos's capabilities. In fact, Shultz will testify that he witnessed Defendant lie directly to his grandfather about Theranos's ability to perform "hundreds of tests" on the Edison, Theranos's proprietary analyzer.

After Defendant found out that Shultz was reporting these issues to his grandfather and the media, on or about May 15, 2015, Theranos's attorneys ambushed Shultz at his grandfather's home and threatened to sue him. One attorney threatened Shultz with a temporary restraining order if he did not

---

[2] Validation testing measures the accuracy of an analyzer or device used for clinical testing. This testing process is meant to ensure that a new device has been confirmed to give accurate and reliable results before it is used clinically, *i.e.*, with patient samples.

"cooperate right now." The lawyers came back the following morning and attempted to make Shultz sign an affidavit saying he had not spoken to *Wall Street Journal* reporters and providing the names of those who had. Shultz ultimately refused to sign any affidavits and said he thought he should speak to a lawyer. Just like Cheung, Shultz remained undeterred from exposing Theranos's dangerous practices. Defendant's intimidation tactics had failed.

Shultz and Cheung were by no means alone. Defendant also threatened Dr. Adam Rosendorff, who quit Theranos in part because of concerns with testing accuracy in the clinical laboratory and forwarded emails to his personal Gmail account for fear regulators would blame him for the conditions in the leave. Defendant and Balwani insisted he delete documents—including ones that reveal no meaningful trade secrets—and sign an affidavit confirming he had returned or destroyed anything remotely referencing Theranos. The government anticipates others will likewise describe a culture of secrecy they had never seen elsewhere.

## ARGUMENT

**I.     Defendant's Motion Should Be Denied Because It Fails to Identify the Testimony and Evidence She Seeks to Exclude**

As an initial matter, the government has interpreted Defendant's motion as an attempt to prevent whistleblowers from testifying about Defendant's intimidation tactics, but it is worth noting that it is entirely unclear from her motion what testimony and evidence Defendant is attempting to exclude. For example, Defendant claims that the government intends to present an "inflammatory narrative" about "legally required trade-secrets protection measures," and then provides a general list of "practices": "Confidentiality policy"; "Restricting access to information and facilities"; "Security systems"; "Use and enforcement of nondisclosure agreements"; "Social media posting"; "Return of company property"; and "Litigation." (Mot at 1–6.) But within this list, Defendant fails to cite any specific testimony or evidence relating to these topics. She threatens admitting evidence on these general topics will require "mini-trials about the reasons why Theranos implemented such measures," again without listing the witnesses who will testify about these measures, or explaining why their testimony is not relevant. (*Id.* at 1, 9.)

//

This is a crucial omission, since the relevance of these categories depends on the specifics of each witness's testimony. For instance, as described above, the relevance of Theranos's confidentiality policy with Cheung depends on how this was used to threaten and intimidate her from coming forward. Cheung's testimony will also provide context for how the secrecy within the lab affected the quality (or rather, lack of quality) of Theranos's blood tests. According to Cheung, for instance, the most experienced and qualified laboratory specialists, "Clinical Laboratory Scientists (CLSs)," who are certified, were *not* permitted into the "Normandy" lab, where Theranos's own analyzers were located, until they could be "trusted," even though these CLSs were ultimately responsible for ensuring Theranos's lab tests met safety standards. Similarly, the siloing of work spaces and laboratories is relevant in the context of specific witness testimony about the lengths Defendant and Balwani went to hide unsafe lab practices from regulators during inspections. This testimony is probative to show how Theranos's lab practices resulted in unreliable and inaccurate blood tests. Absent this context, the Court does not have a basis for excluding the broad categories of testimony or evidence set forth in Defendant's motion.

Nor is it the government's role to divine what testimony and evidence Defendant may be seeking to exclude and provide a relevance summary for each witness on its list. Defendant has had the government's witness and exhibit lists since April 2020, received memoranda of interview for witnesses in discovery, and received a detailed, 85-page Rule 404(b) notice on September 28, 2020. Yet, she makes no attempt to clarify which witness testimony she seeks to exclude. Defendant's motion should be denied because it is too vague. *See United States v. Head*, No. 08-CR-116 KJM, 2013 WL 5739095, at *4 (E.D. Cal. Oct. 22, 2013) (denying motion *in limine* for failing to identify the specific evidence that the movant sought to be excluded); *Quinn v. Fresno Cty. Sheriff*, No. 1:10-CV-01617 LJO, 2012 WL 2995477, at *2 (E.D. Cal. July 23, 2012) (same). If Defendant chooses to do this work in her reply brief, the government will seek to file a surreply to address the specific testimony or evidence she is seeking to exclude.

//

//

## II. Evidence Defendant and Theranos Tried to Stifle Whistleblower Reporting is Relevant and Admissible

Broadly, though, the testimony and evidence of whistleblowers in this case describing Theranos's and Defendant's intimidation tactics is relevant to show Defendant's specific intent and her consciousness of guilt. As set forth above, Defendant through Theranos's lawyers attempted to silence both Cheung and Shultz through various intimidation tactics, including confronting these witnesses at their work places and homes, threatening lawsuits, and apparently conducting physical surveillance on Cheung, among other tactics. "[E]vidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt." *United States v. Gatto*, 995 F.2d 449, 454 (3d Cir. 1993). "This type of evidence is 'second only to a confession in terms of probative value.'" *United States v. Ryncarz*, 63 F. App'x 306, 307 (9th Cir. 2003) (quoting United States v. Meling, 47 F.3d 1546, 1557 (9th Cir.1995)). *See also United States v. Hayden*, 85 F.3d 153, 159 (4th Cir. 1996) ("Evidence of witness intimidation is admissible to prove consciousness of guilt and criminal intent under Rule 404(b), if the evidence (1) is related to the offense charged and (2) is reliable."); *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) ("Though not listed in Rule 404(b), spoliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt."). Accordingly, the testimony of Shultz and Cheung about these intimidation tactics is relevant under Rule 404(b) to show Defendant's consciousness of guilt and should be admitted.

Nor is this evidence excludable under Federal Rule of Evidence 403. It is in no way "unfair" to use Defendant's and Theranos's intimidation tactics against whistleblowers to prove intent here. As set forth above, this evidence is routinely admitted for this purpose. Defendant is also wrong that the broad topics she lists describe "seemingly innocent conduct." (*See* Mot. at 8.) Put in proper context with each witness's testimony, this evidence supports the government's central allegation: that Theranos misrepresented that it could provide accurate and reliable blood tests. For instance, isolating the certified and qualified CLSs from the labs within which patients rests were being run was obviously going to affect the quality of the patient blood tests. There is nothing "unfair" about admitting this evidence against Defendant. "[Rule] 403 favors admissibility." *Hankey*, 203 F.3d at 1172. To the

extent there is any danger of unfair prejudice associated with such evidence, it does not substantially outweigh the evidence's probative value.

Finally, Defendant may present her own theory about this evidence through cross-examination and argument at trial. For example, Defendant may try to establish legitimate reasons for siloing the technicians working in the Normandy lab through cross-examining Cheung and others. But Defendant's claims that these tactics were "innocent conduct" is not a basis for exclusion. Ultimately, it is for the jury to decide what inference to draw from Theranos's secretive practices and retaliatory conduct.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion *In Limine* to Exclude Evidence of Theranos's Trade Secrets Practices (Dkt. # 566).

DATED: January 8, 2021                                 Respectfully submitted,

STEPHANIE HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ Vanessa Baehr-Jones*

_____
VANESSA BAEHR-JONES
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
Assistant United States Attorneys