STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5061
   Fax: (408) 535-5066
   Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH HOLMES, <br><br> Defendant. | Case No. 18-CR-00258 EJD <br><br> UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF REMEDIAL MEASURES AND SETTLEMENTS UNDER RULES OF EVIDENCE 401-403, 407, AND 408 [ECF NO. 572] <br><br> Date: March 23, 2021 <br> Time: 10:00 a.m. <br> Court: Hon. Edward J. Davila |

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Evidence of Remedial Measures and Settlements Under Rules of Evidence 401-403, 407, and 408.

## INTRODUCTION

Defendant's decision in March 2016 to void all blood test results generated from Theranos's analyzer is highly relevant. Despite her self-serving caveats at the time, Defendant's decision has a direct tendency to show the results she reported from Theranos's analyzer were not accurate – in other words, the statements made to patients about their results were false and misleading and the statements to investors about the quality of Theranos's technology were false and misleading. Indeed, the fact that Defendant was unable to correct the reported results and elected to void them entirely speaks volumes about Theranos's technology. Because Defendant's decision to void all blood test results generated from Theranos's analyzer was not voluntary – but compelled by Centers for Medicare & Medicaid Services ("CMS") regulation – Federal Rule of Evidence 407 does not apply. Nor does Rule 407 exclude evidence of Defendant's analysis of her product and laboratory's practices, as opposed to any remedial measure itself. Such evidence also is not excludable under Federal Rule of Evidence 403. Defendant remains free to try to explain to the jury how her statements are not admissions; there is no danger of prejudice, confusion, or misleading the jury – let alone a danger that "substantially outweigh[s]" the probative value of Defendant's admission. *See* FED. R. EVID. 403.

For these reasons, the Court should deny Defendant's motion to exclude evidence of Theranos's voiding of blood test results.[1]

## FACTUAL BACKGROUND

CMS regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA"). The objective of the CLIA program is to ensure quality laboratory testing. *See* https://www.cms.gov/Regulations-and-

---

[1] The government does not intend to offer as evidence the April 2017 consent decree with the Arizona Attorney General's Office ("Arizona Settlement") or the April 14, 2017 settlement agreement with CMS ("CMS Settlement"). As Defendant concedes, in criminal cases such as this, Rule 408(a) does not exclude "conduct or a statement made during compromise negotiations about a claim" when "the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." *See* FED. R. EVID. 408(a)(2); ECF No. 572 at 6:21-23. Statements by Theranos and Defendant to the Arizona Attorney General's Office in the course of its investigation and CMS in the course of its survey and subsequent proceedings are relevant and not excludable under Rule 403.

Guidance/Legislation/CLIA. A CLIA-certified laboratory like Theranos must permit CMS to conduct an inspection to assess the laboratory's compliance with CLIA. *See* 42 U.S.C. § 263a(g); 42 C.F.R. § 493.1773.

On January 25, 2016, following such a survey, CMS notified Theranos that it was "not in compliance with all of the Conditions required for certification in the CLIA program." ECF No. 581-1 at 2 (Def. Ex. 12). CMS advised Theranos that "the deficient practices of the laboratory pose[d] immediate jeopardy to patient health and safety," meaning that "immediate corrective action is necessary because the laboratory's non-compliance with one or more Condition-level requirement has already caused, is causing, or is likely to cause, at any time, serious injury or harm, or death, to individuals served by the laboratory or to the health and safety of the general public." *Id.* In its letter, CMS listed five specific conditions that were not met (including Hematology and Analytic Systems) and its attached Form CMS-2567, Statement of Deficiencies described numerous conditions and standards that were not met and observations CMS made. *Id.* Among other things, CMS observed:

- the laboratory failed the condition for analytic systems for, among many reasons, failing to ensure quality control [QC] test results met acceptance criteria; (ECF No. 581-1 at 14-15); [2]

