STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

        150 Almaden Boulevard, Suite 900
        San Jose, California 95113
        Telephone: (408) 535-5061
        Fax: (408) 535-5066
        Vanessa.Baehr-Jones@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| | ) |
| Plaintiff, | ) UNITED STATES' OPPOSITION TO |
| | ) DEFENDANT HOLMES'S MOTION TO |
| v. | ) EXCLUDE CUSTOMER IMPACT EVIDENCE |
| | ) |
| ELIZABETH HOLMES and RAMESH | ) Date:   March 23, 2021 |
| "SUNNY" BALWANI, | ) Time:  10:00 a.m. |
| | ) Court: Hon. Edward J. Davila |
| Defendants. | ) |
| | ) |

**INTRODUCTION**

When a company provides unreliable medical testing services, severe patient harm is an inevitable result.  Defendant Elizabeth Holmes's fraud scheme—promoting unreliable blood tests to doctors and patients—placed patients' health at great risk.  The evidence at trial will show that she ignored potential and actual patient harm by continuing the scheme even after Theranos received numerous customer complaints.  This evidence is probative of her intent to defraud patients.  Evidence about the effects of Theranos's inaccurate tests will also demonstrate the fraud:  Defendant misrepresented that the blood tests were reliable, and patients paid for them, only to discover that they had not received the benefit of the bargain, an accurate test.  Finally, the patients' and providers' reliance on Theranos's blood tests for critical medical care shows that Defendant's misrepresentations about accuracy and reliability were material.  Life-and-death decisions were being made based on Defendant's lies.[1]

Nor is exclusion under Federal Rule of Evidence 403 warranted.  Defendant purposefully marketed blood tests which were not safe for clinical use.  It was eminently foreseeable that this fraudulent scheme would result in people experiencing physical and emotional harm from receiving inaccurate blood tests.  It is in no sense "unfair" to admit the all-too-predictable results of her fraud as evidence of that fraud.  To the extent there is any danger of unfair prejudice associated with such evidence, it does not substantially outweigh the evidence's probative value.

//

//

//

---

[1] Defendant claims without any evidence, "This bears emphasis:  as far as we are aware, of the 7-10 million test results generated by Theranos, not one caused any physical harm."  (Mot. at 1.)  But Theranos (and others) destroyed the database containing all of Theranos's patient test records after the government formally requested this information, after Defendant had been indicted, and while she was still serving on Theranos's Board.  How can Defendant assert that these millions of records do *not* contain evidence of severe physical harms—even deaths—resulting from Theranos's dangerously unreliable tests?  She cannot and her lawyers should not be permitted to make such baseless claims at trial.  (*See generally* Opp. to Motion *In Limine* to Exclude Anecdotal Test Results.)

GOVT. OPP. TO MOT. TO EXCLUDE CUSTOMER IMPACT
EVICENCE                                                    2
18-CR-00258 EJD

**BACKGROUND**

**I.    The Fraud Schemes**

    **A.    Defendant's Scheme to Defraud Investors**

        Defendant founded Theranos in 2003 with the stated mission of revolutionizing medical laboratory testing through allegedly innovative methods for drawing blood. (Third Superseding Indictment (TSI), Dkt. #469, ¶¶ 1, 4.) Defendant's co-conspirator Ramesh Balwani joined the company in 2009, serving in a variety of high-level management roles over the course of the fraud. (*Id.* ¶ 2.) During the company's first ten years, Theranos operated in "stealth mode," as it pursued the development of proprietary technology that could run clinical tests on devices termed the "Edison" and "minilab" using only tiny drops of blood from a patient's finger, stored in a "nanotainer." (*Id.* ¶ 5.) The promise of these devices, though, never matched the reality. (*See id.* ¶¶ 12, 16–18.)

