STEPHANIE M. HINDS (CABN 154284)
Attorney for the United States,
Acting Under Authority Conferred By 28 U.S.C. § 515

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
VANESSA BAEHR-JONES (CABN 281715)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ELIZABETH HOLMES,<br><br>    Defendant. | Case No. 18-CR-00258 EJD<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO THERANOS' INTERACTIONS WITH GOVERNMENT REGULATORY AGENCIES UNDER RULES OF EVIDENCE 401-404 AND 408 [ECF NO. 575]<br><br>Date: March 23, 2021<br>Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |

**TABLE OF CONTENTS**

FACTUAL BACKGROUND……………………………………………………………………….. 1

    I.      The December 2013 CDPH Inspection………………………………………………..… 1

    II.     The Hiring of Dr. Sunil Dhawan………………………………………………………..... 3

    III.    Theranos Falsely Disclaims Accuracy Problems with Its Analyzer During CMS's Survey……………………………………………………..... ……………….... ……………...….. 3

ARGUMENT………………………………………………………………………………………….. 7

    I.      Evidence Relating to the December 2013 CDPH Inspection Is Admissible………………. 9

        A. "Let's not remind her about the downstairs lab unless she asks again. Just simpler if we can just show her the lab upstairs."…………………………….… 9

        B. The CDPH Report………………………………………………………………. 10

    II.     Evidence Relating to the Hiring of Dr. Dhawan Is Admissible…………………………. 11

    III.    Evidence Relating to the CMS Survey Is Admissible…………………………………... 13

CONCLUSION…………………………………………………………………………………. 15

# TABLE OF AUTHORITIES

### Cases

*Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193 (9th Cir. 2014) ............................................................ 7

*Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735 (5th Cir. 2020) ................................................................ 7

*United States v. Ayers*, 924 F.2d 1468 (9th Cir. 1991) ............................................................................. 8

*United States v. Beckman*, 298 F.3d 788 (9th Cir. 2002) ..................................................................... 8, 9

*United States v. Brown*, 880 F.2d 1012 (9th Cir. 1989) .......................................................................... 13

*United States v. Castillo*, 181 F.3d 1129 (9th Cir. 1999) .......................................................................... 8

*United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007) ............................................................................. 8

*United States v. Holler*, 411 F.3d 1061 (9th Cir. 2005) ........................................................................... 9

*United States v. Houser*, 929 F.2d 1369 (9th Cir. 1990) ..................................................................... 8, 9

*United States v. Lague*, 971 F.3d 1032 (9th Cir. 2020) ........................................................................... 8

*United States v. Luna*, 21 F.3d 874 (9th Cir. 1994) ................................................................................. 8

*United States v. Mehrmanesh*, 689 F.2d 822 (9th Cir.1982) ................................................................... 8

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ......................................................................... 13

*United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977) ........................................................................... 8

*United States v. Ripinsky*, 109 F.3d 1436 (9th Cir. 1997) ....................................................................... 9

*United States v. Rodriguez-Soler*, 773 F.3d 289 (1st Cir. 2014) .............................................................. 7

*United States v. Romero*, 282 F.3d 683 (9th Cir. 2002) ........................................................................... 8

### Statutes

18 U.S.C. § 1001 ........................................................................................................................................ 9

28 U.S.C. § 515 ................................................................................................................................... , 15

### Rules

Fed. R. Evid. 401 ....................................................................................................................................... 7

Fed. R. Evid. 403 ....................................................................................................................................... 7

GOV'T OPP'N TO MOT. TO EXCLUDE REGULATORY    ii
AGENCY INTERACTIONS, CASE NO. 18-258 EJD

Fed. R. Evid. 404(b)(1) ............................................................................................................... 8

Fed. R. Evid. 404(b)(2) ............................................................................................................... 8

Fed. R. Evid. 801(d)(2) ...................................................................................................... 10, 14

The government respectfully submits its Opposition to Defendant's Motion *in Limine* to Exclude Evidence Relating to Theranos' Interactions with Government Regulatory Agencies Under Rules of Evidence 401-404 and 801-803. For the reasons set forth below, the Court should deny the motion.

