JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. CR-18-00258-EJD |
| Plaintiff, | ) **MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL** |
| v. | ) |
| ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI, | ) Date:      March 17, 2023<br>) Time:      10:00 AM<br>) CTRM:    4, 5th Floor |
| Defendants. | ) Hon. Edward J. Davila |

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

ARGUMENT ...........................................................................................................................1

I.     Ms. Holmes Is Neither a Flight Risk Nor a Danger to the Community...........................1

     A.     Ms. Holmes Is Not a Flight Risk. ......................................................................1

     B.     Ms. Holmes Is Not a Danger to Anyone.............................................................3

II.    Ms. Holmes' Appeal Raises Substantial Questions of Law or Fact. ...............................3

     A.     Admission of Dr. Kingshuk Das' Expert Testimony, the CMS Findings, and
            Evidence of Voiding. .........................................................................................4

     B.     The LIS-related Rulings......................................................................................7

     C.     Exclusion of Mr. Balwani's SEC Testimony......................................................9

     D.     The Rulings Related to Dr. Rosendorff. ...........................................................10

     E.     Admission of Evidence of Representations to the Department of Defense........12

     F.     Denial of New Trial Motion Based on the Government's Closing Argument. .................13

III.   A Favorable Ruling on Appeal Would Result in a New Trial on All Counts. ...........................14

CONCLUSION......................................................................................................................15

1

## TABLE OF AUTHORITIES

Page(s)

### CASES

*United States v. Daniels*, 2023 WL 1221017 (S.D. Cal. Jan. 23, 2023)...........................................4

*United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004).................................................................12

*United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997) ...................................................4

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985)..............................................................1, 4

*United States v. Ke-Jeng Hu*, 634 F. App'x 602 (9th Cir. 2016).....................................................12

*United States v. Khan*, 2014 WL 2930656 (N.D. Cal. June 27, 2014) ...........................................2

*United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979)...........................................................8

*United States v. Oaxaca*, 233 F.3d 1154 (9th Cir. 2000).................................................................13

*United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997)....................................................................9

*United States v. Pollard*, 778 F.2d 1177 (6th Cir. 1985)................................................................3

*United States v. Schoneberg*, 396 F.3d 1036 (9th Cir. 2005) ......................................................11

### STATUTES & OTHER AUTHORITIES

42 C.F.R. § 493.1291 .........................................................................................................................7

42 C.F.R. § 493.1812 .........................................................................................................................7

18 U.S.C. § 2 ......................................................................................................................................2

18 U.S.C. § 1001 ..............................................................................................................................11

18 U.S.C. § 1071 ................................................................................................................................2

18 U.S.C. § 1073................................................................................................................................2

18 U.S.C. § 3143 ................................................................................................................................1

Fed. R. Evid. 403 .............................................................................................................................13

Fed. R. Evid. 404 .......................................................................................................................12, 13

Fed. R. Evid. 407 ...............................................................................................................................7

Fed. R. Evid. 701 ...............................................................................................................................5

Fed. R. Evid. 702 ...............................................................................................................................4

Fed. R. Evid. 804 ...............................................................................................................................9

## MEMORANDUM OF POINTS AND AUTHORITIES

The Court should grant Ms. Holmes' motion for release pending appeal because the requirements of 18 U.S.C. § 3143(b) are satisfied. Ms. Holmes is not, and has never been, a flight risk. The government has never sought her detention either pre- or post-conviction. It has her passport, she has been in contact with pretrial services throughout this case, she has two young children and family support in the United States, and her bail is secured by her parents' only home. Nor is Ms. Holmes a physical or financial danger to the community. She has received financial and other support from family and friends, and she continues to work on ideas for patents, as the government notes. None of that is criminal or poses a danger to the community.

There are substantial questions of law or fact on appeal, even if the Ninth Circuit ultimately affirms. This Court need not decide that it has committed reversible error. The standard is only whether the issue "is one of more substance than would be necessary to a finding that it was not frivolous." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) (citation omitted). Unsurprisingly, after a complex trial, there are many such issues here, any one of which—if resolved in Ms. Holmes' favor— would require a new trial. The Court should grant release pending appeal.

## ARGUMENT

### I.   Ms. Holmes Is Neither a Flight Risk Nor a Danger to the Community.

There is no credible argument that Ms. Holmes is a flight risk or danger to the community. The government has never sought her detention during this matter, and after the conviction the Court found implicitly by clear and convincing evidence that she is not likely to flee or pose a danger to the community. *See* 18 U.S.C. § 3143(a)(1). The same standard governs the Court's determination here, and nothing has changed since then that affects that analysis. *Id.* § 3143(b)(1)(A).