- "the laboratory failed to have a procedure for [quality control] for the Edison 3.5 Theranos System[3] prior to 5/15/2014" even though the initial use dates for eight of the 12 analytes run on the system ranged from 11/6/2013 through 5/9/2014" (*id.* at 16);

- "the laboratory failed to ensure that QC for PT/INR was acceptable prior to reporting patient results from April 2015 through September 2015 (*id.* at 41-42);

- "the laboratory failed to ensure that . . . QC was acceptable for the Theranos Proprietary System (TPS) prior to reporting patient test results" (*id.* at 42-46);

- "the laboratory failed to have a quality assessment (QA) procedure to identify and correct problems with the QC values for the Theranos Proprietary System when precision did not meet the laboratory's requirement for precision" (*id.* at 54-56); and

---

[2]   CLIA regulations require a laboratory to have quality control (QC) procedures to monitor the accuracy and precision of the complete testing process. *See* https://www.cdc.gov/labquality/iqcp.html.

[3]   Evidence will show Theranos's analyzer is variously referred to as Edison 3.5, Theranos Proprietary System 3.5 ("TPS"), and TSPU ("Theranos Sample Processing Unit"). This was the only Theranos analyzer ever used in its clinical laboratory to process blood tests, and it was only used for 12 assays. Despite its grandiose claims to investors, Theranos had stopped using its analyzer in its laboratory altogether by the time CMS surveyors arrived in September 2015. *See* January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions *in Limine* ("1/8/2021 Leach Decl."), Ex. 6.

GOVT. OPP'N TO MOT. TO EXCLUDE ALLEGED
REMEDIAL MEASURES, CASE NO. 18-258 EJD        2

- "Based on a review of validation documents on the Theranos Proprietary System (TPS), the laboratory director failed to ensure . . . the quality of results on the TPS; failed to ensure the establishment of performance specifications followed the laboratory's procedures to establish accuracy, precision, reportable range, and/or reference range" (*id.* at 80-81).

In its Form 2567, CMS documented numerous instances where (1) Theranos ran patient tests after failing QC (ECF No. 581-1 at 43-46); (2) QC results for multiple assays, for weeks on end, were at least two standard deviations from the mean (*id.* at 45-46); (3) QC results for multiple assays had coefficients of variation as high as 63.8% (*id.* at 55-56); (4) the overall percentage of QC samples on all tests on all devices was at or in excess of 20% (*id.* at 57-58); and (5) accuracy, precision, reportable range, and allowable bias for multiple assays did not meet even Theranos's criteria (*id.* at 80-81).

Federal law required Theranos to take action. "If a laboratory's deficiencies pose immediate jeopardy . . . CMS requires the laboratory to take immediate action to remove the jeopardy . . . ." 42 C.F.R. § 493.1812. Consistent with this requirement, CMS advised Theranos: "When a laboratory's deficiencies pose immediate jeopardy, CMS requires the laboratory to take immediate action to remove the jeopardy and come into Condition-level compliance." CMS further advised Theranos that it had 10 calendar days to provide CMS with "a credible allegation of compliance and acceptable evidence of correction documenting the immediate jeopardy has been removed and that the action has been taken to correct all the Condition-level deficiencies in question." ECF No. 581-1 at 2.

In addition, federal regulations required Theranos to notify authorized persons and the individual using the test results of reporting errors and issue corrected reports promptly. *See* 42 C.F.R. § 493.1291(k). Specifically, CMS regulations provide:

(k) When errors in the reported patient test results are detected, the laboratory must do the following:

(1) Promptly notify the authorized person ordering the test and, if applicable, the individual using the test results of reporting errors.

(2) Issue corrected reports promptly to the authorized person ordering the test and, if applicable, the individual using the test results.

(3) Maintain duplicates of the original report, as well as the corrected report.