        Despite the inaccurate and unreliable results these devices produced, Defendant and Balwani began a publicity campaign to promote the company in 2013 and to seek additional investors. (*Id.* ¶¶ 6–9, 12–13.) The company published press statements claiming Theranos had "eliminate[ed] the need for larger needles and numerous vials of blood" and could use "blood sample[s] as small as a few drops—1/1000th the size of a typical blood draw." (*Id.* ¶ 7.) Defendant told the Wall Street Journal that Theranos could "run any combination of tests, including sets of follow-up tests" at once, very quickly, all from a single drop of blood. (*Id.* ¶ 8.)

        Defendant and Balwani misled investors directly, through false and misleading written and verbal communications; marketing materials containing false and misleading statements; and false and misleading financial statements, models, and other information. (*Id.* ¶ 12.)

    **B.    Defendant's Scheme to Defraud Patients**

        Defendant and Balwani also misled doctors and patients. From 2013 to approximately 2016, they advertised and marketed Theranos's technologies to doctors and patients, presenting misleading and false claims about the accuracy and reliability of its blood tests, and omitting the problems and limits of Theranos's technologies. (*Id.* ¶ 14–16.) Specifically, as alleged in Paragraph 16, Defendant and Balwani misrepresented that Theranos could provide "accurate, fast, reliable, and cheap blood tests

and test results." In truth, they knew that Theranos technology was not "capable of consistently producing accurate and reliable results." The Indictment further alleges specific blood tests, for which Defendant and Balwani knew Theranos was not capable of consistently producing accurate and reliable results, including bicarbonate, calcium, chloride, cholesterol/HDL/LDL, gonorrhea, glucose, HbA1c, hCG, HIV, LDH, potassium, PSA, PT/INR, sodium, testosterone, TSH, vitamin D (25-OH), among others. (*Id.* ¶ 16.) Notwithstanding the questionable and suspect accuracy of Theranos's test results, Defendant and Balwani wired these results to patients, including Patients B.B., E.T., and M.E., as alleged in Paragraph 26 of the Indictment. (*Id.* ¶¶ 18, 26.)

Evidence at trial will show Theranos's blood tests were so dangerously unreliable, the Centers for Medicare & Medicaid Services (CMS) found Theranos's laboratory posed immediate jeopardy to patient health and safety.

The effects of Defendant's fraudulent conduct were far-reaching and severe: investors lost hundreds of millions of dollars in total, and numerous patients received unreliable or wholly inaccurate medical information from Theranos's flawed tests, placing those patients' health at serious risk.

## II.    Anticipated Patient Testimony

The government is not required to prove that Theranos patients suffered harm in order to sustain its wire fraud convictions. Nevertheless, the effects of Theranos's bad tests will be an integral part of patient and provider testimony at trial because this evidence will show how patients discovered they had been denied the benefit of the bargain: accurate and reliable test results. Defendant—through her own and other Theranos employee statements—misrepresented that Theranos could provide accurate and reliable tests, but patient witnesses, and the providers who treated them, will testify that they instead received inaccurate results. The evidence will also show that Defendant ignored the potential and actual patient harm—evidence that is highly probative of her fraudulent intent.

The evidence will show, for example, that Theranos struggled with the accuracy of its hCG (human chorionic gonadotrophin) test—used by doctors to determine whether a patient is pregnant—and that Defendant was well aware of these problems. One patient, who had been trying unsuccessfully to have a child for a long time, became pregnant only to receive a Theranos blood test during the early

stages of her pregnancy indicating that she was miscarrying.  After being forced to live through the heartbreak caused by that news, she obtained a test result from a conventional lab showing that, thankfully, her pregnancy was still viable.  Another patient received a Theranos test result indicating that she was not pregnant.  In reality, she was currently experiencing an ectopic pregnancy that would have threatened her life had a test from another lab not revealed its presence.  In each case, the patient's experience of these effects—and her subsequent blood tests—revealed that she had been defrauded:  she had purchased a test on which she could not rely.