## FACTUAL BACKGROUND

### I.     The December 2013 CDPH Inspection

On September 9, 2013, Theranos announced a partnership with Walgreens, boasting that it was "introducing CLIA-certified laboratory services with the ability to run its tests on micro-samples" and that its "proprietary laboratory infrastructure minimizes human error through extensive automation to produce high quality results." *See* January 8, 2021 Declaration of AUSA Robert S. Leach in Support of United States' Opposition to Defendant's Motions *in Limine* ("1/8/2021 Leach Decl."), Ex. 25.[1] Theranos, however, performed most blood tests in its CLIA laboratory on FDA-approved and FDA-cleared devices manufactured by others. On or about November 6, 2013, Theranos finally began using a blood analyzer manufactured by Theranos – the Theranos Sample Processing Unit ("TSPU"), also known as the Edison 3.5 – to perform blood tests in its CLIA laboratory. *Id.* Ex. 6. But Theranos never used the TSPU for more than 12 tests, and by June 2015 it had ceased using the TSPU (or any other Theranos-manufactured analyzer) altogether. *Id.*; ECF No. 588-17 at 35-38.

On November 23, 2013, Defendant was advised the California Department of Public Health ("CDPH") would inspect Theranos's CLIA laboratory. Defendant was actively engaged in the preparation for the inspection. 1/8/2021 Leach Decl. Exs. 26 & 27.

On November 26, 2013, Defendant emailed Ramesh Balwani, the CLIA lab director (Dr. Adam Rosendorff), a Theranos Vice President (Daniel Young), and others: "Checking in on the day by day plan for audit preparations. I want to make sure we get an outline of it today. We will meet tomorrow to review it and also discuss mock audits, including any support from our outside consultants." *Id.* Ex.

---

[1] Centers for Medicare and Medicaid Services ("CMS") regulates all laboratory testing (except research) performed on humans in the United States through the Clinical Laboratory Improvement Amendments ("CLIA"). The objective of the CLIA program is to ensure quality laboratory testing. *See* https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA.

28 at TS-0906565. According to a consultant retained by Theranos, during the mock audit, Theranos did not disclose to him it was using a Theranos-manufactured analyzer in the CLIA lab. *Id.* Ex. 29 at 3.

Defendant paid particular attention to what CDPH inspectors would see during the inspection. On November 27, 2013, Defendant told Young, Dr. Rosendorff, and Balwani: "Let me know if the path for walking the auditors in and downstairs has been cemented so we avoid areas that cannot be accessed, and what that path is." *Id.* Exs. 30 & 31. Evidence will show "downstairs" – referred to by Defendant, Defendant's employees, and Balwani as "Normandy" – included the portion of the CLIA lab where the Theranos-manufactured analyzer was used for patient testing.

On December 3, 2013, the day of the inspection, Young sought guidance from Defendant and Balwani about "today's CLIA audit," writing: "I wanted to confirm that you wanted me to attend today's CLIA audit. Last week you had mentioned that I should ensure that no confidential information is exposed to the auditors in any SOP/documentation that is requested. Please let me know if there is anything in addition on which I should focus shall I attend." That same day, Young advised Dr. Rosendorff that he was specifically "asked to attend by EAH/Sunny." *Id.* Ex. 32 at 0011-0012.

During the inspection, consistent with Defendant's and Balwani's direction, Young emailed Dr. Rosendorff: "Let's not remind [the CDPH inspector] about the downstairs lab unless she asks again. Just simpler if we can just show her the lab upstairs." *Id.* at 0013-0014. Multiple witnesses are expected to testify the CDPH inspector never saw the "downstairs" portion of the laboratory where Theranos was using its analyzer for patient testing.

Later on December 3, Theranos employees reported to Defendant and Balwani about the inspection, noting three areas where Theranos was failing, including "QA review on regular (monthly) basis" and "PT [proficiency testing] corrective action." *Id.* Ex. 33. On December 10, 2013, CDPH issued a deficiency report, noting more than a dozen instances where Theranos had no documented corrective action for unsatisfactory or ungraded proficiency test results. *Id.* Ex. 34. In response, Theranos insisted it had fixed the deficiencies by, among other things, hiring a responsible quality assurance/quality control director. *Id.* Ex. 35.