#### A.   Ms. Holmes Is Not a Flight Risk.

Ms. Holmes is not a flight risk. She has been under the supervision of pretrial services for over four and a half years, with an impeccable record, and currently reports to two pretrial services officers. The Court has her expired passport, which she has made no attempt to renew. Her bond is secured by her parents' only home. Ms. Holmes has deep ties to the community: she is the mother of two very

young children; she has close relationships with family and friends, many of who submitted letters at sentencing vouching for her good character; and she volunteers with a rape crisis and counseling organization.  The government has not asked for additional security or stricter measures, which it would have if its tale of a purported flight attempt were genuine.

It is not.  First, Ms. Holmes has never attempted to flee.  *See generally* Dkt. 1722, at 1-2.  Over a year ago, in January 2022, Ms. Holmes explained the circumstances by which, before the verdict and full of hope, Mr. Evans booked a ticket in her name on a commercial airline to attend the Mexico wedding of close friends.  Dkt. 1722-2 at 1.  The ticket was canceled immediately when the government raised the issue.  *Id.*  The government was satisfied with this action and explanation:  it asked no further questions of Ms. Holmes, her counsel, or Mr. Evans, and it did not raise the issue with pretrial services or the Court either at the time or following sentencing.

Next, the government misunderstands the substance and circumstances surrounding the recent change to Ms. Holmes' conditions of release, Dkt. 1722 at 3; Opp. at 6, and gets the implications of the change backwards:  Ms. Holmes' close consultation with pretrial services regarding her family's living situation is exactly what the process expects, not an indication of potential flight.

Finally, the government incorrectly suggests that Ms. Holmes is a flight risk because her partner pays for family living expenses.  The government implies that Ms. Holmes has access to some secret source of funds, when it knows from the extensive information Ms. Holmes and Mr. Evans voluntarily provided to probation that she does not.   There is nothing untoward about Mr. Evans paying for the living expenses of his children and partner.  If the government is suggesting that Ms. Holmes' association with others with financial means makes her a flight risk, that argument baselessly assumes that others will commit a federal crime by assisting flight.  *See* 18 U.S.C. §§ 2, 1071, 1073.

The government primarily cites *United States v. Khan*, 2014 WL 2930656 (N.D. Cal. June 27, 2014), as support.  That case involves obvious differences, including that the defendant had substantial family abroad and maintained assets there (Ms. Holmes has neither), and the defendant was facing disgorgement of millions in a separate case (Ms. Holmes has essentially no assets of meaningful value to disgorge).  *Id.* at *4.  Ms. Holmes' family—including her toddler and infant, her partner, her aging

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

2

1  parents, her brother, and her partner's parents and siblings—are all in the United States.  The record

2  amply demonstrates by clear and convincing evidence that Ms. Holmes is not a flight risk.

3      **B.      Ms. Holmes Is Not a Danger to Anyone.**

4          Nor is Ms. Holmes a physical or financial danger to the community.  The Court implicitly found

5  as much in permitting her to remain on release for the past year.  And the government has not previously

6  argued—including between conviction and sentencing, when the applicable standard was identical—that

7  bond conditions are insufficient to protect the community from financial harm.

8          The government's response that Ms. Holmes is "resourceful[]" (Opp. at 7) in no way undermines

9  the fact that her substantial notoriety ensures that she will never be in a position to cause financial harm.

10  That Theranos developed different business lines at different times is irrelevant to Ms. Holmes' *present*

11  ability to cause financial harm.  And the notion that Ms. Holmes is dangerous because the letters of over

12  130 friends and family members paint her as kind, caring, and generous, or because friends and family

13  members lent her money in a time of need (Opp. at 7) is not credible.

14          The government also suggests that Ms. Holmes is dangerous because she holds patents and

15  intends to work on patents in the future.  Opp. at 7.  But there is nothing criminal or dangerous about

16  ideas or patents.  Substantial scrutiny will undoubtedly attend any future inventions Ms. Holmes might

17  patent.  The mere fact that she might patent future inventions does not portend financial harm to others.

18          Finally, the government's argument that Ms. Holmes is a danger to the community because she

19  has not shown "remorse" (Opp. at 7), if accepted, would make it impossible for any defendant who

20  defended her innocence at trial and who intends to appeal in good faith to obtain release pending appeal.

21  A defendant need not confess, and thus render her appeal futile, to obtain release pending appeal.

22          In sum, since 2018 Ms. Holmes' conditions of release have sufficed to ensure her presence and

23  others' safety.  Ms. Holmes is highly motivated to continue complying with her conditions of release so

24  that she can work with her lawyers while she pursues her appeal.