*Id.*

Following CMS's January 25, 2016 letter, Theranos "voided *all* results reported for the assays run on the Theranos Proprietary System 3.5 (TPS) in 2014 and 2015 and all reported PT/INR tests run on the Siemens Advia BCS XP instrument that went into use in October 2014 through September of 2015." ECF No. 583-1 at 3 (Def. Ex. 27) (emphasis added). For example, on March 28, 2016, Theranos issued a report with "corrected results" for a female patient, indicating that a previously reported value for hCG was void. *See* 1/8/2021 Leach Decl., Ex. 7. Theranos similarly issued a report with "corrected" results for another female patient, indicating that a previously reported value for hCG was void. *Id.* Ex. 8. Although Defendant insisted this was "out of an extreme abundance of caution" in the same breath she said it was "based on [Theranos's] dissatisfaction with prior QA oversight." ECF No. 583-1 at 3 (Def. Ex. 27).[4]

Later in an April 1, 2016 response to CMS, Theranos expressly and repeatedly linked its voiding of the tests to the QC deficiencies noted by CMS: "The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment's program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends with the TPS 3.5. . . . Based upon its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015." ECF No. 583-1 at 13-14, 40, 43.

## ARGUMENT

**I.   Evidence That Theranos Voided All Blood Test Results Generated from Its Analyzer and PT/INR Results Is Relevant**

Evidence is relevant if it has "any tendency" to make a fact of consequence more or less probable than it would be without the evidence. FED. R. EVID. 401. The relevancy requirement is "a very low bar" that "is not very hard to meet." *United States v. Rodriguez-Soler*, 773 F.3d 289, 293-294

---

[4]   Defendant also seeks to minimize the voiding by claiming it was "a small percentage of Theranos' test results." ECF No. 572 at 1:8-9, 8:19-20. This obscures the fact Defendant voided *all* tests run on Theranos's analyzer – the device that was supposed to set Theranos apart from competitors and revolutionize blood testing. The allegedly larger universe of unvoided tests were run on FDA approved or cleared devices.

(1st Cir. 2014); *see Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

Evidence that Defendant voided all blood test results generated from Theranos's analyzer, as well as results for PT/INR, has a tendency to prove the falsity of her statements to investors and patients.

Defendant argues she did not specifically admit that "Theranos' technology produced inaccurate results" (ECF No. 572 at 4:3-4) but that inference is easily drawn from voiding the test. If Defendant had confidence in the result, or if she could ascertain the correct value, there would be no need to void the test. She argues the decision was made "in the context of ongoing discussions with CMS in which the company was trying to show its willingness to correct." *Id.* at 4:4-8. This understates and distorts matters. CMS and federal regulation required Theranos to take corrective action and notify authorized persons and the individual using the test results of erroneous results. The jury is not required to accept Defendant's inference she was just trying to be a good corporate citizen, nor her self-serving claim that her actions were out of an abundance of caution. She also claims quality controls and quality assurance programs have nothing to do with accuracy. If that were true, voiding the test would be pointless. Evidence at trial will show quality controls have everything to do with accuracy and reliability. For example, CMS inspector Sarah Bennett is expected to testify: "CMS is responsible for the implementation of the CLIA regulations, which are designed to ensure the accuracy and reliability of laboratory testing. . . . If the QC is problematic, there is no way to assess whether the patient data is accurate and reliable. If the laboratory runs the controls and they are unacceptable, then they should not be running patients after that." ECF No. 584-3 at 3 & 6. Indeed, the CMS deficiency notice demonstrates that Theranos's analyzer in practice was repeatedly generating erroneous results. *See* ECF No. 581-1 at 45-46, 55-56, 57-58, & 80-81.

Defendant's disavowal of her reported test results is direct evidence both of the falsity of her prior statements and her knowledge that the statements were false. Such evidence easily exceeds the low bar for relevance.

## II. Rule 407 Does Not Bar Admission of Theranos's Voiding of Tests or Its Internal Investigations

### A. Because Theranos Was Legally Required to Take Immediate Action to Remove Immediate Jeopardy to Patients, and Was Legally Required to Notify Authorized Persons of Reporting Errors, Rule 407 Does Not Apply

Federal Rule of Evidence 407 provides:

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or – if disputed – proving ownership, control, or the feasibility of precautionary measures.