The evidence will also show that Defendant was well aware of these problems.  Defendant knew in October 2013, when Theranos first began patient testing, that Theranos's hCG tests had significant precision problems.  (*See* Decl. of Robert Leach ("Leach Decl."), Exh. 77 (email chain including Defendant which describes hCG precision issues).)  Yet Theranos—under her direction—went ahead and offered its hCG tests to patients anyway.  The problems persisted over the next two and a half years while Theranos continued to offer these tests on patients.  On June 13, 2014, Defendant received another warning in an email from her brother Christian Holmes:  "Just FYI—HCG right now causing some serious issues and patient complaints."  (*Id.*, Exh. 78.)  Still, Theranos continued to administer these tests.  In August 2014, Defendant was copied on an email chain documenting a provider's "very low" confidence level in Theranos's hCG tests given the numerous incorrect results his patients had received. (*Id.*, Exh. 79.)  And in September 2014, a provider emailed yet another complaint:  a patient had received a negative hCG test, treatment of her had then been based on this result, only for a scan a few weeks later to reveal a baby's hearbeat.  (*Id.*, Exh. 80.)  Defendant's deceptively incredulous response— "How did that happen?"—is probative of her intent and knowledge:  she knew exactly how it happened (Theranos's hCG tests were unreliable), yet she had decided to continue offering hCG tests because it benefited the company and her financially.  This is evidence of the fraud.

## ARGUMENT

## I.    Defendant's Motion Should Be Denied Because It Fails to Identify the Patient Testimony She Seeks to Exclude

Defendant's motion fails because she does not identify with sufficient clarity what evidence she seeks to exclude.  *See United States v. Head*, No. 08-CR-116 KJM, 2013 WL 5739095, at *4 (E.D. Cal.

Oct. 22, 2013) (denying motion *in limine* for failing to identify the specific evidence that the movant sought to be excluded). Although Defendant appears to be asking this Court to exclude large portions of patients' testimony at trial, she only cites one patient as an example. Defendant then argues generally that patients' "emotional and physical harm" evidence should be broadly excluded. Defendant has had the government's witness list identifying the patient witnesses the government anticipates calling at trial since April 2020, and Defendant has received in discovery the memoranda of interview for all the anticipated patient witnesses. Nevertheless, she fails to provide any detail about which portions of *patient* testimony, aside from victim E.T., this Court should order precluded. Defendant's motion should be denied because it is too vague.[2]

## II. Information About the Effects of Theranos's Inaccurate Blood Tests is Relevant and Admissible Under Federal Rules of Evidence 401 and 403

Because Defendant does not present any facts about the patients' anticipated testimony, she glosses over how the clinical results of Theranos's bad blood tests showed exactly how these patients were defrauded. As set forth below, the effects of Theranos's inaccurate blood tests are probative to show that (1) patients did not receive the benefit of the bargain; (2) Defendant's misrepresentations about the accuracy and reliability of the tests were material; and (3) Defendant's fraudulent intent.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Relevant evidence is inherently prejudicial." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (citation omitted). Relevant evidence only becomes inadmissible "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the

---

[2] Defendant complains that if the Court permits introduction of this evidence, "Ms. Holmes will be forced to, for each customer, litigate issues such as circumstances surrounding the collateral ramifications of the allegedly inaccurate test; the standards of professional conduct regarding repeating blood tests; and whether the treating physicians' actions were contrary to those standards. This would subject the jury to multiple mini-trials on the subject of each customer's collateral harms. Litigating these issues . . . would be a time-consuming sideshow." (Mot at 6–7.) Litigating the admissibility of this testimony, however, was the subject for these motions *in limine*. That Defendant has chosen *not* to address any specific patient testimony or tests (aside from E.T.) in her motion is not an argument for granting her motion, nor is the threat of trial litigation a reason to exclude vague categories of patient testimony now. Defendant may cross-examine patients and providers at trial if she believes the evidence does not support that their blood tests were inaccurate. This is not a basis to exclude the testimony.

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing." *Hankey*, 203 F.3d at 1172 (citation omitted). "Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.*

As noted above, it is not at all clear what patient testimony Defendant seeks to exclude. It is clear, however, that whether she is moving to exclude background information about patients' health, or testimony about the clinical experiences of patients, this information is relevant and not overly prejudicial.