//

//

**II.     The Hiring of Dr. Sunil Dhawan**

In late 2014, Theranos's CLIA laboratory was floundering.  In September, Defendant's own brother confided in her "it's pretty obvious we have issues with calcium, potassium and sodium specifically" and it seemed "worth considering a hiatus in reporting these values." *Id.* Ex. 36 at THPFM0000861075.

On November 14, 2014, Defendant's lab director (Dr. Rosendorff) told her:  "I feel really uncomfortable with . . . what is happening right now in this company.  Is there any way you can get [a former lab director] back on the CLIA license and take me off?  I am feeling pressured to vouch for results that I cannot be confident in."  *Id.* Ex. 37 at TS-0903726.  Dr. Rosendorff is expected to testify he observed increasing complaints, increasing requests to speak to physicians, and a problem with one assay (potassium) that "wasn't going away." *Id.* Ex. 38 at 177-179.

On November 21, 2014, Dr. Rosendorff asked Defendant and Balwani whether they were comfortable that Theranos was voiding "critical ISE results," e.g., sodium and potassium, such that Theranos would "miss truly critical ISE result[s]."  Balwani's instinct was to fire him.  *Id.* Ex. 39.  He told Defendant:  "we need to . . . cut him Monday."  *Id.*

Around the same time, Defendant and Balwani secretly confided in text messages:

| | |
|---|---|
| Balwani: | Need to focus on op.  Getting hurt in market |
| . . . | |
| Defendant: | We have to own this. |
| Balwani: | Lab . . . need[s] director level people. |
| . . . | |
| Balwani: | Need professionals across the board. . . . |
| Balwani: | We need. The lab and call center fixed. |
| . . . | |
| Balwani: | New lab dirs., lab manager like Tracy |
| Balwani: | Rebuild |
| Defendant: | Fundamentally we need to stop fighting fires by not creating them |
| Defendant: | Need to fix root cause here |

1 . . .

2 Balwani: We can't scale with wag.

3 . . .

4 Balwani: Normandy lab is a fucking disaster zone.

ECF No. 594 at THER-2566599-605 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach (ECF No. 588-1)).

The government anticipates Dr. Rosendorff will testify that, in December 2014, he resigned believing Defendant and Balwani were sweeping things under the carpet and that, as time went by, they became less and less concerned with transparency and accuracy and more concerned with image to the point Theranos was a giant PR exercise.

With her laboratory in turmoil and the relationship with Walgreens faltering, Defendant turned to: Balwani's dermatologist, Dr. Sunil Dhawan. Dr. Dhawan had never seen a Theranos analyzer, he was not familiar with Theranos's test methods, and he had no prior experience with any lab outside dermatopathology. 1/8/2021 Leach Decl. Ex. 40 at US-REPORTS-0008327, 8348. Defendants lured him to Theranos with assurances his role would be minimal: "The time commitment is very minimal. This will be mostly an on call consulting role . . . it won't interfere with your [regular] work . . . This will be 1-3 months role." *Id.* at US-REPORTS-0008350. For this, Dr. Dhawan was promised and paid $5,000 per month. *Id.* at US-REPORTS-0008353, 8354, & 8359.

Between November 2014 and August 2015, Dr. Dhawan did *no* work for Theranos (despite receiving payments and further assurance of equity). *Id.* at US-REPORTS-0008328; US-REPORTS-0008361-68. On or about September 9, 2015, Balwani wrote Dr. Dhawan to finalize issues relating to Dr. Dhawan's compensation, and stated: "I also need your help on an additional matter. We have a lab audit coming up on 9/22 at 9am . . . and wanted to see if you can be present for at least part of it." Balwani also provided directions to the lab Dr. Dhawan was purportedly supervising. *See, e.g.*, *id.* at US-REPORTS-0008371-72. The "lab audit" was a reference to the survey CMS was set to begin on September 22.