25  **II.    Ms. Holmes' Appeal Raises Substantial Questions of Law or Fact.**

26          The "substantial question" standard "does not require the district court to find that it committed

27  reversible error."  *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985) (citing *Handy*, 761

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

F.2d 1279).  "Congress did not intend to limit bail pending appeal to cases in which the defendant can demonstrate at the outset of appellate proceedings that the appeal will probably result in reversal or an order for a new trial."  *Handy*, 761 F.2d at 1280. Instead, Ms. Holmes must present a question that is "of more substance than would be necessary to a finding that it was not frivolous." *Id.* at 1283.  The following issues, individually and collectively, present substantial questions:

>   **A.   Admission of Dr. Kingshuk Das' Expert Testimony, the CMS Findings, and Evidence of Voiding.**

Dr.  Das' testimony and Patient Impact Assessment were expert opinions admitted in contravention of Rule 702 and were, in any event, highly prejudicial evidence that established nothing probative of the elements of the offenses.  The admission of the CMS findings and evidence of voiding amplified this problem with additional inflammatory but irrelevant evidence.  And this evidence prejudiced Ms. Holmes' defense because the government used it to prove that Theranos' technology did not work as promised—what the government called in closing "sort of the underlying false statement in the case" and "a thread through this scheme."  Tr. 8959.

Dr. Das' Expert Testimony. The government attempts to characterize Dr. Das' testimony as mere percipient testimony about concerns he reported to Ms. Holmes.  Opp. at 14.  That argument overlooks a glaring problem:  Dr. Das was hired in 2016, after all at-issue representations to investors (and patients for that matter) introduced at trial.  His testimony thus served no valid notice purpose.  Nothing Dr. Das told Ms. Holmes could have informed her intent when she made representations to investors.  Even if it were proper expert testimony, its prejudice outweighed any conceivable probative value.

Further, it was not proper expert testimony.  The government's argument continues to conflate the concepts of percipient and expert testimony.  "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702."  *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997); *see also United States v. Daniels*, 2023 WL 1221017, at *2 (S.D. Cal. Jan. 23, 2023) (citing *Figueroa-Lopez* and excluding lay testimony about extraction of cell phone data). The government ignores this case law in its brief; in fact, it cites no cases whatsoever on this issue.

Dr. Das' opinions plainly resulted from "a process of reasoning which can be mastered only by

1  specialists in the field," Fed. R. Evid. 701 Advisory Committee Notes to 2000 Amendment, and thus

2  were expert opinions.  He explained detailed scientific concepts that formed the basis of his opinions.

3  For example, the government elicited testimony concerning the "retrospective analysis" used to generate

4  the Patient Impact Assessment and technical concepts such as "high rates of 1-2S QC rule failures."

5  11/9/21 Tr. 5830-31.  The government's claim that it was only during cross-examination that Dr. Das

6  was asked to "expand" on technical aspects like Sigma metrics (Opp. at 15) is incorrect.  The

7  government repeatedly asked Dr. Das to expand on technical subjects in direct examination over

8  objection.  *See, e.g.*, 11/9/21 Tr. 5820-21.  Ms. Holmes was entitled to probe that testimony admitted

9  over her objection without forfeiting the objection.  And her counsel did not ask Dr. Das to "expand" on

10  the Sigma metric as the government claims.  To the contrary, Dr. Das invoked the term in response to a

11  question concerning a subject raised by the government on direct examination, and Ms. Holmes' counsel

12  immediately requested that he "stay out of the complexity" in responding to the question.  *Compare*

13  11/9/21 Tr. 5796 (direct examination), *with* 11/10/21 Tr. 5931-41 (cross-examination).

14  Critically, the findings in Dr. Das' Patient Impact Assessment comprised a "comprehensive

15  retrospective analysis," Tr. 5827, 5830; TX 4943 at 1, 9, of the sort that experts in litigation conduct.

16  Indeed, the government disclosed a supplemental expert report from its retained expert Dr. Master

17  (whom it never called) attempting to conduct a similar analysis. Dkt 842-1, at 1-9.  Dr. Das testified

18  that, as a result of his Patient Impact Assessment, "the laboratory … concluded that there is a possible

19  patient impact for every test reported from the laboratory's TPS 3.5 instruments."  11/9/21 Tr. 5832.

20  This was expert testimony, even if it concerned "the job that [Ms. Holmes] hired him to do."  Opp. at 15.

21  If the Ninth Circuit agrees with Ms. Holmes that Dr. Das provided expert opinion, there will be

22  no question that the opinion was not properly disclosed.  The government does not dispute that (1) Ms.

23  Holmes had no ability to test the bases and reasons underlying Dr. Das' expert opinions, including his

24  Patient Impact Assessment; (2) the government's "disclosure" of Dr. Das' expert testimony arrived

25  nearly a year and a half after the Court-imposed deadline and one month before trial, Dkt. 893-1; (3) the

26  government's "disclosure" was a four-sentence email with no explanation of what his opinions were or

27  the reasons and bases for those opinions, *id.,* and (4) the data on which Dr. Das relied no longer existed.