FED. R. EVID. 407.

The rule, however, applies only to voluntary remedial measures. "An exception to Rule 407 is recognized for evidence of remedial action mandated by superior governmental authority . . . because the policy goal of encouraging remediation would not necessarily be furthered by exclusion of such evidence." *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990); *see Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020) ("[F]ederal law mandates that Shipcom pay its nonexempt employees overtime wages. Because Shipcom is legally obligated to take these measures to comply with the [Fair Labor Standards Act], excluding evidence of Plaintiffs' reclassification to nonexempt status would not further a social policy of encouraging employers to correctly classify their employees in the future." (citation omitted)); *In re Aircrash in Bali, Indonesia*, 871 F.2d 812, 817 (9th Cir.1989) ("The purpose of Rule 407 is not implicated in cases involving subsequent measures in which the defendant did not voluntarily participate. . . . In this case, Pan Am's management, although to be commended for its cooperation, nonetheless was legally obligated to cooperate with the FAA's investigation."); *Herndon v. Seven Bar Flying Serv., Inc.*, 716 F.2d 1322, 1331 (10th Cir. 1983). ("Where a superior authority requires a tort feasor to make post-accident repairs, the policy of encouraging voluntary repairs which underlies Rule 407 has no force – a tort feasor cannot be discouraged from voluntarily making repairs if he *must* make repairs in any case.").

In a footnote, Defendant argues, without citation to evidence, that the voiding of blood tests generated on Theranos's analyzer and PT/INR results was voluntary. Elsewhere, she describes CMS's mandates as "ongoing discussions." This is wrong. Theranos was obligated to cooperate with the inspection. It was obligated to take immediate action to remove the immediate jeopardy it was causing patients and come into condition-level compliance. And, federal regulations required Theranos to notify authorized persons and the individual using the test results of reporting errors and issue corrected reports promptly. Theranos did not issue thousands of corrected reports of its own good will; it had to.

Because Defendant cannot demonstrate that her voiding of all blood tests generated on Theranos's analyzer, as well as PT/INR results, was voluntary, Rule 407 does not apply and is no basis for exclusion.[5]

### B. Rule 407 Does Not Apply to Theranos's Analysis or Investigation of its Product

Rule 407 prohibits evidence of voluntary subsequent *measures*, not evidence of a party's analysis of its product, even when prompted by regulators. *See Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron,* 805 F.2d 907, 918 (10th Cir.1986) (upholding admission of post-accident tests of allegedly defective product because "[i]t would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports"). The fact that such analysis may often result in remedial measures being taken does not mean that evidence of the analysis may not be admitted. *See Benitez–Allende v. Alcan Alumino Do Brasil, S.A.,* 857 F.2d 26, 33 (1st Cir.1988) (upholding admission of test of allegedly defective product even though test was used to plan voluntary recall of product following accident).

Similarly, post-accident analyses or studies are generally not considered subsequent remedial measures. *See Novick*, 946 F.3d at 739 (holding evidence of an internal audit that led defendant to reclassify employees as nonexempt under FLSA was admissible); *Brazos River Authority v. GE Ionics,*

---

[5] Rule 407 also does not apply because voiding of a test is not a "measure" within the meaning of the rule akin to a subsequent repair, installation of safety devices, changes in company rules, or discharge of employees. *See* FED. R. EVID. 407 advisory comm. note. And the evidence is offered to prove the falsity of Defendant's statements, not negligence or intentionally tortious conduct. Rule 407 should not be read to give fraudsters who admit the truth a safe harbor from their admissions.

GOVT. OPP'N TO MOT. TO EXCLUDE ALLEGED
REMEDIAL MEASURES, CASE NO. 18-258 EJD         7

*Inc.*, 469 F.3d 416, 430–31 (5th Cir. 2006); *Prentiss & Carlisle Co. v. Koehring-Waterous Div.*, 972 F.2d 6, 10 (1st Cir.1992).