### A.    Background Information About Patients' Health and Circumstances

Biographical and background information is inherent in the testimony of almost every witness and admissible. *See* Fed. R. Evid. 401, advisory committee note ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding."); *see also United States v. Brato*, No. 91-50361, 1992 WL 317206, at *3 (9th Cir. Nov. 3, 1992) (unpublished) (finding that background information was admissible because the claimed prejudice was speculative). In particular, evidence about the victim patients' background, including their medical history and their specific medical need for clinical blood tests, is relevant to explain how they came to purchase Theranos blood tests. Moreover, Theranos specifically marketed its blood tests to patients whose medical conditions required frequent blood testing, as well as patients who lacked health insurance. Thus, patients' medical background and employment/insurance information is relevant to explain how Defendant tailored her fraudulent claims, and how these claims were material.

### B.    Patient and Provider Testimony About the Effects of Theranos's Blood Tests is Relevant and Admissible

Defendant argues that *any* physical or emotional harm resulting from an inaccurate Theranos blood test would be irrelevant to the charges since the offense concerns the loss of property. (Mot at 1–2.) This is incorrect. As described above, the patient fraud alleges that Defendant and Balwani misrepresented to patients that Theranos's blood tests provided accurate and reliable results, when it fact

1  its tests were dangerously inaccurate and unreliable.  Thus, the outcomes of Theranos's bad blood tests

2  represent the very basis for the fraud:  Theranos claimed their tests could be used clinically, patients paid

3  for reliable and accurate blood tests as part of their medical care, and the patients' subsequent

4  experiences revealed that they had not received reliable and accurate tests.  Patient and provider

5  testimony about the effects of Theranos's blood tests are therefore probative to show patients did *not*

6  receive the benefit of the bargain.  What Defendant characterizes as "emotional and physical harms"—

7  without referencing any specific patient testimony other than that of E.T.—are, in fact, the patient's

8  explanations for how they discovered that their Theranos blood tests were inaccurate, *i.e.*, that they had

9  been defrauded.

10          For example, as described above, patients who received negative hCG results only learned that

11  these results were wrong because of what happened next:  subsequent tests or scans showed they were,

12  in fact, pregnant.  There is no way to extract the results of Theranos's bad blood tests from the proof of

13  how these patients had been defrauded.  Similarly, one patient who was a breast cancer survivor on

14  estrogen-blocking drugs received a Theranos test showing her estrogen levels were much higher than

15  would be expected given her treatment course.  She immediately thought that the test results must either

16  be wrong or her cancer had returned and a tumor was growing somewhere in her body.  Her OBGYN

17  provider called her later that day, also convinced there was something wrong with the Theranos test

18  result.  Her oncologist then wanted her to come in to have a new blood test performed.  Her subsequent

19  test through Sonora Quest showed her estrogen levels at the predictable level given her treatment and

20  her oncologist told her "everything looked good."  Again, the facts of how this patient uncovered the

21  inaccuracy of Theranos's blood test are inextricably intertwined with showing that she was defrauded.

22          Evidence about the effects of Theranos's bad blood tests is also probative because it

23  demonstrates that Theranos's representations about the reliability and accuracy of its tests were material.

24  Statements are material if "they [have] a natural tendency to influence, or were capable of influencing, a

25  person to part with money or property."  Ninth Cir. Mod. Crim. Inst. No. 8.121.  The fact that the

26  patients relied to their detriment on Theranos blood tests in clinical settings shows that the statements

27  Defendant made, or is responsible for making, concerning the accuracy and reliability of Theranos's

28

blood tests were capable of influencing the patients—the victims—to part with money or property. Doctors and patients will testify that they *did* intend to rely on the Theranos blood tests. The resulting negative effects of the inaccurate results support this reliance. Thus, this evidence helps to prove that Theranos's misleading statements in marketing materials about the accuracy and reliability of its tests were material.

Finally, evidence of the effect of Defendant's fraud on victim patients tends to show that Defendant acted with fraudulent intent. "Proving specific intent in mail fraud cases is difficult, and, as a result, a liberal policy has developed to allow the government to introduce evidence that even peripherally bears on the question of intent." *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994). "Proof that someone was victimized by the fraud is thus treated as some evidence of the schemer's intent." *Id.*; *see also United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983) ("[W]hen the contested issue is intent, whether or not victims lost money can be a substantial factor in a jury's determination of guilt or innocence."); *United States v. Foshee*, 606 F.2d 111, 113 (5th Cir. 1979) ("This [liberal] policy extends . . . to permit the government to introduce any evidence remotely bearing on the question of fraudulent intent . . . . include[ing] evidence that loss was sustained as a result of the scheme."). Evidence of victims' loss is of particular evidentiary value where, as the government expects to prove here, Defendant and Balwani continued with their scheme despite receiving complaints from patient customers that their blood tests were not accurate. *See United States v. Weaver*, 290 F.3d 1166, 1173 (9th Cir. 2002) (finding sufficient evidence of intent to defraud where defendants continued to sell their service after it had repeatedly failed to work).

Evidence about the effects of Theranos's bad blood tests demonstrate the fraud, show that Defendant's misrepresentations were material, and reveal Defendant's fraudulent intent. Accordingly, this evidence is highly relevant and admissible.

The cases on which Defendant relies do not help her. *United States v. Gibson*, in fact, supports the government's position that the "actual" loss the patient victims sustained as a result of inaccurate blood tests should be admitted as probative of the fraud. No. 2:17CR126, 2018 WL 4903261 (E.D. Va. Oct. 9, 2018). It was only "collateral" losses that the court excluded there. *Id.* at * 6–7. Similarly, in

*United States v. Sokolov*, 91 F.3d 396 (3d Cir. 1996), the Third Circuit found that collateral evidence about how an insurance company's fraud affected the victim's personal lives, including testimony about a victim developing depression, had little to no probative value. The anticipated patient and provider testimony here about Theranos's inaccurate blood tests is in no way comparable. Finally, *Hi Quoc Truong v. Runnels* addressed on habeas review whether the prosecutor committed misconduct in referencing the decedent's family's loss in closing argument when no such testimony had been admitted in a murder trial. No. C 06-4235 MMC, 2011 WL 6778784, at *1 (N.D. Cal. Dec. 27, 2011), *aff'd*, 584 F. App'x 544 (9th Cir. 2014). This case is simply inapplicable.

### C. "Emotional" Testimony

Finally, Defendant's request to exclude "emotional" testimony fails. Just because testimony may cause jurors to have sympathy for victims does not mean that it is overly prejudicial. Rather, evidence only causes unfair prejudice if it "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Bailleaux*, 685 F.2d 1105, 1111 (9th Cir. 1982). "As used in Rule 403, 'unfair prejudice' means that the evidence not only has a significant impact on the defendant's case, (as opposed to evidence which is essentially harmless) but that its admission results in some unfairness to the defendant because of its non-probative aspect." *Id.* at 1111 n. 2.

When weighing the probative nature of the evidence at issue against the danger of potential undue prejudice, the testimony and evidence should be admitted. Testimony about the victim patients' medical needs and the effect Defendant's fraud had on them is highly probative, as discussed above. "[Rule] 403 favors admissibility." *Hankey*, 203 F.3d at 1172. As also discussed above, courts have routinely approved of the use of such evidence in mail and wire fraud prosecutions. Defendant here purposefully marketed blood tests which were not safe for clinical use. It was eminently foreseeable that this fraudulent scheme would result in people experiencing physical and emotional harm from receiving inaccurate blood tests. It is in no sense "unfair" to admit the all-too-predictable results of her fraud as evidence of that fraud. To the extent there is any danger of unfair prejudice associated with such evidence, it does not substantially outweigh the evidence's probative value.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion *In Limine* to Exclude Customer Impact Evidence (Dkt. # 562).

DATED:  January 8, 2021                         Respectfully submitted,

STEPHANIE HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s/ Vanessa Baehr-Jones*
_____
VANESSA BAEHR-JONES
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
Assistant United States Attorneys