On September 15, 2015, Balwani thanked Dr. Dhawan for dropping by and advised he "need[ed] a couple of hours from [him] this coming weekend, unfortunately I have close to 300 SOP's that need

signing." *See, e.g., id.* at US-REPORTS-0008373.  During the CMS survey, CMS observed that many SOPs and other records were not signed, dated, and approved until September 19, 2015, two days before the inspection was scheduled to start.  ECF No. 588-3 at 17-18, 87, & 110.

On or about September 21, 2015, Defendant congratulated Dr. Dhawan on "joining a team defined by the excellence with which every objective is pursued."  1/8/2021 Leach Decl. Ex. 40 at US-REPORTS-0008387.

In November 2015, Walgreens advised Defendant that Theranos's "Laboratory Leadership" created a potential risk to the safety of customers, observing: "Dr. Dhawan[] is *full-time* practicing dermatologist with inadequate relevant laboratory leadership experience.  He offers very limited time, oversight, and experience to your lab." *Id.* Ext. 41 at THER-2105783.

### III. Theranos Falsely Disclaims Accuracy Problems with Its Analyzer During CMS's Survey

On September 22, 2015, CMS commenced a survey of Theranos's Newark laboratory.  Texts between Defendant and Balwani reveal she closely monitored the survey and was praying for a good outcome:

| | | |
|---|---|---|
| Defendant: | All my prayers in the universe | |
| Defendant: | For today | |
| Defendant: | Infinite love too. | |
| . . . | | |
| Balwani: | Starting in 5.  They r here. | |
| Defendant: | Awesome. | |
| Balwani: | Very hostile so far.  They say have complaints. | |
| . . . | | |
| Balwani: | Gary [Yamamoto, a CMS surveyor] is trying to be pro Theranos. | |
| . . . | | |
| Defendant: | Praying literally non stop | |
| Defendant: | Do you want me to step out of Fda call? | |
| Balwani: | No | |
| Defendant: | Off can talk any time. | |

. . .

| | | |
|---|---|---|
| Balwani: | | Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. |

ECF No. 595 at THER-2566767-768 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach).[2]

During the survey, one of the inspectors requested Balwani provide a listing of the blood tests Theranos performed on the TSPU (i.e., the Edison 3.5) in the CLIA laboratory. 1/8/2021 Leach Decl. Ex. 24 at 3. Balwani responded that Theranos was no longer using the device in the laboratory. *Id.* The inspector persisted and Balwani committed to providing a list the next day. *Id.*

That evening, Defendant and her employees frantically pulled together validation data for Edison 3.5. After her team mistakenly reported that one assay was never run in "Normandy" (i.e., downstairs, on the Edison 3.5), Defendant inquired: "Are we sure the rest of the list you have is comprehensive / nothing else missing." *Id.* Ex. 42 at TS-1148891.

On the morning of September 23, Defendant was advised that there were "2 reports that need correction (VitD and estradiol)" and "two issues [regarding Estradiol and hCG] that will take more time to track down." *Id.* at TS-114880. Defendant directed: "Pull in all additional resources now to help --." *Id.*; *see also* id. Ex. 43. Her texts with Balwani continued:

| | |
|---|---|
| Defendant: | Will make sure all teams are reviewing reports.  Let me know anything else can do to support. |
| Balwani: | Going bad so far.  Pray. |
| Balwani: | Daniel [Young] has nothing ready. |
| Balwani: | Told me everything is in the binders. |
| Balwani: | Not there |
| Defendant: | Praying |
| Defendant: | At my desk |
| Defendant: | Tell me how I can help |
| Defendant: | I'm coming there |
| Defendant: | I am here going upstairs to review data now. |

---

[2] On August 25, 2015, the FDA commenced an inspection of Theranos.  Defendant took a lead role in providing documents to the FDA inspectors.  1/8/2021 Leach Decl. Ex. 14 at US-FDA-0035550.

| | | |
|---|---|---|
| Defendant: | Do you want us to send the reports down? We have been going through and have notes which I am putting into cover notes in case you choose to use explaining that things might look different are NOT issues. Can send reports without cover notes any time. | |
| Balwani: | No | |
| Balwani: | We r doing walk thru lab | |
| Balwani: | When we come back | |
| Defendant: | OK let me know. We should connect on this too when convenient / don't step out for it. | |
| . . . | | |
| Defendant: | Praying continually | |

ECF No. 595 at THER-2566768-769 (Ex. M to 11/20/2020 Declaration of AUSA Robert S. Leach (ECF No. 588-1)).

On September 23, Balwani provided a CMS surveyor a letter on Theranos letterhead stating:

> [T]he following is the list of the Laboratory Developed Tests (LDTs) that Theranos tested on Theranos device, also called Theranos Sample Processing Units (TSPUs), along with the time periods when those tests were run. . . . As we explained in person, Theranos changes the platforms on which it runs tests from time to time. The decision to move testing off of TSPUs and onto other platforms in this case was a business decision . . . and does not reflect on the reliability or accuracy of any platform.

1/18/2021 Leach Decl. Ex. 6 ("CMS Letter"). The letter listed 12 tests with dates ranging from November 6, 2013 to June 25, 2015. *Id*.

CMS continued its survey in November 2015. On this occasion, Defendant "shadow[ed]" one of the inspectors. *Id.* Ex 24 at 3.

**ARGUMENT**

Evidence is relevant if it has "any tendency" to make a fact of consequence more or less probable than it would be without the evidence. FED. R. EVID. 401. The relevancy requirement is "a very low bar" that "is not very hard to meet." *United States v. Rodriguez-Soler*, 773 F.3d 289, 293-294 (1st Cir. 2014); *see Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

Relevant evidence may not be excluded under Rule 403 unless its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FED. R. EVID. 403.

Under Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2).

"'Rule 404(b) is a rule of inclusion – not exclusion – which references at least three categories of other 'acts' encompassing the inner workings of the mind: motive, intent, and knowledge." *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020) (quoting *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc)). Indeed, "unless the evidence of other acts *only* tends to prove propensity, it is admissible." *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999) (emphasis added) (citing *United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991)); *see United States v. Mehrmanesh,* 689 F.2d 822, 830 (9th Cir.1982) ("We have uniformly recognized that the rule is one of inclusion and that other acts evidence is admissible whenever relevant to an issue other than the defendant's criminal propensity.").

"A district court may admit other act evidence if: (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged." *Lague*, 971 F.3d at 1038; *United States v. Beckman,* 298 F.3d 788, 794 (9th Cir. 2002).[3]

The government need not prove Rule 404(b) evidence by even a preponderance of evidence. *Lague*, 971 F.3d at 1040. The Ninth Circuit has repeatedly emphasized the "low threshold" for finding Rule 404(b) evidence to be "sufficient proof" of a prior act. *See, e.g., United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir. 1990); *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002).

---

[3] The Ninth Circuit has observed that a lesser degree of similarity is required between the charged crime and the uncharged crime when the evidence is offered to prove intent, as opposed to identity. *See United States v. Luna*, 21 F.3d 874, 878 n.1 (9th Cir. 1994) (quoting *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977)).

Evidence of "other acts" is admissible irrespective of Rule 404(b) if the evidence is inextricably intertwined with the charged conduct. *United States v. Beckman*, 298 F.3d 788, 793 (9th Cir. 2002). This exception applies when (1) particular acts of the defendant are part of a single criminal transaction, or when (2) the "other act" evidence is necessary for the government to offer a coherent story of the crime. *Id.* at 794 (citation omitted); *United States v. Ripinsky*, 109 F.3d 1436, 1442 (9th Cir. 1997).

Evidence admissible under Rule 404(b) also is subject to the standards set forth in Federal Rule of Evidence 403. *Houser*, 929 F.2d at 1373; *United States v. Holler*, 411 F.3d 1061, 1067 (9th Cir. 2005) (holding district courts are to balance the probative value of the evidence against its prejudicial effect).

**I.      Evidence Relating to the December 2013 CDPH Inspection Is Admissible**

      **A.      "Let's not remind her about the downstairs lab unless she asks again. Just simpler if we can just show her the lab upstairs."**

Evidence that Defendant and her subordinates sought to keep the Normandy/downstairs lab from the eyes of CDPH inspectors has a tendency to show they feared regulatory scrutiny and believed the technology could not pass muster. It is relevant to Defendant's state of mind during the conspiracy and tends to show she knew her representations about Theranos's technology were false.

Defendant resists this connection, arguing it "is premised on the notion that Theranos somehow intended to, or did, mislead regulators by not disclosing information" and that such an assertion begs the question "what did CMS and CDPH regulations and protocols require Theranos to disclose." ECF No. at 7:3-7. Defendant also argues because no one was charged with or violated 18 U.S.C. § 1001, the evidence cannot be relevant. All of this misses the point. The evidence is relevant not because it shows a violation of a statute, but because it reflects on the intent of Defendant and her subordinates – i.e., it shows they feared scrutiny, which in turn supports the inference they knew or feared Theranos's technology could not pass muster. Whether they made a false statement to CDPH, failed to disclose something they were required to disclose, or otherwise violated the law is beside the point; the statements reflect state of mind.

//

Defendant argues Balwani "could have desired to minimize disruption in that particular location." *Id.* at 9:1-4. The defense is free to argue such a speculative inference, but such an argument does not preclude the admission of Defendant's concealment of the Normandy lab. The government's view – that the evidence reflects Defendant's guilty state of mind—is equally or more plausible. Under such circumstances, this is not a question of admissibility. The jury should be permitted to hear the evidence and decide between the competing inferences.

Defendant also suggests she lacks connectivity to Balwani's direction to Young and Young's communication to Dr. Rosendorff, but the chain of events leading up these messages supports the conclusion that Defendant and Balwani were aligned in controlling what the inspector saw. Indeed, Defendant specifically inquired days before the inspection: "Let me know if the path for walking the auditors in and downstairs has been cemented so we avoid areas that cannot be accessed, and what that path is." The day of the inspection Young emphasized to Defendant her comment "that I should ensure that no confidential information is exposed." Based on the facts described above, it is fair to infer that Defendant authorized Balwani and Young's statements to CDPH and is responsible for the statements of her agents and employees and coconspirator statements. *See* FED. R. EVID. 801(d)(2)(B-E).

For these reasons, evidence that Defendant and her subordinates sought to keep the Normandy lab from the eyes of CDPH inspectors is relevant and not excludable under Rule 403. Defendant's Rule 404 arguments also fail. The government's theory does not hinge on propensity. To the contrary, the evidence is relevant because it shows intent, state of mind, and knowledge. It shows that during the conspiracy Defendant believed her technology would not pass must if exposed. It is inextricably intertwined with the conspiracy offense and passes any test for Rule 404(b).

### B.  The CDPH Report

Defendant also seeks to exclude the CDPH report itself. Such evidence is relevant. Evidence that Theranos failed to meet CMS conditions and standards designed to ensure accuracy and reliability have a tendency to show Theranos was not capable of providing accurate and reliable results. It is relevant to state of mind and specifically her intent. Defendant's failure to ensure a properly functioning laboratory despite deficiencies being brought to her attention in 2013 has a tendency to show knowledge, intent, notice, and absence of mistake.

Such evidence is not excludable under Rule 403. Defendant argues "the technical, industry-specific jargon in that report would sow confusion among lay jurors." ECF No. 575 at 9:11-13. But there is no avoiding the fact that this is a case about the blood testing business. Defendant's knowledge of problems in her laboratory is highly relevant – all the more because the quality control and proficiency testing issues that arose in 2013 continued through the CMS survey in 2015. Defendant also argues the report notes "only technical deficiencies." *Id.* at 6. The jury should be permitted to decide for itself whether Defendant's failure was "technical" or a serious departure from standards implemented for accuracy and reliability, and in any event it is Defendant's reaction to the 2013 deficiencies that is relevant and indicative of intent, knowledge, identity, notice, absence of mistake, or lack of accident.

For reasons set forth in the government's opposition to Defendant's motion to exclude the 2015-2016 CMS survey, the CDPH report is not hearsay. Even if it were, it is admissible for non-hearsay purposes, as described above. And Theranos's response to it is not hearsay but an admission.

## II.   Evidence Relating to the Hiring of Dr. Dhawan Is Admissible

Evidence relating to the hiring of Dr. Dhawan is admissible to show Defendant's intent and state of mind. When confronted with evidence that the CLIA laboratory was producing erroneous results, Defendant hired a relatively unknown friend of Balwani. After Balwani assured him the time commitment was "very minimal," Defendant delayed months before bringing him to the Newark laboratory on the eve of the CMS survey, all the while paying him $5000 per month for no work.

Such evidence tends to show Defendant did not prioritize the accuracy and reliability of Theranos's tests. It tends to show she did not take seriously problems in the CLIA laboratory. It tends to show that Theranos's CLIA laboratory was not the revolution in blood testing Defendant touted to investors, but something that could be left to a caretaker lab director with a minimal time commitment. Because she paid for him to perform no work, it also suggests she did not want medical scrutiny of the laboratory or the questioning exhibited by Dr. Rosendorff.

The probative value of the evidence is enhanced when one considers who Defendant engaged for other roles. She touted to the press that she had a board of directors of distinguished statesmen and private company CEOs. She hired Big Law firms to "run circles" around the FDA, to fend off *The Wall*

*Street Journal* when it started asking questions, and to attack former employees she feared were providing information to reporters. Indeed, in prior communications to the government, Defendant insisted through counsel one could infer a lack of intent from her hiring decisions. 1/18/2021 Leach Decl. Ex. 44 (heading: "Lack of Intent: Board of Directors," "Lack of Intent: Subject Matter Experts," "Subject Matter Experts: Theranos Staff"). This same logic renders the circumstances surrounding the hiring of Dr. Dhawan relevant and not excludable under Rule 403.

The probative value of the evidence also is enhanced in light of Dr. Rosendorff's complaints. Rather than hire someone to aggressively pursue the issues Dr. Rosendorff raised, Defendants hired Balwani's friend and paid him even though he did not set foot in the lab until days before the CMS survey. Meanwhile, they privately acknowledged in texts to each other the CLIA lab was a "disaster," that they "[n]eed[ed] professionals" and "[t]he lab . . . fixed" with "[n]ew lab dirs." This speaks to Defendant's knowledge and intent.

Defendant argues the evidence lacks relevance because Dr. Dhawan met the minimal requirements for serving as a lab director under CMS regulations. No one questions Dr. Dhawan met those minimal qualifications. But that does not mean one cannot draw inferences from Defendant's choice to ignore and silence Dr. Rosendorff, hire Dr. Dhawan, and then not have Dr. Dhawan work. Defendant hired David Boies to sue and intimidate whistleblowers and journalists that dared speak truth about Theranos; she hired a Fremont-based dermatologist to advise patients whether they had hCG levels consistent with pregnancy or miscarriage, PT/INR values that could impact someone's risk for a stroke, and life threatening illnesses such as HIV. More fundamentally, it is not merely Dr. Dhawan's background as Balwani's friend and dermatologist that is probative – it is the fact that he did no work for months on end and that Theranos's failing CLIA lab went leaderless throughout this period.

Finally, Rule 404(b) does not apply. Hiring a lab director is not a crime, wrong, or other act. In any event, the evidence meets the Ninth Circuit's test for 404(b) evidence: it tends to prove a material point (her state of mind and intent); (2) the other act is not too remote in time (it is *during* the conspiracy); (3) the evidence is sufficient to support a finding that defendant committed the other act (she signed his offer letter and addressed it to "Sunil"); and (4) the act is similar to the offense charged. And it is inextricably intertwined with the scheme to defraud and conspiracy offenses.

### III. Evidence Relating to the CMS Survey Is Admissible

Defendant seeks to exclude "interactions between Theranos representatives and CMS in September 2015." ECF No. 575-1. There is no basis for such an order.

Statements by and conduct before CMS during its September 2015 survey could hardly be more relevant. Defendant's desperate text messages during the inspection clearly reflect fear about what CMS would find, and have a tendency to show that she knew Theranos's technology was not what it was claimed. The CMS Letter is an admission that Theranos was not even using its blood analyzer at the time of the survey, and had only ever used it for twelve assays. This has a tendency to show its analyzer was not as Defendant claimed to investors and that Theranos was not capable of consistently producing accurate and reliable tests, as the operative indictment alleges. The false, self-serving statement that Theranos stopped using the analyzer for business reasons and not accuracy problems likewise has a tendency to show state of mind, knowledge, and intent. Whether or not CMS was actually misled by the statement, it reflects a defensive effort to distract and avoid inquiry into Theranos's analyzer.

Defendant argues the CMS survey evidence is not "tied" or "link[ed]" to her.[4] This is wrong. As the facts described above demonstrate, there is every reason to believe Defendant closely monitored and directed Theranos's responses in the CMS survey. On September 22, she told Balwani that she was "praying" and offered to "talk any time." That evening she monitored emails as Theranos frantically pulled together documents asking: "Are we sure the rest of the list you have is comprehensive / nothing else missing." On September 23, she directed that "all additional resources" be brought "now" to bear. She offered "anything else [she could] do to support"; personally reviewed data for the CMS surveyors ("I am here going upstairs to review data now"); and advised Balwani to "connect on this too when convenient." ECF No. 595 at THER-2566768-769 (Ex. M to 11/20/2020 Declaration of AUSA Robert

---

[4] Defendant cites to *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020), which holds that wire fraud requires an intent to deceive and cheat. Defendant's statements during the 2015 CMS survey have a tendency to show she knew Theranos's technology was not as represented to investors and patients. She also cites *United States v. Brown*, 880 F.2d 1012, 1014-15 (9th Cir. 1989), but that case held that evidence a murder defendant shot into a house and brandished a gun on two prior occasions was not probative to show motive to commit the murder. The case is, to put it mildly, distinguishable. Here, Defendant's statements during the 2015 CMS survey have a tendency to show she knew her representations were false.

S. Leach (ECF No. 588-1)). And when the CMS survey continued in November 2015, she shadowed one of the surveyors. Her personal involvement here was not out of the ordinary; she also managed and provided documents in the FDA inspection. 1/8/2021 Leach Decl. Ex. 14 at US-FDA-0035550. Based on the above, it is fair to infer that Defendant adopted and authorized the CMS Letter and other statements to CMS and is responsible for the statements of her agents and employees and co-conspirator statements. *See* FED. R. EVID. 801(d)(2)(B-E).[5] Indeed, Defendant's argument would exclude nearly all co-conspirator statements.

Defendant's Rule 403 arguments fail for similar reasons. The evidence is highly relevant. The risk of unfair prejudice is zero – Defendant remains free to argue Balwani, or others, are responsible for the CMS Letter. Defendant also appeals to the complexity of the CLIA regime, but her desire to make this issue appear complex is not persuasive. Theranos admitted to CMS it stopped using its analyzer and had only used it for 12 tests. It falsely tried to assure CMS this was a business decision rather than an accuracy or reliability problem. It is no more complicated than that.

Finally, Defendant's Rule 404 arguments are unavailing. To the extent statements to CMS during the survey are properly considered Rule 404(b) evidence,[6] the evidence tends to prove a material point (her knowledge of the falsity of her statements); (2) the other act is not too remote in time (indeed it is during the conspiracy; (3) the evidence is sufficient to support a finding that defendant committed the other act (the Ninth Circuit has emphasized this is a low threshold); and (4) the act is similar to the offense charged.

//
//
//
//
//

---

[5] The government also anticipates others involved in the CMS survey, including its General Counsel, will testify to Defendant's knowledge of statements made to CMS.

[6] The government is offering part of the CMS Letter for its truth (i.e., that Theranos's analyzer was used for only 12 tests in the CLIA lab and quickly abandoned).

**CONCLUSION**

For these reasons, the Court should deny the motion.

DATED: January 8, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Attorney for the United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515

*/s Robert S. Leach*
_____
JEFF SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
VANESSA BAEHR-JONES
Assistant United States Attorneys