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

1    <u>CMS Findings</u>.  Relatedly, it is fairly debatable whether the Court erred in admitting the CMS

2    findings, ostensibly for the limited purpose of establishing "notice."  The government has no answer for

3    the fact that evidence regarding CMS' findings and sanctions in late 2015 and early 2016 are not

4    relevant to Ms. Holmes' earlier state of mind at the time of alleged misrepresentations.  After-the-fact

5    notice could not have informed Ms. Holmes' intent.  The government's argument that the CMS findings

6    were relevant to show "ongoing notice" to Ms. Holmes of problems, "as scientists had been raising to

7    [Ms. Holmes] for years" (Opp. at 14), only proves the prejudice to Ms. Holmes.  The government's

8    argument improperly uses the CMS report to bolster its (otherwise weak) evidence that Ms. Holmes

9    knew of problems with the technology during the relevant period.

10   One of Ms. Holmes' key defense arguments was that the government had only anecdotal

11   evidence of issues with the technology (and resulting notice to Ms. Holmes) based on snippets of emails,

12   the experiences of a few customers, and testimony about challenges in the patient testing lab.  Tr. 9217

13   (closing: "The government didn't offer you any overview during its case of statistical evidence.  We

14   have no idea other than based on the anecdotes that we've heard through emails on a few occasions and

15   the individual cases . . . from the three patients who testified.").  The admission of the CMS report, even

16   for a limited purpose, undermined that key defense because, on the government's theory, it served to

17   create the misimpression that Ms. Holmes had notice of the issues referenced in the CMS Report during

18   the time the alleged misrepresentations were made.

19   Moreover, although the Court ultimately admitted the CMS report itself for a limited purpose,

20   the government repeatedly read the report into the record during Dr. Das' testimony and asked if he

21   agreed with its findings, rendering the instruction a nullity. For example, the government quoted the

22   report's finding that "in October 2014 the data revealed . . . tests showed percentage of QC samples with

23   more than 15 percent of values greater than 2 SD . . . [and] overall 29 percent of QC samples on all tests

24   . . . had values greater than 2 SDs" and asked Dr. Das if he ever communicated disagreement with that

25   finding and asked him to explain to the jury what he understood that finding to mean.  11/9/21 Tr. 5820-

26   21.  Whether or not the report itself was admitted for a limited purpose, Dr. Das' improperly admitted

27   expert testimony was not so limited.  And Ms. Holmes had no meaningful opportunity to challenge the

28

1    CMS findings since the government did not call either of the report's authors as a witness, as it assured

2    the Court it would do before trial.  *See, e.g.*, Dkt. 675 at 2.

3            Finally on this point, the government's argument that the report was admissible to rebut Ms.

4    Holmes' evidence of her state of mind in 2016 (Opp. at 14) misses the mark.  The Court ruled *before*

5    *trial* that the CMS report was admissible, denying Ms. Holmes' motion in limine to exclude the report.

6    Dkt. 798 at 20.  Ms. Holmes was entitled to present responsive evidence showing her state of mind after

7    learning of the CMS findings after the Court had ruled the report admissible over her objection.

8            <u>Voiding</u>.  Rules 403 and 407 barred evidence that Theranos voided tests conducted on Theranos

9    technology.  The government suggests the evidence was probative because "the fact that [Ms. Holmes]

10   had to be persuaded" to void those test results bears on her "intent and knowledge."  Opp. at 15.  But,

11   again, this event—just like Dr. Das' analysis and the CMS report—post-dated any proven

12   representations to investors or patients and thus could not have informed Ms. Holmes' intent or

13   knowledge at the relevant time.  Rather, the government used the evidence at trial to argue that the

14   technology didn't work.  *See* 12/16/21 Tr. 8999-9000.  In any event, as Dr. Das testified, "there was no

15   disagreement about voiding."  11/10/21 Tr. 5948.  Ms. Holmes "fully supported" that decision.  *Id*.

16          The government asserts, without argument, that Rule 407 does not apply because CLIA

17   regulations obligated Dr. Das to void the test results.  Opp. at 15.  The regulations require "immediate

18   action" upon an immediate jeopardy finding and "corrected reports" when "errors in the reported patient

19   test results are detected."  42 C.F.R. §§ 493.1812, 493.1291(k).  But they say nothing about voiding test

20   results as a prophylactic measure.  Dr. Das did not cite these regulations when he testified about why he

21   voided the results.  11/9/21 Tr. 5833-34.  CMS employee Sarah Bennett explicitly stated that Theranos

22   made that decision on its own:  "CMS didn't tell them to do that."  Dkt. 584-3 at 7.  In fact, the Court

23   has previously acknowledged that "[t]here is evidence in the record to support both parties' position" on

24   this issue.  Dkt. 798 at 35.  At a minimum, then, the issue presents a substantial question.

25   **B.      The LIS-related Rulings.**

26          There is a substantial question whether the Court erred in denying Ms. Holmes' pretrial motion

27   to suppress, motion for evidentiary hearing and to compel, and mid-trial motion to strike.  Mot. at 6-7.

28   MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
     CR-18-00258 EJD

In response, the government recycles arguments long discredited by the record.  First, the government suggests that the at-issue evidence relates solely to the patient counts.  Opp. at 16.  But the evidence derived from the LIS related to all counts.  That is because the government relied on that evidence to support its core allegation that Theranos' technology did not work, and that Ms. Holmes made misrepresentations to investors *and* patients concerning that technology.  Dkt. 469, ¶¶ 12(A), 16.

Next, the government claims that the LIS could not be used to "sort accurate from inaccurate patient results or determine an overall failure rate."  Opp. at 17.  Dr. Rosendorff's testimony destroys this argument.  He testified that he used the LIS to "gather all of the information to do an investigation in instances where there was a patient complaint or a doctor complaint," 9/28/21 Tr. 2091, and, more broadly, to "see how the Theranos results had been trending . . . see how many are out of reference range," 10/6/2021 Tr. at 2908-09; *see* 9/29/2021 Tr. 2182-86; 9/28/2021 Tr. 2065, 2088-89, 2092-93.

The government also renews its suggestion that Ms. Holmes played a part in the loss of the LIS.  Opp. at 17.  The government has never produced evidence supporting that insinuation—because there is none.  If anything, this argument is one more reason why it is, at a minimum, fairly debatable that evidence derived from the LIS should have been suppressed.  In *United States v. Loud Hawk*, the Ninth Circuit suggested that the risk that the defendant would be unfairly blamed for the absence of evidence supports suppression.  628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., controlling op.).

Lastly, the government claims that Ms. Holmes took the position before trial that "what happened to the LIS database and who was responsible for its destruction was irrelevant at trial."  Opp. at 17.  But at that hearing, defense counsel argued that the government should be precluded from insinuating, without evidence, that *Ms. Holmes* was at fault for the loss of the LIS.  Defense counsel did not argue that the government's failure to preserve the LIS was irrelevant—to the contrary, counsel argued that "we should have no limitations with respect to our ability to argue about [the government's] failures to obtain that evidence." 5/4/21 Hr'g Tr. 50-51.

The government does not confront the legal errors in the Court's prior rulings identified in Ms. Holmes' motion.  Mot. at 6-7.  And the government's factual arguments show why there are, at a

1   minimum, substantial questions as to whether the Court abused its discretion in resolving contested,

2   highly technical issues without an evidentiary hearing.

3       **C.      Exclusion of Mr. Balwani's SEC Testimony.**

4       It is at least fairly debatable whether the Court erred in excluding Mr. Balwani's testimony

5   regarding his ownership of the financial model, which in turn formed the basis for the projections that

6   the government alleged were knowingly false.  11/17/21 Tr. 6664, 6739.  The government argues that

7   his testimony was not admissible under Rule 804(b)(3) because, it contends, the statements "largely

8   deflect or share blame by pointing to others."  Opp. at 18.  Quite the contrary:  Mr. Balwani stated that

9   he "started building a financial model [in 2010]  … that he owned," and that he was "responsible for,"

10  Dkt. 1163-2 at 6-7; that no one "else from Theranos … . was working on [the model]" and "[no]body

11  else modified it," Dkt. 1163-3 at 5; that he was "revving the model and adding so many assumptions that

12  [Holmes] may not [have been] familiar with all of [the assumptions] or even most of them," *id.* at 6; and

13  that Holmes did not "ever edit the model," *id.* These statements do not share or deflect blame to others.

14  As the Ninth Circuit has explained, a statement that explains "[someone else] had nothing to do with it

15  [is] not an attempt to shift blame or curry favor."  *United States v. Paguio*, 114 F.3d 928, 934 (9th Cir.

16  1997) (citing *Williamson v. United States*, 512 U.S. 594, 603 (1994)).

17      The government's argument that there was insufficient corroboration of Mr. Balwani's

18  statements ignores the evidence that Mr. Balwani, not Ms. Holmes, sent the model to investors.  *See* TX

19  4077 at 2 (Grossman email to Balwani requesting "access to the financial model we reviewed with you

20  today"); 11/16/21 Tr. 6411 (explaining Grossman requested the projections with the underlying

21  assumptions); 11/23/21 Tr. 7664-65 (explaining Balwani generated projections from model and shared

22  both with investors).  The government points to Lisa Peterson's testimony that Ms. Holmes discussed

23  the financial projections based on 900 Walgreens locations, but omits Ms. Peterson's testimony that Ms.

24  Holmes "alerted" her to the "primary risk" that Theranos would be unable to "execute on that and grow

25  at that rate." 10/26/21 Tr. 4762.  Thus, the government's only evidence showing Ms. Holmes discussing

26  the financial projections proves that she said the projection was at risk.  That evidence does not

27  contradict Mr. Balwani's testimony that he, not Ms. Holmes, owned the financial model.

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
    CR-18-00258 EJD

1

**D.      The Rulings Related to Dr. Rosendorff.**

2       The restrictions on the cross-examination of Dr. Rosendorff violated Ms. Holmes' confrontation

3   right and impeded her ability to probe his bias and competence.  The government does not dispute Dr.

4   Rosendorff's importance.  His bias and competence were critical to the case and inherently intertwined.

5   It is an extraordinary fact that three of four laboratories headed by Dr. Rosendorff after he left Theranos

6   had serious problems and/or faced regulatory investigation—at least two of which directly implicated

7   his role as laboratory director.  Given this fact, he had every incentive to shift blame for problems at

8   Theranos to anyone but himself.  The jury unquestionably would have viewed Dr. Rosendorff's

9   testimony with great skepticism if it knew these facts.  This was not improper "character" evidence, as

10   the government claims (Opp. at 19-20).  The evidence went directly to his bias and competence.

11       The government responds that "some" of the at-issue regulatory scrutiny was unrelated to Dr.

12   Rosendorff's work.  Opp. at 19.  The reverse implication of that argument is obvious:  some (in fact,

13   much) of the scrutiny did involve his work.  At PerkinElmer, the Immediate Jeopardy finding occurred

14   on Dr. Rosendorff's watch, Dkt. 1077-6, and at uBiome, the government investigated whether the

15   company billed patients for unvalidated tests when Dr. Rosendorff was laboratory director and thus

16   responsible for validating tests, Dkt. 1078-3 (under seal).  That the uBiome investigation also covered

17   earlier and later periods in no way diminished the relevance of that investigation to Dr. Rosendorff's

18   testimony.  This was no sideshow into unrelated investigations.

19       Cross-examination of Dr. Rosendorff concerning his role at other laboratories, and investigations

20   of those laboratories, would have exposed his bias and lack of competence and devastated his

21   credibility.  Significantly, additional evidence concerning the then-ongoing CMS investigation of

22   PerkinElmer's laboratory practices—at a time during which Dr. Rosendorff was director—would have

23   proved a motive to shift blame to Ms. Holmes for issues in the Theranos laboratory, and to tailor his

24   testimony to the government's liking.  10/5/21 Tr. 2553.  Had the Court permitted Ms. Holmes to probe

25   "the nature of any investigation, the quality of the investigation, [and Dr. Rosendorff's] specific role in

26   it," the jury would have had a concrete sense of the stakes for Dr. Rosendorff.  *Id.* at 2710.  The

27   significant testing and quality-control issues at Invitae—the laboratory run by Dr. Rosendorff

28

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

immediately after he departed Theranos—directly implicated his competency and (again) provided a basis for the jury to question his bias. *Id*. at 2551. And the federal investigation at uBiome, which examined laboratory and test status issues when Dr. Rosendorff was laboratory director, also implicated his competence and bias to testify in a way helpful to the prosecutors—as did Dr. Rosendorff's firing from uBiome. *Id*. at 2552; Dkt. 1078-4 (under seal). Indeed, Dr. Rosendorff omitted uBiome from the resume he provided to the government, thus exposing him to potential criminal liability under 18 U.S.C. § 1001. Dkt. 1077-3 at 8. The questions Ms. Holmes intended to ask all went to his bias, competence, or credibility. The Confrontation Clause entitled her to probe these subjects. *See, e.g., United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005).

The government suggests these investigations could not have biased Dr. Rosendorff because he gave testimony or statements to the government pre-dating these investigations. Opp. at 20. But Ms. Holmes' proposed cross-examination was not limited (as the government claims) to "the simple fact of investigations at companies where [Dr. Rosendorff] once worked." *Id*. at 19. Ms. Holmes also intended to probe the underlying laboratory problems, which went to his competence. In any event, the government's argument is essentially that it could have tried to rehabilitate Dr. Rosendorff's credibility with prior consistent statements. The argument thus concedes the relevance of these facts to his credibility. Nor was this improper character evidence. Because Dr. Rosendorff's ability to testify on technical issues was premised on his "judgment and experience as a certified laboratory director," Dkt. 798 at 77, Ms. Holmes was entitled to confront that foundation through cross-examination—as the Court's pretrial ruling recognized, *id*. at 76. There is at least a substantial question whether the jury should have heard this evidence of bias and lack of competence from a key witness.

It is also debatable whether Dr. Rosendorff's post-trial statements require a new trial. The government suggests that the evidentiary hearing cured any issue. Opp. at 20-21. But Dr. Rosendorff never disputed Mr. Evans' account of his visit to Ms. Holmes' residence or any of his statements during the visit. The government points to the Court's holding that Dr. Rosendorff's post-trial statements were "too vague and general" to support a *Napue* violation. Opp. at 21. But Dr. Rosendorff's statements that the government presented an incomplete picture were consistent with a misleading government

examination.  *See* Dkt. 1618 at 5-8.  And disclosure of this information to the jury would have

devastated the government's credibility.  The notion that any error was harmless because Dr.

Rosendorff's testimony related to Theranos' "internal" operations, rather than "external" ones (Opp. at

21), is deeply flawed—as the alleged misrepresentations related to issues "internal" to Theranos.

### E.   Admission of Evidence of Representations to the Department of Defense.

The government undisputedly never disclosed under Rule 404(b) evidence that Ms. Holmes

purportedly made misrepresentations to the Department of Defense (DOD) in 2012.  The government

argues, without authority, that the allegedly false statements to DOD were "inextricably intertwined"

with the investor-related counts because "Theranos had to get the military branch interested in its

product to have something to exaggerate and misrepresent to investors later" and because they showed

Ms. Holmes' "intent and knowledge" that statements to investors about Theranos' work with DOD were

false.  Opp. at 21.  Evidence is so "inextricably intertwined" with the charged offense that a Rule 404(b)

analysis is unnecessary when the evidence (1) "constitutes a part of the transaction that serves as the

basis for the criminal charge" or (2) is necessary "in order to permit the prosecutor to offer a coherent

and comprehensible story regarding the commission of the crime." *United States v. DeGeorge*, 380 F.3d

1203, 1220 (9th Cir. 2004).  Neither applies here.

The indictment alleged that Ms. Holmes falsely misrepresented to investors beginning in

December 2013 that Theranos "had a profitable and revenue-generating business" with the military and

that Theranos technology was "deployed to the battlefield."  Dkt. 469 ¶ 12(E).  Evidence that Ms.

Holmes purportedly sought to create a relationship with DOD by making false statements almost two

years before does not bear on either claim.  *Cf. United States v. Ke-Jeng Hu*, 634 F. App'x 602 (9th Cir.

2016) (offenses inextricably intertwined when involving "same representations, and events that occurred

during the same time period").  And such evidence was hardly necessary for the government to present a

coherent and comprehensive narrative.  The government called several witnesses who discussed

representations by Ms. Holmes regarding DOD and at least two who testified about the progress of

Theranos' DOD programs, and played audio of those representations to investors.  Testimony about

representations to DOD in no way advanced that narrative.  Instead, it was classic propensity evidence

admitted in contravention of Rule 404(b).

The government also responds that the error is harmless because the Court's order denying Ms. Holmes' Rule 29 motion stated in a footnote that the evidence sufficed to support the conviction putting aside the constructive amendment and variance grounds identified by Ms. Holmes (including representations about DOD).  However, "[d]etermining the harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict." *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000).  The evidence was highly prejudicial—the government's examination implied that Ms. Holmes was dishonest in her statements to DOD about the number of tests Theranos offered; the devices used for patient testing; the speed of test results; and integrity of testing data. 10/19/21 Tr. 4039-42.  The effect of the evidence was to depict Ms. Holmes as a dishonest person on these topics and to create the impression she was more likely to have made misrepresentations to investors on these topics.  This was highly prejudicial, as any juror would likely be disturbed by the suggestion of fraud on the military.  For this reason, the evidence also should have been excluded under Rule 403, independent of the Court's conclusion on the Rule 404(b) issue.

### F.   Denial of New Trial Motion Based on the Government's Closing Argument.

The government's claim that its closing and rebuttal arguments in Mr. Balwani's trial are "entirely consistent" with its arguments in Ms. Holmes' trial is incorrect.  Opp. at 21.  *Compare, e.g.*, Holmes 12/17/21 Tr. 9308 ("There's no evidence regarding a link between what Mr. Balwani and Ms. Holmes's relationship was like and the conduct that she's charged with committing."), *with* Balwani 6/24/22 Tr. 7652 (Mr. Balwani's close relationship with Ms. Holmes "would have given him a lot of influence over her," and his age and experience mean his opinions carried "a lot of weight with her").  Ms. Holmes' relationship with Mr. Balwani was material to her intent and knowledge.  As Ms. Holmes testified at trial, though Mr. Balwani did not "force[]" her to make any representations, she often did so in reliance on him with respect to the key areas of Theranos' operations he controlled.  11/29/21 Tr. 7879.  It is at least fairly debatable that this evidence would have so undermined the government's case as to result in an acquittal on the remaining counts.

III.     **A Favorable Ruling on Appeal Would Result in a New Trial on All Counts.**

The government insists that these issues relate only to "one subpart" of the alleged investor conspiracy/scheme and thus will not result in a new trial.  But these issues cut across the case, the jury's mixed verdict shows this was a close case, and a favorable ruling on appeal would require retrial.

The government first argues that many of these issues relate to the capabilities of Theranos' technology and thus "correspond almost entirely to the patient-related counts." Opp. at 9.  But, as the government concedes, the technology's accuracy and reliability was "the key overlapping misrepresentation between the two fraud schemes." *Id.* at 10.  The government's trial presentation put alleged misrepresentations to investors about the technology's capabilities front and center.  In closing, the government described these alleged misrepresentations as "sort of the underlying false statement in the case" and "a thread through this scheme." 12/16/21 Tr. 8959; *see also id.* at 8910, 8915, 8936-37. The government will be unable to walk away from this statement on appeal.  And while the government attempts to distinguish between representations about the technology's capabilities in indictment paragraph 12(A) (*e.g.*, accuracy, speed, number of tests), Opp. at 9-10, those representations, and the evidence discussed above, all go to the same core issue:  whether the technology worked as promised.[1]

The government repeatedly referenced the evidence discussed in this brief in closing in an attempt to convince the jury that Theranos' technology did not work.  *See, e.g.*, 12/16/21 Tr. 8953-54, 8998-9000. And even apart from its closing, the government highlighted its allegations regarding misrepresentations about the technology's capabilities in opening, *see, e.g.*, 9/8/21 Tr. 532, 537-38, 540-41 (opening); and its examination of investor witnesses (including the testifying C-2 investors relating to the counts of conviction), *see, e.g.*, 11/2/21 Tr. 5102-03 (D. Mosley); 10/26/21 Tr. 4670 (L. Peterson).

Although the government now tries to shift the focus to other alleged misrepresentations in indictment paragraph 12, at trial the government repeatedly tied other alleged misrepresentations—for example, about the Walgreens relationship—back to what it called the core misrepresentation about the

---

[1] The Court cannot draw any conclusions about the prejudicial nature of these errors from the jury's acquittal on the patient counts.  There were many defects in the government's patient case— including the complete failure to prove the content of any representations to patients.

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

technology's capabilities. *See* 12/16/21 Tr. 8920-21 ("[T]he point here is that when Theranos, when Ms. Holmes and Mr. Balwani are telling investors that we are going to roll out nationally with Walgreens, the relationship is going well, there are sort of two ways they know that Holmes knows that that's false. . . . She knows that the relationship is destined to fail because the technology can't do what Walgreens thinks it can do."); 9/8/21 Tr. 537-38 (attributing use of third-party modified devices to performance of Theranos device) Tr. at 8968 (stating alleged DOD misrepresentations were made "for investors to believe that the technology worked").  And government witnesses testified that alleged misrepresentations concerning validation of the technology by pharmaceutical companies were important because they related to the technology's accuracy. *See, e.g.*, Tr. 4683 (L. Peterson) ("Pfizer is a large reputable pharmaceutical company that we thought used the analyzer and was saying that the results were accurate.").  In other words, the government told the jury that Holmes' various alleged misrepresentations were false because the technology didn't work.  By tying Theranos' technology to this broad swathe of indictment allegations, the government heightened the prejudice associated with the issues addressed above.

The remaining issues would similarly require reversal or a new trial.  The exclusion of Mr. Balwani's testimony taking ownership of the financial model was especially prejudicial because the jury convicted Ms. Holmes on the three wire-fraud counts related to C-2 investors, and the C-2 investor witnesses (but not the C-1 investor witnesses) received the financial projections. 10/26/21 Tr. 4761-62 (Peterson); 11/3/21 Tr. 5274-75 (Mosley); 11/17/2021 Tr. 6677 (Grossman).  And, as already discussed above, the erroneous admission of evidence about alleged misrepresentations to DOD prejudiced Ms. Holmes' defense of the entire investor case because it depicted her as a general liar.  Furthermore, the government's argument in closing (as well as the excluded Balwani testimony) go directly to the existence of a conspiracy and a scheme to defraud and thus independently cut across each count.

## CONCLUSION

The Court should grant Ms. Holmes' motion for release pending appeal.

DATED: February 23, 2023

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

1
                           /s/ Amy Mason Saharia

2
                           KEVIN DOWNEY

3
                           LANCE WADE

4
                           AMY MASON SAHARIA

                           KATHERINE TREFZ

                           Attorneys for Elizabeth Holmes

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2023 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING APPEAL
CR-18-00258 EJD