Rule 407 thus is no barrier to admission of statements by Defendant and Theranos to CMS in which they admit the deficiencies identified by CMS. For example, Theranos stated: "The laboratory has conducted a thorough re-review of QC data for each assay run on the TPS 3.5 from January 1, 2014 until the TPS 3.5 was fully retired in early-August 2015. As explained further in the attached patient assessment analysis, the laboratory is not satisfied with its old quality assessment's program's ability to effectively flag and promptly address QC imprecision, QC failures, and QC trends with the TPS 3.5. . . . Based upon its re-review of QC data for the TPS 3.5, the laboratory has determined that its prior QA program failed to satisfactorily address these types of QC issues for assays run on the TPS 3.5 in 2014 and 2015." ECF No. 583-1 at 14-15, 40, 43. Whatever its connection to Defendant's voiding of tests, such admissions and investigations are not excluded by Rule 407.

**III.   Rule 408 Does Not Bar Admission of Theranos's Voiding of Blood Tests or Its Communications with CMS**

With some exceptions, Rule 408 prohibits use of two categories of evidence to prove the validity or amount of a dispute claim:

> (1) furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim – except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

FED. R. EVID. 408(a). The government does not intend to offer as evidence the Arizona Settlement or the actual CMS Settlement.

Rule 408 bars no more. As Defendant concedes, in criminal cases such as this, Rule 408(a) does not exclude "conduct or a statement made during compromise negotiations about a claim" when "the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." *See* Fed. R. Evid. 408(a)(2); ECF No. 572 at 6:21-23. Thus, statements by Theranos and Defendant to the Arizona Attorney General's Office in the course of its investigation and CMS in the course of its survey and subsequent proceedings are not subject to exclusion under Rule 408.

## IV. Rule 403 Does Not Bar Admission of Theranos's Voiding of All Blood Tests Generated by Its Analyzer and PT/INR Results

Defendant also appeals to Rule 403.  But relevant evidence may not be excluded under Rule 403 unless its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403.

Here, the probative value of Defendant's decision to void all blood test results generated by its analyzer, as well as PT/INR results, in the face of systemic problems with quality control, is highly probative.  It demonstrates that her prior statements were false, that she knew they were false, and that she lacked confidence in their accuracy and reliability.  The fact that Defendant was unable to correct the reported results, but had to void them entirely enhances the inference that Theranos's technology was not working the way she claimed to patients and investors.  Indeed, Defendant herself has admitted Theranos failed to sufficiently address QC imprecision, QC failures, and QC trends.  ECF No. 583-1 at 14-15, 40, 43.  Nothing about voiding tests provokes an "emotional" response, or asks the jury to convict on an extraneous issue or draw an inference not supported by evidence.

Defendant cites *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016), but that case is not binding, highly fact specific, and ultimately helpful to the government.  There, the court *denied* exclusion of PG&E remedial measures taken "in the days and months following the San Bruno explosion" following a resolution by the California Public Utilities Commission that it take immediate measures to improve and evaluate the safety of its pipeline system.  *Id.* at 953-955 (denying four categories of measures taken by PG&E).  Ignoring this portion of the order, Defendant turns to an earlier discussion where the court excluded remedial measures and a $1.6 billion penalty specifically ordered by the CPUC in a proceeding, for fear the jury would conclude the defendant was deserving of punishment.  The analogy here would be admission of sanctions imposed by CMS in the CMS Settlement or an adjudicative proceeding.  The fact-specific reasoning of *PG&E* has little relevance here, and Defendant fails to show how there is any danger of undue prejudice, confusion, or misleading the jury – let alone danger that substantially outweighs the probative value of Defendant's admission and conduct.

## CONCLUSION

The Court should deny the motion to the extent it seeks exclusion of anything other than the Arizona and CMS Settlements.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys